NICOLA T. HANNA
United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. Bar No. 210309)
Assistant United States Attorney
Santa Ana Branch Office
    Ronald Reagan Fed. Bldg. and U.S. Courthouse
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3542
    Facsimile: (714) 338-3561
    E-mail:    charles.e.pell2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 19-00016-JVS |
| Plaintiff, | OBJECTIONS TO PRESENTENCE REPORT AND GOVERNMENT'S SENTENCING POSITION |
| v. | |
| DONGYUAN LI, | Hearing Date: December 16, 2019 |
| Defendant. | Hearing Time: 9:00 a.m. |
| | Location:   Courtroom of the Hon. James V. Selna |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Charles E. Pell, hereby files its Objections to the Presentence Report (PSR) and the government's sentencing position.

This Objection and sentencing position is based upon the attached memorandum of points and authorities, the files and records

///

///

1    in this case, the attached exhibits, and such further evidence and
2    argument as the Court may permit.

3    Dated: December 6, 2019              Respectfully submitted,

4                                         NICOLA T. HANNA
                                          United States Attorney
5
                                          BENJAMIN R. BARRON
6                                         Assistant United States Attorney
                                          Chief, Santa Ana Branch Office
7
                                          _____/s/_____
8                                         CHARLES E. PELL
                                          Assistant United States Attorney
9                                         Santa Ana Branch Office

10                                        Attorneys for Plaintiff
                                          UNITED STATES OF AMERICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Defendant operated and managed a large international Chinese birth tourism fraud scheme, for which she has pleaded guilty to conspiracy to commit immigration fraud and one count of visa fraud. As detailed below, defendant should be sentenced to 33 months' imprisonment, which is the low end of the applicable Guidelines range as calculated by the government.

In the written plea agreement, the parties agreed that the base offense level is 11 under U.S.S.G. § 2L2.1(a), but left open other specific offense characteristics and adjustments.  As summarized immediately following and in depth within this memorandum, the government believes that the following two additional Guidelines adjustments apply: (1) nine-point adjustment under Section 2L2.1(b)(2)(C) for an offense involving 100 or more documents; and (2) three-point adjustment under Section 3B1.1(b) for aggravating role.  Because the PSR concluded otherwise, the government objects to the PSR's conclusions that this vast international immigration fraud conspiracy, with hundreds of customers, involved only seven (7) visa applications, and that defendant did not occupy any type of management or supervisory role in the conspiracy.

*First*, as discussed in depth below, defendant was a manager or supervisor of this extensive international immigration fraud scheme:

- <u>Decision-making authority</u>: as detailed below, defendant made many decisions regarding her fraudulent scheme, and other scheme participants had to seek and obtain defendant's approval before taking actions in furtherance of the scheme.  Moreover, defendant controlled the money (*e.g.*, when and how much to wire from

China to the U.S. and whether to issue refunds), which further shows the extent of her authority;

- **Nature of participation in the commission of the offense**: Defendant participated in multiple aspects of the fraudulent scheme, from "soup to nuts," including directing customers to training on how to trick U.S. immigration and customs, controlling the bank accounts (including those she had opened in nominee names), renting the housing (including fraudulently using her mother's identity to do so), and obtaining visa extensions for customers who needed them (also through fraud);

- **Claimed right to a larger share of the fruits of the crime**: Defendant had complete control over huge amounts of scheme funds. She controlled millions of dollars in scheme proceeds flowing from China into U.S. bank accounts in her name or her mother's name, as well as she was the person to direct and approve wire transfers and customer refunds, all while living in a house in Irvine that she had bought with $2.1 million cash;

- **The nature and scope of the illegal activity**: Defendant's immigration fraud scheme was large – both as to the millions of dollars involved and hundreds of international birth tourism customers, extensive – based upon its international character, and egregious – as to the fraud from beginning to end. Further, defendant's fraudulent scheme involved multiple layers of falsities, from the original fraudulent visa applications, to lies during the visa interview at the U.S. consulate in China, to taking a flight from China to Hawaii to LAX (instead of directly to LAX), to lies to U.S. Customs, to sometimes obtaining a fraudulent visa extension for a customer (*a la* Count 2), to defrauding the hospitals

1   into obtaining the "indigent"/cash-pay rate reserved for those with

2   no means/insurance;

3          •   The degree of control and authority exercised over

4   others:

5              o   Defendant's own words made it clear that she

6                  exercised control over others and parts of the

7                  scheme, when she told the undercover agent: "I'm

8                  in charge";

9              o   Defendant rendered approvals for actions of other

10                 participants, including for refunds, which is

11                 something only a person with manager-level or

12                 supervisory authority (or higher) could do;

13             o   Other scheme participants' words also confirm

14                 defendant's role and how those participants

15                 deferred to defendant, addressing defendant as

16                 "Manager Li";

17             o   Defendant directed her mother to open bank

18                 accounts and sign checks in her name, which

19                 defendant then used to pay rent and other

20                 expenses to operate the scheme, while attempting

21                 to conceal her own involvement.  Defendant's use

22                 of such nominees is an additional indicium of her

23                 manager/supervisor role; and

24             o   Defendant paid her employees in the U.S. in cash,

25                 which included paying $4,000/month to a lower

26                 level manager whom she supervised;

27   In short, as detailed below, the entire scheme would not operate

28   without defendant's management and supervision.

*Second*, as also detailed below, defendant's scheme involved more than 100 documents, which included:

- Fraudulent U.S. visitor visas, which had been procured by visa applications containing false information, and were used and possessed in the scheme by the customers;

- Visa applications submitted in China on behalf of hundreds of customers, which had false statements as to purpose of trip, duration of trip, and location where customer would be staying;

- Customs and immigration forms completed by the customers at U.S. ports of entry, listing the duration of the visit and where the customers were purportedly going to stay during their visit to the United States;

- Visa extension applications submitted in the U.S.; and

- Related documents such as customer flight itineraries, and customers' U.S.-born children's birth certificates, U.S. passports, and Social Security cards.

No party can reasonably dispute the size of defendant's fraudulent scheme and its large number of customers, nor could they, based upon the number of apartments rented every month (as early as September 2013, defendant was writing checks for more than $30,000/month to pay for those apartments); defendant's scheme website boasted than it had already served more than 550 birth tourism customers; during the search in March 2015, agents encountered more than 20 of defendant's Chinese birth tourism customers; digital evidence (*e.g.*, spreadsheet found on one of defendant's computers that listed 47 customers for just January to July 2014); and millions of dollars transferred from China during the years of the conspiracy, which didn't even constitute the lion's

4

share of the proceeds – much of which remained in China.

Applying those offense characteristics, the government calculates the applicable final Guidelines offense level as **20**.  With a Criminal History Category I, the applicable Guidelines sentencing range is 33-41 months' imprisonment, with a statutory maximum of 15 years.  A sentence at the low end of that Guideline range – 33 months' imprisonment – is reasonable.  The applicable fine range is $15,000 to $150,000.

As discussed in depth *infra*, multiple reasons justify said recommended sentence.  First, even though defendant was a very rich foreign Chinese national who had already previously defrauded the U.S. as a birth tourism customer herself, defendant nonetheless continued to defraud the U.S. government on a much grander scale by operating an international immigration fraud scheme for almost two years, until ultimately shut down by search warrants in March 2015.  Second, defendant's fraudulent scheme was egregious.  Her scheme not only involved lying to the U.S. government by submitting visa applications with false information in order to trick the U.S. government into issuing visas to Chinese foreign nationals to come to the U.S., but defendant herself also personally coached customers how to then lie to U.S. Customs.  Moreover, as part of the scheme, defendant unlawfully used identification information of others to rent and pay for the apartments she was using in the scheme.  Third, defendant was a manager/supervisor of her international fraudulent scheme who controlled millions of dollars generated by the scheme and used to operate it, as well as directed other scheme participants, including issuing approvals for scheme actions.  Not only did defendant manage and supervise the main part of the scheme, and

1  attempt to conceal her million-dollar international immigration fraud

2  – one of the largest in the history of the U.S. – but also, her

3  scheme victimized the hospitals and doctors that the customers used

4  by not paying the full charges, and physician and other medical

5  provider bills ended up in collection.

6      In this case, justice, as well as deterrence, mandates a

7  significant prison sentence.  Thus, the government recommends a

8  Guidelines sentence of 33 months' imprisonment.

9  **II.  PROCEDURAL HISTORY**

10      On January 30, 2019, defendant was indicted for multiple federal

11  felonies for operating a Chinese birth tourism scheme.  (DE 1.)  The

12  Indictment against defendant charges her with: (1) conspiracy to

13  commit immigration fraud, wire fraud, international money laundering,

14  and aggravated identity theft (Count One); (2) visa fraud (Count 2);

15  (3) wire fraud (Counts 3-13); (4) international promotional money

16  laundering (Counts 14-22); (5) ID theft (Counts 23-25); and

17  (6) aggravated ID theft (Counts 26-28), for her operating a huge

18  international Chinese birth tourism scheme.  (*Id.*)

19      On May 29, 2019, the Ninth Circuit affirmed this Court's

20  decision that had ordered defendant detained pending trial.  (DE 61.)

21      On September 17, 2019, pursuant to a written plea agreement (DE

22  65), defendant pleaded guilty to Counts One (conspiracy to commit

23  immigration fraud, in violation of 18 U.S.C. § 371) and Two (visa

24  fraud, in violation of 18 U.S.C. § 1546(a)) of the Indictment against

25  her.  (DE 72.)

26      Last week, on Monday, November 25, 2019, the Presentence Report

27  (PSR) issued.  (DE 92.)  Probation also recommended a sentence of 10

28  months' imprisonment.  (DE 91.)

III. **STATEMENT OF FACTS**

    A.    <u>Background on Chinese birth tourism</u>

        As detailed in the 2015 search warrant affidavits, for the past several years, thousands of pregnant women from China have been traveling to the United States using temporary visitor visas for the sole purpose of giving birth in the United States so that their children will enjoy the benefits of natural-born American citizens, *i.e.*, "birthright U.S. citizenship." (Exh.-1.)  According to a CNN-Money article entitled "Why Chinese Moms want American babies," a "booming birth tourism industry has sprouted from coast to coast to cater to growing interest -- in 2012, about 10,000 Chinese women gave birth in the U.S., more than double the 4,200 in 2008, according to Chinese state media."  A 2015 law review article noted that one source "estimates that, of the more than 300,000 children born to foreign citizens in the United States every year, 40,000 are to birth tourists—foreign individuals legally in the United States with a travel visa."  The reasons for wanting to give birth in the United States include:

- "Many of the families want an American kid because a foreign passport could be the family's ticket out of China if they grow weary of pollution or food safety scares;"

- American "superior education resources" and "clean environment;"

- American "free public schools and low-interest loans;"  and

- "The whole family may eventually get in on the act, since parents may be able to piggyback on the child's citizenship and apply for a green card when the child turns 21."

In most cases, the birth tourism customers who come to from China to

give birth in the United States are wealthy: "[t]he desire to leave China is especially pronounced among the wealthy. Almost two-thirds of Chinese with more than 10 million yuan ($1.6 million) in the bank have emigrated, or are planning to, according to a Hurun report released last year."   Moreover, according to a 2015 New York Times article entitled "Wary of Future, Professionals Leave China in Record Numbers," middle-class Chinese "don't feel secure for their future and especially for their children's future" because "[t]hey don't think the political situation is stable."   Perpetrators of birth tourism schemes typically charge $20,000 to $50,000, which is a fee the wealthy in China are able to pay.

**B.   Underlying federal criminal investigations into Chinese birth tourism operations in southern California**

Defendant's indictment was part of a large USAO investigation with Homeland Security Investigations (HSI), IRS-Criminal Investigation (IRS-CI), and Federal Bureau of Investigation (FBI) into Chinese birth tourism operations in the Central District of California.   The USAO initiated investigations in three areas throughout the Central District: Orange County (primarily Irvine), Los Angeles County (primarily Rowland Heights), and San Bernardino County/Inland Empire (primarily Rancho Cucamonga).   After identifying and targeting the largest operations, conducting international undercover operations, and working with local law enforcement, agents executed approximately 35 search warrants in March 2015 throughout the District at apartments and houses being used to house the pregnant Chinese nationals, as well as the residences and/or offices of the operators.   That included approximately 10 searches at Orange County apartments operated by defendant in her Chinese birth tourism

scheme, as well as her residence.  During that five year

investigation, federal agents interviewed many witnesses, some of

whom have also testified under oath, and reviewed thousands of

documents, many in Chinese.

C.    **Overview of defendant's fraudulent Chinese birth tourism**

**scheme**

Defendant, defendant's husband Qiang Yan (Yan), Chao Chen

(Chen), and their employees and co-schemers in the U.S. and China

operated a multinational business primarily based in Orange County,

California, and the People's Republic of China (PRC) that committed

visa fraud by housing pregnant foreign nationals in the United States

for the sole purpose of giving birth in the United States so their

children would obtain birthright U.S. citizenship, even though their

customers had procured U.S. visitor visas by fraud by misrepresenting

the true intention of their visits to the United States.  Defendant

and Chen's business, Youwin, advertised on the internet, including on

its then-website www.yyusa.com.  Their business operated in the U.S.

and China, and offered the following services to pregnant Chinese

nationals: (1) fraudulently obtaining nonimmigrant visitor visas to

enter the U.S.; (2) training for the visa interview at the U.S.

consulate; (3) coaching for passing the U.S. Customs inspection at

the U.S. port of entry; (4) housing in apartments in Irvine for a

period of approximately three months or the duration of the pregnancy

and postnatal care; (5) transportation for restaurants, shopping, and

recreation; (6) transportation for prenatal visits and hospitals; and

(7) obtaining birth certificates, U.S. passports, and Social Security

cards for the birth tourism customers' children born in the U.S.

Defendant charged fees ranging from $40,000 to $80,000 for the birth

tourism services.  Bank records show that in 2013, defendant received approximately $1,500,000 and Chen $500,000 in wire transfers from China, and in 2014, defendant received approximately $1,500,000 in such transfers from China.

The following diagram created by the government roughly depicts how defendant's international immigration fraud scheme operated:



(Exh.-5)

In June 2016, defendant's partner Chen pleaded guilty pre-indictment to visa fraud, marriage fraud, and tax fraud, and agreed to cooperate.  However, several months later, he fled to China pending sentencing (for which he has been separately charged).[1]

---

[1] After federal agents executed search warrants in March 2015 at various apartments where defendant was housing her birth tourism customers, and at defendant's multi-million-dollar residence in Irvine, a handful of defendant's customers were designated as material witnesses and ordered to remain in the U.S. pending release by the Court.  While interviewing those various material witnesses, the government discovered that California attorney Ken Liang was for a fee assisting some of them to flee the U.S., in violation of the

During the search of her multi-million-dollar house in Irvine, March 2015, agents interviewed defendant, and she made many admissions regarding her involvement in the scheme, including that: she herself first used birth tourism in 2013 to have U.S. born children; she knew customers would fly in through Hawaii instead of directly to LAX because it would be easier to get pass immigration there; and she had advised customers to conceal their pregnancies or they would not pass immigration or obtain a visa.

In addition, evidence obtained during the searches – including WeChat[2] text and voice messages – is some of the most damning evidence against defendant, including one text message where when explaining the need for a new front person because Chen was gone, defendant wrote to her husband Yan that their birth tourism operation was illegal.  Other text and voice messages include defendant's coaching a customer to get through customs and talking about altering documents for one of her customer's visa extension application.

Defendant also directed and received millions of dollars in international wire transfers from China to the United States, which she then used to operate the scheme, so the Indictment charges her in

_____

material witness Court Orders.  In related case SA CR 15-00061-AG, Liang was convicted in late 2015, and in early 2016, sentenced to 21 months' imprisonment.

[2] According to *Wikipedia*, WeChat (Chinese: 微信; literally: "micro-message") is a Chinese multi-purpose messaging, social media and mobile payment app developed by Tencent. It was first released in 2011, and by 2018 it was one of the world's largest standalone mobile apps by monthly active users, with over 1 billion monthly active users (902 million daily active users).  Described as one of the world's most powerful apps by Forbes, it is also known as China's "app for everything" and a "super app" because of its wide range of functions and platforms.  In addition to China, it is also the most popular messaging app in Bhutan.  WeChat has been accused of censoring politically important topics in China, including human rights abuses.

counts 14 to 22 with international (promotional) money laundering.

As detailed below, the evidence shows that defendant managed/supervised her large international fraudulent Chinese birth tourism operation, which involved more than 100 documents.

Thus, defendant should be sentenced to 33 months of imprisonment – the low end of the applicable Guidelines, which will serve all of the Section 3553(a) factors, including general deterrence.

**D.    Facts defendant admitted in plea agreement and during her change of plea hearing**

In the plea agreement and during her change of plea hearing, defendant admitted the following facts:

- Beginning in or around 2013 through March 2015, defendant, together with others, operated a birth tourism business in Irvine, California, and the People's Republic of China (PRC), called You Win USA Vacation Services Corporation (You Win).  Generally, You Win would assist pregnant foreign nationals (typically PRC nationals) to travel to the United States and/or to remain in the United States to give birth, so that their children would receive birthright U.S. citizenship.

- You Win's pregnant customers would generally obtain nonimmigrant visas from the U.S. government in order to come to the United States and/or remain in the United States to give birth.

    o    Some of You Win's customers made false statements on their visa applications and/or to U.S. immigration officials, and You Win sometimes assisted its customers in doing so.  For example, You Win sometimes instructed its birth tourism customers to apply for their visas to come to the United States early in their pregnancy so they would be able to conceal their pregnancy from U.S. officials.

1             o     In addition, You Win assisted some of its customers in

2 preparing and/or submitting visa applications that You Win knew

3 contained false statements.

4             ▪     For example, many of You Win's customers' visa

5 applications would state that the purpose of their trip to the United

6 States was for business and/or tourism; that the length of their stay

7 would be approximately eight to 14 days; and that they would be

8 staying in Hawaii, New York, or Los Angeles.

9             ▪     In reality, many of those customers intended to

10 come to the United States to give birth; they sometimes intended to

11 stay in the United States for up to three months; and they intended

12 to stay in Irvine, California.

13       •     Once the customers' visa applications had been filed, You

14 Win's agents and employees in China would coach some of their Chinese

15 customers on how to pass the U.S. Consulate interview in China,

16 including by telling the customers to falsely say they were going to

17 stay in the United States for only two weeks.

18       •     Once the customers received their visas to travel to the

19 United States, You Win's agents and employees in China would coach

20 some of their Chinese birth tourism customers on how to pass the U.S.

21 Customs inspection at the port of entry by concealing their

22 pregnancies.

23             o     You Win sometimes directed its customers to book two

24 flights: (a) the first flight from China to Hawaii, instead of from

25 China to Los Angeles International Airport (LAX), because they

26 believed that it would be easier to clear U.S. Customs through

27 Hawaii; and (b) the second flight from Hawaii to LAX, which would

28 then be considered a domestic flight with no U.S. Customs check.

- At the time defendant operated the birth tourism business, Defendant was generally aware that You Win's agents and employees in China would assist You Win's customers in submitting applications for nonimmigrant visas and/or visa extensions; that some of those applications might contain the above-identified false statements; and that You Win "trained" its customers on how to pass interviews with U.S. immigration and/or customs officials, including by telling its customers how to respond to certain questions and to conceal their pregnancies.

- Between on or around December 2014 to March 2015, defendant, who resided in Irvine, California, received and housed You Win's customers after they arrived in the United States.  While You Win's customers were in the United States, Defendant provided various services to them, including housing, meals, transportation, and other miscellaneous services.  Defendant hired several persons in Irvine, California, to assist her with providing these services to You Win's customers.

- Defendant also received wire transfers from China, some of which were used to promote, further, or facilitate You Win's activities in the United States.  This includes Defendant making payments for the apartments that she and others had leased in Irvine, California, which You Win used to house their customers.  This includes a payment of $30,965 on October 3, 2013, and a payment of $30,321.23 on November 4, 2013.

- Defendant assisted Chinese national X.Y.L., once that customer was in the United States, to fraudulently obtain a visa extension to stay in the United States to give birth.

  o Customer X.Y.L. ultimately needed to obtain a visa

14

extension to be able to remain in the United States so she could give birth, because immigration officers at LAX had admitted her to remain in the United States for only 15 days, which was not enough time for her to stay and give birth in the United States.

     o    Defendant helped that customer to fraudulently obtain a visa extension so she could stay in the United States to give birth.

     ▪    Part of the visa extension application was submitting proof of sufficient funds.

     ▪    On January 16, 2015, defendant left a voicemail message to that customer, telling the customer that defendant would "transfer the money from my account to yours first, so you get a proof of funds," in order to trick U.S. Immigration that the customer had sufficient resources to qualify for a visa extension.

     ▪    Defendant then transferred approximately $96,000 to the customer's bank account so the customer could use it with her visa extension application to show as proof of sufficient funds.

     o    On January 23, 2015, defendant assisted Chinese birth tourism customer X.Y.L. to file an application with USCIS to extend her visa, which defendant knew contained false statements.

When during the change of plea hearing the Court asked defendant to tell the Court what she had done, defendant said:

> Your Honor, from October 2013 until March of 2015, I participated in a company called You Win USA.  The company business was to assist some Chinese national moms to give birth to their babies in the U.S.

> I knew this company would help for some customers.  They would make false statements when they applied for a

visa, for example, how to conceal the pregnancy from the
immigration officers; for example, telling the immigration
officer they were only going to remain in the U.S. for a
few weeks.  For example, they flew from China only to
Hawaii and then a change of flight from Hawaii to Los
Angeles.

I was in charge of these customers' housing, meals,
and transportation while they were in the U.S.

(Trans. at 29-30.)  The Court then asked defendant "Did you agree
with others to participate in this scheme to assist these women to
come illegally into the United States," and defendant answered "Yes."
(*Id.* at 30.)  In response to the Court's questioning about who else
was involved with defendant in the scheme, defendant said:

I do know in China there was a person whose name is Li Li
who helped these people obtain the false visa.  Then once
they arrived in the U.S., I provided the housing, meals,
and the transportation.

(*Id.* at 30-31.)

E.   **Factual findings in the PSR**

The PSR made the following factual findings regarding
defendant's immigration fraud conspiracy:

- Overview:[3] "From 2013 to March 2015, Li, together with
others, operated a birth tourism business in Irvine, California, and
the PRC, called You Win USA Vacation Services Corporation ("You
Win"), which would assist pregnant foreign nationals (typically PRC
nationals) to travel to the U.S. and/or to remain in the U.S. to give

---

[3] The descriptive titles of these paragraphs are the
government's language, not the PSR's.  The PSR's language is quoted.

16

birth, so that their children would receive birthright U.S. citizenship." (PSR ¶ 20 (footnote omitted).)

- <u>Services offered</u>: "You Win operated in the U.S. and China, and offered the following services to pregnant Chinese nationals:"
    - o "fraudulently obtaining nonimmigrant visitor visas to enter the U.S.";
    - o "training for the visa interview at the U.S. consulate";
    - o "coaching for passing the U.S. Customs inspection at the U.S. port of entry";
    - o "housing in apartments in Irvine for a period of approximately three months or the duration of the pregnancy and postnatal care";
    - o "transportation for restaurants, shopping, and recreating";
    - o "transportation for prenatal visits and hospitals; and";
    - o "obtaining birth certificates, U.S. passports, and Social Security cards for the birth tourism customers' children born in the U.S."

(PSR ¶ 22.)

- "You Win charged "packages" ranging from $40,000 to $80,000 for their birth tourism services." (*Id.*)

- <u>False statements on visa applications</u>: "You Win's pregnant customers would generally obtain nonimmigrant visas from the U.S. Government in order to come to the U.S. and/or remain in the U.S. to give birth. Some of You Win's customers made false statements

17

on their visa applications and/or to U.S. immigration officials, and You Win sometimes assisted its customers in doing so."

    o    "For example, You Win sometimes instructed its birth tourism customers to apply for their visas to come to the U.S. early in their pregnancy so they would be able to conceal their pregnancy from U.S. officials."

(PSR ¶ 23.)

- <u>False statements on visa applications</u>: "In addition, You Win assisted some of its customers in preparing and/or submitting visa applications that You Win knew contained false statements."

    o    "For example, many of You Win's customers' visa applications would state that the purpose of their trip to the U.S. was for business and/or tourism; that the length of their stay would be approximately eight to 14 days; and that they would be staying in Hawaii, New York, or Los Angeles."

    o    "In reality, many of those customers intended to come to the U.S. to give birth; they sometimes intended to stay in the U.S. for up to three months; and they intended to stay in Irvine, California."

(*Id.*)

- <u>Coaching</u>: "Once the customers' visa applications had been filed, You Win's agents and employees in China would coach some of their Chinese customers on how to pass the U.S. Consulate interview in China, including by telling the customers to falsely say they were going to stay in the U.S. for only two weeks."

    o    "Once the customers received their visas to travel to the U.S., You Win's agents and employees in China would coach some of their Chinese birth tourism customers on how to pass

18

the U.S. Customs inspection at the port of entry by concealing their pregnancies."

   o "You Win sometimes directed its customers to book two flights: (a) the first flight from China to Hawaii, instead of from China to Los Angeles International Airport (LAX), because they believed that it would be easier to clear U.S. Customs through Hawaii; and (b) the second flight from Hawaii to LAX, which would then be considered a domestic flight with no U.S. Customs check." (PSR ¶ 24.)

   •  <u>Defendant's knowledge of extent of scheme</u>: "At the time Li operated the birth tourism business, Li was generally aware that You Win's agents and employees in China would assist You Win's customers in submitting applications for nonimmigrant visas and/or visa extensions; that some of those applications might contain the above-identified false statements; and that You Win "trained" its customers on how to pass interviews with U.S. immigration and/or customs officials, including by telling its customers how to respond to certain questions and to conceal their pregnancies." (PSR ¶ 25.)

   •  <u>Housing</u>: "Between December 2014 and March 2015, Li, who resided in Irvine, California, received and housed You Win's customers after they arrived in the U.S.. While You Win's customers were in the U.S., Li provided various services to them, including housing, meals, transportation, and other miscellaneous services. Li hired several persons in Irvine to assist her with providing these services to You Win's customers. These employees included Zhi Xin Pang, who worked as a driver for approximately ten women.[2] Pang drove the women to the malls and to hospitals, including Fountain Valley

Hospital.3 Pang was paid approximately $2,000 in cash biweekly from Li." (PSR ¶ 26 (footnotes omitted).)

- **International wire transfers**: "During her participation in the scheme, Li also received wire transfers from China, some of which were used to promote, further, or facilitate You Win's activities in the U.S." (PSR ¶ 27.)

- **Directions given to Chinese scheme participants**: "in a WeChat message on January 8, 2015, Li asks the You Win Chinese-based accountant to 'transfer the salary for the aunties today, ok/I haven't received the 100,000,' to which the accountant responds, "Okay, sis. I'll go to the company later to wire it over." (*Id.*)

- **Chinese scheme participants seeking authorization from defendant**: "During Li's participation in the scheme, the Beijing office reached out to her for approvals of refunds."

  o "In a WeChat message dated January 25, 2015 at 7:58 PM, Li was asked to give her approval to issue a refund to that customer, as follows: 'CEO LI: Manager Li, how are you? Pregnant mom ZHANG Haixia had booked Gold Package. Now because the baby is a girl, her husband arranged abortion for her. Therefore request refund. Amount is 23,800 - 1,080 + 22,720. Please approve. Thank you manager Li. Thank you Qiuqiu.'"

- **Count 2 conduct (customer Xiao Yan Liu's fraudulent visa extension)**: PSR Paragraphs 34-38 detail facts surrounding defendant's assisting that customer to fraudulently obtain a visa extension, including defendant's transferring approximately $96,000 to the customer's bank account so that the customer could use it to show proof of sufficient funds with her visa extension application.

1    **F.    Customers encountered during March 2015 search of**
2         **defendant's scheme apartments**

3    Defendant's birth tourism customers would make false statements
4    on their visa applications about the purpose of their trip, the
5    intended length of stay in the U.S., and the location where they
6    would be staying in the U.S.  For example, the customers' visa
7    applications would falsely list the purpose of trip as "Temp.
8    Business Pleasure Visitor (B)"/"Business & Tourism (Temporary
9    Visitor) (B1/B2)" and would list that the visit would last only a
10   week or two – when in fact, they were present to give birth in the
11   U.S., and were going to stay in the U.S. much longer than a week or
12   two.  In addition, most of the visa applications also falsely listed
13   the purported location where they would be staying - never listing
14   Irvine.  An example of one of defendant's customer's visa
15   applications with those false statements follows:

16

17
18
19
20
21
22
23
24
25

26   The agents reviewed the visa applications of more than 20 You
27   Win birth tourism customers (and husbands) who were encountered
28   during the searches executed in March 2015 at the apartments being

21

used by defendant to house her birth tourism customers.  Based upon
review of those customers/material witnesses' visa applications, all
had the same types of false statements in their visa applications.
The customers' visa applications in China would make false statements
about the purpose of their trips, the intended length of stay in the
U.S., and the locations where they would be staying in the U.S:

| DEFENDANT'S CUSTOMERS FOUND ON MARCH 3, 2015 DURING SEARCHES (IRVINE, CA) | | | | | | |
|---|---|---|---|---|---|---|
| NAME | VISA APP DATE | LISTED PURPOSE | LISTED DURATION | LISTED STAY LOCATION | ENTRY & EXIT DATES | CHILD DOB & LOCATION |
| Y.W. | 09/02/14 | Business & tourism (B1/B2) | 20 days | New York, NY | 01/20/15 HI 07/09/15 LAX | 03/21/15 Fountain Valley |
| M.S. | 06/30/14 | Business & tourism (B1/B2) | 18 days | San Francisco | 11/09/14 HI 03/13/15 LAX | 02/07/15 Fountain Valley |
| Q.P. | 06/30/14 | Business & tourism (B1/B2) | 18 days | San Francisco | 11/09/14 HI 03/13/15 LAX | Husband of M.S. |
| Liu, Xiao Yan | 09/29/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/26/14 LAX 06/03/15 LAX | 03/30/15 Fountain Valley |
| D.L. | 08/27/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 01/02/15 HI 09/26/15 LAX | 03/09/15 Fountain Valley |
| Z.W. | 10/06/14 | Tourism/ Medical treatment (B2) | 15 days | Florida | 02/15/15 HI 05/23/15 LAX | 04/24/15 Fountain Valley |
| Y.S. | 10/30/14 | Tourism/ Medical treatment (B2) | 2 weeks | San Francisco | 12/13/14 HI 03/04/15 LAX | 01/27/15 Santa Ana |
| Y.Z. | 09/03/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/02/14 HI 03/05/15 LAX | 02/03/15 Fountain Valley |
| S.Y.Y. | 09/03/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 01/20/15 SFO 03/05/15 LAX | Husband of Y.Z. |
| Y.R. | 08/22/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 11/30/14 HI 03/05/LAX | 02/02/15 Fountain Valley |
| J.C. | 08/22/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 01/18/15 SFO 03/05/15 LAX | Husband of Y.R. |

| DEFENDANT'S CUSTOMERS FOUND ON MARCH 3, 2015 DURING SEARCHES (IRVINE, CA) | | | | | | |
|---|---|---|---|---|---|---|
| NAME | VISA APP DATE | LISTED PURPOSE | LISTED DURATION | LISTED STAY LOCATION | ENTRY & EXIT DATES | CHILD DOB & LOCATION |
| L.G. | 11/18/14 | Business & tourism (B1/B2) | 4 months | Monterey Park | 01/06/15 HI 03/29/15 LAX | 02/27/15 Fountain Valley |
| Y.C. | 11/18/14 | Business & tourism (B1/B2) | 20 days | Monterey Park | 01/06/15 HI 03/29/15 LAX | Husband of L.G. |
| J.Z. | 09/05/15 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/27/14 HI 03/29/15 LAX | 02/21/15 Fountain Valley |
| X.Z. | 09/05/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/27/14 HI 03/24/15 LAX | 02/21/15 Fountain Valley |
| L.Y. | 09/04/14 | Tourism/ Medical treatment (B2) | 14 days | San Francisco | 01/04/15 HI 04/03/15 LAX | 03/17/15 Fountain Valley |
| J.X. | 09/04/14 | Tourism/ Medical treatment (B2) | 14 days | San Francisco | 01/04/15 HI 04/03/15 LAX | Husband of L.Y. |
| L.L. | 12/25/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 02/12/15 HI 05/28/15 LAX | 04/04/15 Fountain Valley |
| Y.Zha. | 07/27/14 | Business & tourism (B1/B2) | 21 days | New York, NY | 02/12/15 HI 05/05/15 LAX | 04/01/15 Newport Beach |
| Y.Zho. | 09/09/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 11/15/14 HI 03/05/15 LAX | 02/03/15 Santa Ana |
| Y.D. | 09/09/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 11/15/14 HI 03/05/15 LAX | Husband of Y.Zho. |
| W.Y. | 12/04/14 | Business & tourism (B1/B2) | 30 days | New York, NY | 02/12/15 HI 05/15/15 LAX | 04/27/15 Newport Beach |
| Y.S. | 10/10/14 | Business & tourism (B1/B2) | 8 days | Los Angeles | 02/01/15 IAH 06/03/15 LAX | 04/25/15 Newport Beach |

## G.    Undercover operation of defendant's scheme

PSR Paragraphs 30-33 describe the international undercover operation that HSI and IRS-CI conducted into defendant's scheme.  Her own words captured during that UC operation demonstrate that defendant was intimately familiar with all aspects of the scheme.

23

First, "[o]n February 23, 2015, a female undercover agent called Li directly and explained that she was interested in coming to the U.S. to give birth.  Li told the female undercover agent that they have an office in Beijing that can help her get her visa to come to the U.S. and to coach her on how to clear customs, as follows:

> 'Our company in Beijing covers helping you with applying for the visa and training you, which includes the training to pass customs…the training to apply for the visa. We'll need to train you for the visa so you can go through the visa interview without problems.'"

(PSR ¶ 30.)

Defendant also admitted that the operation in China and the operation in the U.S. were the "same company:"  "Li told the female undercover agent that the office in Beijing is part of the You Win Company in Southern California, stating, 'we are the same company.'" (PSR ¶ 31.)

Defendant also showed that applying for the fraudulent visa was part and parcel of her international immigration fraud scheme:

> The female undercover agent told Li that she had no income and no job, but her husband had a job and money. Li answered that was not a problem because, "We will tell you how to apply for the visa and what to say at the interview with the immigration officer."

(*Id.*)  By her own words, defendant demonstrated her extensive knowledge of the visa application fraud portion of the conspiracy: "Li also advised the female undercover agent not to

24

wait too long to get her visa because if her stomach is too big then she will get denied on the spot." (*Id.*)

In addition, defendant explained that once the female undercover agent obtains the visa to come to the U.S., her company would coach the customer on how to slip through U.S. Customs:

> And then, after the visa interview is over, we'll also tell you how to go through customs successfully when you go through customs. We have training for all of that. That's why, you are…it's not like it can be explained in one sentence.

(*Id.*) Defendant gave additional details regarding how to trick immigration during the visa interview at the U.S. embassy:

> Because if your belly is obvious when you go to the U.S embassy for the visa interview, then you'll get denied on the spot. So you'll need to get the visa first and then come over, come over to the U.S two months later. When you pass through inspections in the United States…we'll give you basic training to let you know the easier way to pass inspections.

Defendant then directed the undercover agent to contact the company's office in Beijing, providing the phone number. (PSR ¶ 32.) "Li then told the undercover female agent that she was in charge of the birth tourism operation in the U.S., as follows:

> 'Okay. Contact them directly and then I'm in charge of the U.S. area contacts. And then

25

> Beijing, that number is the person in charge of
> the China area. The China area includes all of
> the visa application, training, and all of the
> stuff like signing a contract; Manager Li is in
> charge of all of that. When you come to the U.S.
> I'll be in charge of taking care of all of your
> needs. That's the difference between our China
> area and our U.S. area.'"

(*Id.* (footnote omitted).)  Defendant then explained the pricing structure for her birth tourism services, which ranged from $40,000 to $80,000.  (*Id.*)

HSI and IRS-CI also conducted an undercover investigation of Chen.  During that undercover operation, scheme participants in China uploaded a visa application in the undercover agent's notional name, which had false statements as to purpose (temporary business pleasure visitor), duration (20 days), and location (Long Beach, CA) where she would be staying in the United States.

**H.   March 2015 interview of defendant**

On March 3, 2015 (the day of the searches), Mandarin-speaking IRS-CI SAs interviewed defendant.  While is often the case with criminals when they are interviewed by law enforcement, much of what defendant said during that interview was self-serving.  However, defendant did make many admissions during that interview, including:

- She was a birth tourism customer herself earlier in 2013, when she gave birth to twins in the U.S.[4]

---

[4] Defendant's 2013 visa application, dated 03/18/13, falsely stated that she would be coming for 15 days and staying in Los Angeles.  The consular notes reflect: "Family of 3 (parents and

- Shortly after she and her husband Yan paid Chen for her own birth tourism package, she and Yan decided to invest in his company. She noted that at that time, Chen did not have many customers and could not pay the rent for the business so he needed help. She said that Chen knew that they (Li and Yan) were wealthy and thought they looked friendly and approachable.

- She said that her and her husband's "partnership" with Chen in the birth tourism operation began in August 2013. They made an initial investment with Chen of $150,000, which was paid in September 2013.

- Her husband Yan handled the finances with the money received in China. She said that customers made payment to You Win in China. Money would then be wired to Li's bank account in the U.S. She said she had several accounts in the U.S., identifying BofA, East West, Wells Fargo, Citibank, and HSBC.
  - o She said money would also be wired to her mother Hang Ping's account.
  - o She said that You Win's bank accounts in China are at China Trust Bank, and that Lilly has control of those accounts.

- She was responsible for auditing You Win's expenses. She received expense sheets from Chen, which she would then reconcile with Lilly.

---

daughter) for tourism. Parents have been to Canada and Australia and have own trading company. Relationship with daughter bonafide. Will stay 2 weeks."

- She never had discussions with the customers re: visas, because that wouldn't apply once they were in the U.S.[5]

- The customers arrive via domestic flights from either Hawaii or Las Vegas.  She first said that the customers liked to visit Hawaii or Vegas first for a few days for vacation, but then admitted that it was "possible" that the customers first flew into Hawaii or Las Vegas because it would be easier for them to obtain their visas and pass immigration.

- She has 9 employees for You Win in the U.S., but she is unsure of their legal status.  She pays those employees in cash, with salaries that range between $2,000 and $3,000.  She pays the manager Pang Zhi Xing $4,000/month.

- She owns four homes in the U.S. and has deposits on an additional three.  Three of the homes are in Irvine, and four in Murrieta.  Two of the Irvine homes and two of the

---

[5] That statement by defendant was demonstrably false.  First, for customer Xiao Yan Liu (the visa extension application for which defendant pleaded guilty in Count Two), Li not only coached that customer when entering the U.S., but also helped the customer to obtain a visa extension by filing an application with fraudulent information (including transferring her money into the customer's bank account to trick USCIS).  And several of defendant's statements to the undercover agent specifically included discussions about obtaining the visa and the visa process, such as:

- "'Our company in Beijing covers helping you with applying for the visa and training you, which includes the training to pass customs…the training to apply for the visa. We'll need to train you for the visa so you can go through the visa interview without problems";

- "We will tell you how to apply for the visa and what to say at the interview with the immigration officer"; and

- "Because if your belly is obvious when you go to the U.S embassy for the visa interview, then you'll get denied on the spot.  So you'll need to get the visa first and then come over, come over to the U.S two months later."

28

Murrieta homes are completely paid off.

- She knows it is illegal to submit false visa applications. She claimed she was unaware of any false information on the visa applications for You Win's customers. She said that she was "shocked" to hear that 90% of her customers had false information on their visa applications.
  - However, she acknowledged that she advised a customer not to look noticeably pregnant or else they would not pass immigration or be approved for a visa.
  - She said she never told a customer to lie on the visa application, but that she told them only to "not look pregnant."
- She reiterated that Lilly was in charge of helping the customers with the visas. She noted that Lilly hires a company in China to help their customers with visas, and pays that company 1,000 RMB (currently $150) per person. She said she does not know what they do in China to get the customers' visas approved.

(PSR ¶ 51 & defendant's MOI dated 03/03/2015.)

**I.   Defendant's fraudulent conduct surrounding her birth tourism customer from Count Two**

In addition to pleading guilty to the international immigration fraud scheme, defendant also pleaded guilty to Count 2 – visa fraud in violation of 18 U.S.C. § 1546(a), for a visa extension that defendant assisted one of her birth tourism customers (Xiao Yan Liu) to obtain after she had arrived in the U.S. That fraud occurred after defendant had previously coached that same customer through U.S. customs when the customer was at the port of entry.

29

On November 14, 2018, in <u>United States v. Liu</u>, SA CR 18-00239-JVS,[6] Liu was charged with visa fraud under Section 1546(a) for her false visa application to come to the U.S.[7] and false extension, which had false statements and fraudulent documents, and Section 1001 false statement for lying to CBP officers at the port of entry.

Defendant coordinated Liu's visa extension and committed fraud by transferring money from her (defendant's) bank account to Liu's bank account, so that Liu could submit a bank statement showing that she had money as part of her visa extension application. The agents recovered text messages and phone calls between them that establish defendant's involvement in both helping Liu enter the U.S. for birth tourism, as well as to fraudulently obtain a visa extension.

First, defendant directed Liu to go through Hawaii, not LAX, because her other birth tourism customers were being denied entry at LAX.

---

[6] On February 15, 2019, that case was transferred from Judge Guilford to Judge Selna.

[7] Liu's visa application had the routine falsities: B1/B2 business & tourism (temporary visitor), 8 days, and Howard Johnson in Fullerton. The notes from Liu's consular interview indicate that she lied there too: ½ couple to sight see. Wife is doctor for power company's hospital. Husband is tax auditor for city tax bureau. Good jobs. Have an 8 yr old child. <u>Will not have another child in US.</u> From lower fraud part of Henan. Going with tour group." (emphasis added).

Second, on December 23, 2014, in the following voice message, defendant coached Liu on how to slip through U.S. customs (*e.g.*, concealing pregnancy and saying in U.S. only for vacation):

Dec 23, 2014 4:03 PM

[The message in the audio recording is translated below]

-----------------------------------------------------

Dongyuan:    The main thing is they look and see if you look obvious [pregnant]; can they see it? First thing is not to let them see it. Second thing is don't deny it if they can see it and just say that you're still here for vacation and just show them the return flight ticket. Mainly, it's going to be depending on the immigration officer, that is… No, not an immigration officer… it depends on the Customs officer… Actually, a lot of it depends on the… how do I say it…your luck. Of course, there aren't many who were sent back on the same flight. Some were denied…only got a few days, some only got a week… After coming in, there will be a need to look for an attorney, which is about two thousand…two thousand U.S. dollars to look for an attorney. Mm… it's all possible, so there's nothing that's absolute.

-----------------------------------------------------

Okay, let's test our luck

(The flower icon is defendant, and the lion icon is Liu.)  Defendant went so far as providing Liu with someone else's itinerary and directing her to use – **and alter** – it to get through U.S. customs, to make it appear to the inspector that Liu had a return trip to China already booked, which would be dated to match a short two-week vacation in the U.S.:

Dec 25, 2014 11:49 AM

[The message in the audio recording is translated below]

-----------------------------------------------------

Dongyuan:    Yanchen, what I'm giving you here is a friend's itinerary. She's coming here on the same flight as yours. So you can look at the itinerary and then make modifications according to your return flight ticket. And then, you can hold onto it. If they can't tell that you're pregnant, then you can show this to them and they probably won't ask you anything additional. Once the sun comes up, I'll tell you the specifics, all right?

-----------------------------------------------------

Dec 25, 2014 2:08 PM

31

When Liu landed at LAX, because she appeared to be pregnant and had not mentioned during her consular interview that she planned to come to the U.S. to give birth, CBP stamped her in for only 15 days, which allowed her to remain in the U.S. only from 12/26/14 to 01/10/15. That meant that Liu had to obtain a visa extension in order to be able to stay and give birth in the U.S.  So, defendant instructed her on the information needed to secure a visa extension, which included defendant's telling Liu that defendant would transfer money into Liu's bank account to show USCIS "proof of funds":

Jan 16, 2015 4:57 PM

[The message in the audio recording is translated below]

----------------------------------------------------

Dongyuan:    Yanchen, so it's like this: because it's a little bit of a rush if it's next week. I have to get all of your documents ready tomorrow and give them to the attorney. I've spoken to the doctor as well and I will pick up the doctor's proof. So do you have all the documents that are needed? Have you prepared them? Either on your cell phone or your computer. For example: your property deed, proof for your car, photos, do you have them all? If you do have them, then I will have to print them out. As for money, I will transfer the money to you from over here first because wire transfer won't make it in time and you can't make any wire transfers on Saturday and Sunday in China. I will transfer the money from my account to yours first, so you get a proof of funds, all right? All...all the stuff that I asked you to prepare, do you have...can you print all of them out right now? You need to get them ready, all right?

Defendant then explained to Liu that Liu also needed a bank account document from China showing that she had assets to include with her application to extend her visa.  So in a phone message to Liu dated 01/16/15, defendant directed Liu to alter the banking documents she had in order to (falsely) show she had more money:

            You can have him just get one, but it can't be

            fake. Just have him print one out from the

            computer and send it to you and then print it out

            from over here. Make it a little bit more...a

            little bit more, so they won't think…. Don't make

it even numbers with too many zeros and make it a
little bit more because that'll show that you
have asset and work. Show that you have family
and a child, you won't stay here and take
advantage of the benefits, that'll be good, all
right? Make it a little bit more. Since there's
no property deed and proof of car [ownership],
it's better to have a little bit more cash, all
right?

In this last WeChat audio message on that same day (01/16/15),
defendant also demonstrates not only the facility with which she
commits fraud, but her knowledge of whether U.S. law enforcement
would be able to check the veracity of Chinese-based documents:

Dongyuan:     No, they just want a scanned copy. These foreigners, they won't look at whether
              yours are real or fake. They can't tell if it's real or fake. You just have to…
              [Chuckle] It can be edited on it…they want a scanned copy. So you can scan a
              copy onto a computer and then make editing on the computer. Once you edit it,
              you can send it over. The foreigners, they can't…it's impossible that they will
              connect to the network in China. They can't tell if it's real or fake. They'll think
              it's real as long as you provide it to them, you know?

----------------------------------------------------

On January 23, 2015, Liu filed an application to extend her
nonimmigrant status (Form I-539) to USCIS, which was fraudulent.  And
at the time of her extension application, Liu had violated the terms
of her visa by providing false statements in her initial visa
application that she was traveling for 10 days on a tour to L.A.,
when in truth and in fact, Liu was entering the United States to stay
at least 4 months to have a baby in the United States.

More importantly, Liu falsely claimed to have $98,000 in her
bank account to support her during her stay in the United States.
However, bank records show that was not her money.  Instead, as noted

1  in the PSR, defendant had transferred money from her account into

2  Liu's account in order to make it appear as if Liu had sufficient

3  funds to support herself.  And bank records show that the money was

4  then subsequently transferred back to defendant's account.

5       **J.    Related criminal conduct – wire fraud**

6       Counts Three through 13 of the Indictment charge defendant with

7  wire fraud, in violation of Title 18, United States Code, Section

8  1343.

9       To run their birth tourism business, defendant and Chen

10  rented/leased dozens of locations in Irvine to house their many birth

11  tourism customers who were awaiting giving birth.  The Indictment

12  charges defendant with wire fraud for making multiple false

13  statements to, and concealing operative facts from, the apartment

14  owners, thereby tricking the owners into renting them many apartments

15  that they then used to operate their immigration fraud scheme.  The

16  apartment owners were also harmed by, among other things, the

17  increased wear-and-tear to their units, problems created with other

18  tenants, and the diminution in value of their complexes due to many

19  occupants coming and going, large commercial kitchens being operated,

20  and other problems from defendant and Chen's birth tourism operation,

21  which even resulted in loss business from other renters who left.

22       Agents confirmed that early on, defendant and Yan were present

23  with Chen when renting apartments from the Douglas apartment complex

24  to use for housing their birth tourism customers.[8]

25  _____

26       [8]For example, agents interviewed a real estate agent, M.C., who
    had taken Chen to view apartments at the Douglas apartment complex in
27  2013.  M.C. said that Chen told him that he wanted 50 units at first,
    but that the apartment complex would only let him get 10.  M.C. said
28  that two other people had accompanied Chen when they went to get the

As mentioned *supra*, in addition to tricking the apartment owners into renting to them so that they could operate their birth tourism business, defendant and Chen also further tricked the apartment owners by using the names of people on the lease applications who were not going to be the actual occupants of the apartments.  In addition, some of those rental applications attached altered bank records in order to qualify for those leases.

For example, defendant used her mother P.H.'s identity to fraudulently rent an apartment used in defendant's birth tourism scheme.  Count 28 of the Indictment charges defendant with aggravated ID theft for using her mother's identity to rent apartments used in the scheme.  The surrounding counts also charge defendant for the same offenses for using other identities in her scheme.[9]

_____

apartments, and that those two people were Mr. "Yan" and his wife "Dong Li." Agents also interviewed M.H., who was business manager at the Douglas apartments.  She identified photographs of defendant and Chen.  She said that defendant had come in with rental checks before.

[9] On February 14, 2018, P.H. provided under oath testimony.  She confirmed her signature on the East West signature card for the accounts ending in 8933 and 2457.  P.H. testified that she doesn't speak, read, or understand English.  One of the apartments, unit 223, had P.H.'s name as the occupant, signed on 01/10/15.  P.H. testified that the signature on the apartment form at the bottom was hers, but she did not remember whether and when she had signed it.  She specifically testified that she only signs any documents in English if her daughter is with her.  She confirmed that from 11/21/13 to present, she had lived at the 78 Harrison address, and not at the Douglas address.  She was also shown several checks written from the P.H. East West bank account ending in 8933, which were used to pay for apartments that defendant and Chen had used to house their birth tourism customers, including 02/03/15 for $3,354.25 for Douglas unit #123 and 02/03/15 for $3,665.12 for Douglas unit #102.  P.H. testified that the signatures on those checks were hers, but not the other writing on the checks.  However, P.H. testified that the only person she would trust to write checks from her account that she would sign was her daughter (defendant).  She testified that her daughter never told her that she would be renting apartments using her (P.H.'s) name.  P.H. testified that to her knowledge, her daughter never rented any apartments in Orange County for any purpose.

35

Most of the other units were rented in the names of past birth tourism customers, and also had false information in the applications and/or attached to them.

## IV. ARGUMENT

While the PSR does contain most of the relevant facts, it erred in its conclusions on the number of documents involved in the conspiracy and defendant's role in the scheme.  As discussed below, the evidence overwhelmingly establishes that there were more than 100 documents involved in the conspiracy.  Additionally, the evidence in the record – including defendant's own words – show that she occupied a manager/supervisor role in the conspiracy.

**A.**   **The PSR erred by failing to include several important facts relevant to the contested Guideline factors.**

The PSR failed to include several important facts that should have been included because they directly relate to the contested Guideline factors, so the government must object to those omissions.

First, the PSR failed to include any of the facts about the Weichat voice messages between defendant and customer Xiao Yan Liu (from Count 2).  Defendant's fraudulent conduct surrounding that customer's fraudulent visa extension (from Count Two of the Indictment) was detailed *supra*, to which defendant pleaded guilty. That fraudulent conduct by defendant is relevant both as to her role in the conspiracy, as well as the number of documents involved in the conspiracy, including: (1) coaching Liu how to get through customs; (2) providing Liu a friend's itinerary and directing Liu to alter it to make it look like she (Liu) had already booked a return trip to China; and (3) in addition to the fraudulent transfer of funds, defendant directed Liu to alter other bank records to show she (Liu)

36

had more money (noting "These foreigners, they won't look at whether yours are real or fake.  They can't tell if its real or fake.  You just have to … [Chuckle]").

The government objects that the PSR did not include those five (5) Weichat voicemail messages.[10]

Second, as of mid-2014, You Win's website claimed that it had served more than 550 birth tourism customers:



---

[10] By transmissions dated October 24 and 29, 2019, the government provided this information to the assigned Probation officer.

37

1   (Exh.-3.)  The translation of the line is that they had already

2   served over 550 customers.  That screen shot is dated June 2014.

3        The government objects that the PSR failed to include this fact,

4   which is relevant to the number of documents involved in defendant's

5   fraudulent scheme.[11]

6        Third, the PSR failed to include the interview statements of

7   customer/material witness D.L., which relate directly to defendant's

8   role in the fraudulent scheme.  According to D.L.'s 06/17/15

9   interview (Exh.-2):

10  would bring fruit and visit with the women.  LI understood that Dongyuan was
    the owner of the U.S. portion of the YouWin operation  LI stated that she did

11  [D.L.]  stated that Big Pang worked for Dongyuan and acted as a general manager,

12

13  The government objects that the PSR failed include those statements

14  from a customer/material witness, who made statements directly

15  relevant to defendant's role in the scheme (*i.e.*, "the owner").[12]

16  **B.    The PSR erred by requiring clear and convincing evidence**

17  **for the Guideline factor of number of applications.**

18       In its conclusion that only seven documents were involved in the

19  scheme, the PSR required "a demonstrable connection by clear and

20  convincing evidence" between You Win and specific customer's

21  fraudulent visa applications.  (PSR ¶ 59.)

22       The government objects to the PSR's imposition of that higher

23  standard, because preponderance of the evidence is the proper

24  standard here.  See United States v. Felix, 561 F.3d 1036, 1045 (9th

25  Cir. 2009) ("The preponderance of evidence standard is generally the

26  _____

27       [11] By transmissions dated October 24 and 29, 2019, the government
    provided this information to the assigned Probation officer.

28       [12] By transmissions dated October 24 and 29, 2019, the government
    provided this information to the assigned Probation officer.

                                   38

appropriate standard for factual findings used for sentencing."); see also United States v. Watts, 519 U.S. 148, 156, 117 S. Ct. 633, 637, 136 L. Ed. 2d 554 (1997) ("we have held that application of the preponderance standard at sentencing generally satisfies due process") (citations omitted); United States v. Treadwell, 593 F.3d 990, 999 (9th Cir. 2010) ("Ordinarily, a district court uses a preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud."); United States v. Garcia-Sanchez, 189 F.3d 1143, 1148 (9th Cir. 1999) ("Facts used in sentencing usually need to be established only by a preponderance of the evidence."); U.S.S.G. § 6A1.3, Commentary ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case").[13]

The exception to this general rule is when "the sentencing factor has an 'extremely disproportionate effect on the sentence relative to the offense of conviction,' in which case findings of fact must be supported by clear and convincing evidence." United States v. Jenkins, 633 F.3d 788, 808 (9th Cir. 2011); United States v. Mezas de Jesus, 217 F.3d 638, 642 (9th Cir. 2000) (involving sentencing based upon uncharged conduct of kidnaping, where defendant was convicted only of being illegal alien in possession of firearm). There is no bright-line rule for determining when the clear and

---

[13] "The government bears the burden of proving, by a preponderance of the evidence, the facts necessary to enhance a defendant's offense level under the Guidelines." United States v. Showalter, 569 F.3d 1150, 1159 (9th Cir. 2009) (quoting case) (alteration and quotation marks omitted).

39

convincing evidence standard applies; instead, the Ninth Circuit
looks "at the totality of the circumstances, examining several
factors, none of which is dispositive."  United States v. Riley, 335
F.3d 919, 925–26 (9th Cir. 2003).  The Ninth Circuit has identified
six factors to determine whether an enhancement has such an effect as
to require satisfying the heightened standard of proof:

> (1) whether "the enhanced sentence fall[s] within the
> maximum sentence for the crime alleged in the indictment;"
> (2) whether "the enhanced sentence negate[s] the
> presumption of innocence or the prosecution's burden of
> proof for the crime alleged in the indictment;" (3) whether
> "the facts offered in support of the enhancement create new
> offenses requiring separate punishment;" (4) whether "the
> increase in sentence [is] based on the extent of a
> conspiracy;" (5) whether "the increase in the number of
> offense levels [is] less than or equal to four;" and
> (6) whether "the length of the enhanced sentence more than
> double[s] the length of the sentence authorized by the
> initial sentencing guideline range in a case where the
> defendant would otherwise have received a relatively short
> sentence."

United States v. Jordan, 256 F.3d 922, 928 (9th Cir. 2001) (quoting
case).

Here, however, that exception should not apply to this case,
because "[s]entencing enhancements based entirely on the nature and
extent of the conspiracy, as opposed to acquitted or uncharged
conduct, typically do not require proof by the clear and convincing
standard."  Jenkins, 633 F.3d at 808 n.8 (citing United States v.

40

1    <u>Armstead</u>, 552 F.3d 769, 777 (9th Cir. 2008), and <u>United States v.</u>

2    <u>Harrison-Philpot</u>, 978 F.2d 1520, 1524 (9th Cir. 1992).

3         That's the case here.  The challenged Guidelines factor is based

4    on the extent of the conspiracy, to which defendant has admitted, as

5    well as her own words establish.  So, it is unlikely that such

6    enhancement would constitute the type of "extremely disproportionate

7    effect on the sentence relative to the offense of conviction" that

8    would require application of the clear-and-convincing exception to

9    the general rule.

10        Even if the exception were to apply here, application of the

11   Ninth Circuit's six factors weighs strongly against requiring proof

12   by clear and convincing evidence: (1) the enhanced sentence of 33

13   months falls way below the statutory maximum of 10 (or 15 years)

14   applicable to the crimes to which defendant pleaded guilty;

15   (2) defendant pleaded guilty; (3) the facts supporting the

16   enhancement do not create new offenses – they apply to the

17   conspiracy; (4) "the increase in sentence [is] based on the extent of

18   a conspiracy;" (5) depending on how it is viewed, the increase is

19   greater than 4 offense levels; (6) the increase in sentence more than

20   doubles the length of the sentence (11 months to 33 months), but that

21   is only because the base offense level is so low.  In total, less

22   than 2 years of additional imprisonment (22 months) does not seem to

23   be the type of "extremely disproportionate effect" case where the

24   exception is meant to apply; further, the factor in question applies

25   to the scope of the conspiracy, as opposed to uncharged conduct.

26   <u>E.g.</u>, <u>Riley</u>, 335 F.3d at 926 ("The fact that an enhancement is based

27   on the extent of a conspiracy for which the defendant was convicted

28   weighs heavily against the application of the clear and convincing

                                       41

evidence standard of proof.").

Thus, the PSR erred in requiring clear and convincing evidence as to the number of documents under Section 2L2.1(b).

C.   **The PSR erred factually and legally in its conclusion that there were only seven documents involved in the conspiracy.**

Guidelines Section 2L2.1(b) provides that "[i]f the offense involved six or more documents or passports," the offense level is increased by three levels for 6-24 documents/passports, six levels for 25-99 documents/passports, and nine levels for 100 or more documents/passports.  U.S.S.G. § 2L2.1(b)(2)(A)-(C).

The PSR concluded that "[i]n this case, the relevant fraudulent documents are the nonimmigrant visa applications that You Win USA's clients submitted to the U.S. government," and based on that conclusion, made the factual finding that the offense involved only 7 applications.  (PSR ¶¶ 58-59.)  The government objects to that conclusion, for the following four reasons: (1) based upon the facts of this case, the relevant documents under Section 2L2.1(b) include all of the following: (a) the initial visa applications uploaded in China; (b) the subsequent visas procured by those fraudulent visa applications; (c) the immigration and customs forms filled out by all customers at the U.S. ports of entry; (d) visa extension applications done in the U.S.; and (e) the resulting visa extensions procured by those fraudulent visa extension applications; (2) the evidence establishes that You Win was, in fact, involved with many more than 7 visa applications in China; and (3) Section 2L2.1(b) does not require that the documents involved in the scheme be themselves fraudulent to be counted, as long as those documents were involved in the scheme.

As discussed *supra*, defendant's international immigration fraud

42

scheme was very large.  Accordingly, as part of the scope of that fraudulent scheme, it had hundreds of customers.  And those customers routinely submitted visa applications that contained false statements about the purpose of their trip, the intended length of stay in the U.S., and the location where they would be staying in the U.S.

The following sections address separate independent methods for the Court to conclude that that Section 2L2.1's 9-level enhancement for "100 or more" documents applies to the facts of this case.

1.  **In addition to the initial visa applications, the documents involved in the conspiracy also include the resultant visas procured by that fraud, which were then used and possessed in the conspiracy.**

The PSR concluded that "the relevant fraudulent documents are the nonimmigrant visa applications," and then found that the offenses involved only 7 applications.  (PSR ¶ 59.)  The government objects to that conclusion, because it improperly limits the scope of Section 2L2.1's documents involved in the offense to the initial visa applications themselves, as opposed to all documents involved in the scheme.

The starting point is with the crimes of conviction: one count of conspiracy to commit immigration fraud and one count of substantive visa fraud.  Section 1546(a), entitled "Fraud and misuse of visas, permits, and other documents," not only criminalizes "falsely mak[ing] any immigrant or nonimmigrant visa" application, but also punishes a defendant who "uses, attempts to use, possesses . . . any such visa . . .knowing it . . . to have been procured by means of any false claim or statement . . ."  18 U.S.C. § 1546(a) (emphasis added).

43

Here, the PSR erred by requiring a "demonstrable connection" between You Win USA and assisting its customers' applications for visitor visas that were made in China.  That is a too stingy reading of the visa fraud statute, by limiting its coverage to only the initial application process, as opposed to the use or possession of said visa that had been procured by fraud.

As discussed in the next section, the government objects to the PSR's conclusion that there was insufficient connection between the visa applications that took place in China and You Win.  But, that is of no moment, because there can be no dispute that defendant and You Win did have a direct connection to those customers' use, attempted use, and possession of the visas that their customers had procured by fraud.  In other words, the entire purpose of the housing in the United States was to receive the customers once they had used their fraudulently-procured visas to enter and remain in the United States. And the customers had contracted with You Win before coming to defendant's rented apartments in Irvine, California.  So, all of those customers' issued U.S. visas were both used and possessed as part of defendant's conspiracy: (1) used/possessed to fly from China to the U.S.; (2) used/possessed to enter the U.S. at the ports of entry; (3) used/possessed to fly from the ports of entry to LAX, to arrive in Irvine; (4) used/possessed to be able to legally remain in the U.S.; and (5) used/possessed to fly back to China with newborn baby with birthright U.S. citizenship.  That's all that Section 2L2.1 requires for documents "involved" in the offense.  An example of such an issued U.S. visa from one of defendant's customers was photographed when that customer was found during the March 2015

44

1   searches:



21   Thus, on this independent basis, regardless of whether You Win

22   was involved with the initial visa applications in China, defendant's

23   conspiracy involved 100 or more documents.

24   **2.   There is sufficient evidence that You Win helped the**

25   **applicants with obtaining their visas in China.**

26   The evidence in the record establishes, by either a

27   preponderance or clear and convincing evidence, that You Win helped

28   its customers with obtaining their visas in China.

45

Defendant admitted the following in the factual basis of her plea agreement:

- You Win's pregnant customers would generally obtain nonimmigrant visas from the U.S. government in order to come to the United States and/or remain in the United States to give birth.

- Some of You Win's customers made false statements on their visa applications and/or to U.S. immigration officials, and You Win sometimes assisted its customers in doing so.  For example, You Win sometimes instructed its birth tourism customers to apply for their visas to come to the United States early in their pregnancy so they would be able to conceal their pregnancy from U.S. officials.

- You Win assisted some of its customers in preparing and/or submitting visa applications that You Win knew contained false statements.

- Once the customers received their visas to travel to the United States, You Win's agents and employees in China would coach some of their Chinese birth tourism customers on how to pass the U.S. Customs inspection at the port of entry by concealing their pregnancies.

- You Win sometimes directed its customers to book two flights: (a) the first flight from China to Hawaii, instead of from China to Los Angeles International Airport (LAX), because they believed that it would be easier to clear U.S. Customs through Hawaii; and (b) the second flight from Hawaii to LAX, which would then be considered a domestic flight with no U.S. Customs check.

46

- • Defendant assisted Chinese national X.Y.L., once that customer was in the United States, to fraudulently obtain a visa extension to stay in the United States to give birth.

(DE 65 at 8-20.)

Defendant admitted the following in her own words during her change of plea hearing on September 17, 2019:

- • Your Honor, from October 2013 until March of 2015, I participated in a company called You Win USA. The company business was to assist some Chinese national moms to give birth to their babies in the U.S.

- • They would make false statements when they applied for a visa, for example, how to conceal the pregnancy from the immigration officers; for example, telling the immigration officer they were only going to remain in the U.S. for a few weeks. For example, they flew from China only to Hawaii and then a change of flight from Hawaii to Los Angeles.

- • I do know in China there was a person whose name is Li Li who helped these people obtain the false visa.

(Trans. at 29-31.)

The PSR found the following regarding false visa applications as part of the conspiracy:

- • "You Win operated in the U.S. and China, and offered the following services to pregnant Chinese nationals:"

  - o "fraudulently obtaining nonimmigrant visitor visas to enter the U.S.";

  - o "training for the visa interview at the U.S. consulate";

47

1                    o       "coaching for passing the U.S. Customs inspection at

2                            the U.S. port of entry";

3  (PSR ¶ 22.)

4          •       "You Win's pregnant customers would generally obtain

5  nonimmigrant visas from the U.S. Government in order to come to the

6  U.S. and/or remain in the U.S. to give birth. Some of You Win's

7  customers made false statements on their visa applications and/or to

8  U.S. immigration officials, and You Win sometimes assisted its

9  customers in doing so."

10                   o       "For example, You Win sometimes instructed its birth

11                           tourism customers to apply for their visas to come to

12                           the U.S. early in their pregnancy so they would be

13                           able to conceal their pregnancy from U.S. officials."

14  (PSR ¶ 23.)

15         •       "In addition, You Win assisted some of its customers in

16  preparing and/or submitting visa applications that You Win knew

17  contained false statements."

18  (*Id.*)

19         •       "Once the customers' visa applications had been filed, You

20  Win's agents and employees in China would coach some of their Chinese

21  customers on how to pass the U.S. Consulate interview in China,

22  including by telling the customers to falsely say they were going to

23  stay in the U.S. for only two weeks."

24         •       "Once the customers received their visas to travel to the

25  U.S., You Win's agents and employees in China would coach some of

26  their Chinese birth tourism customers on how to pass the U.S. Customs

27  inspection at the port of entry by concealing their pregnancies."

28  (PSR ¶ 24.)

                                        48

And defendant said the following to the undercover agent:

• "On February 23, 2015, a female undercover agent called Li directly and explained that she was interested in coming to the U.S. to give birth.  Li told the female undercover agent that they have an office in Beijing that can help her get her visa to come to the U.S. and to coach her on how to clear customs, as follows:

'Our company in Beijing covers helping you with applying for the visa and training you, which includes the training to pass customs…the training to apply for the visa. We'll need to train you for the visa so you can go through the visa interview without problems.'"

(PSR ¶ 30.)

• "The female undercover agent told Li that she had no income and no job, but her husband had a job and money. Li answered that was not a problem because, 'We will tell you how to apply for the visa and what to say at the interview with the immigration officer.'"

(PSR ¶ 31.)[14]

All of the above shows that as part of the scheme, You Win did in fact assist their customers with obtaining their visas in China, including filing the visa applications with false information, training to pass the visa interviews at the U.S. consulate in China, and coaching to pass U.S. customs at the ports of entry.

---

[14] As detailed in the search warrant affidavit, during the 2014 undercover operation, scheme participants in China uploaded a visa application for the notional customer, which had false information. (Exh.-1 at 50-53.)

Given the number of customers, all of whom had visas procured by false statements, it was error for the PSR to conclude that there were only 7 applications involved in the conspiracy.

In fact, contrary to the PSR's finding, customer X.Y.L. – whom the PSR counted as one of the 7 documents – actually had at least <u>4</u> documents involved in the scheme herself: (1) initial application for visa in China; (2) visa issued in China and used to enter the U.S.; (3) visa extension application in U.S.; and (4) visa extension.

3. **<u>The documents involved in the conspiracy also include the U.S. Customs and other immigration documents that defendant's customers completed at the U.S. ports of entry, which also contained false information.</u>**

Steps 7 and 8 of the scheme diagram involve when the customer had arrived from China at the U.S. port of entry, which was generally Hawaii, before the customer would shortly thereafter catch a domestic flight to Los Angeles. At that entry point, all foreign visitors must complete various customs declaration forms and/or DHS I-94 admission record. Of the pieces of information that U.S. Customs and immigration officers are seeking is the purpose and location of the stay in the United States. In this scheme, the customers would continue the lies and state that they were only visiting the U.S. and would list Hawaii or some other location, instead of Irvine.

First, the voicemail messages that defendant left to customer from Count Two of the Indictment (Xiao Yan Liu) show exactly that – defendant's instructing that customer to lie and say she was visiting the U.S. only for a short vacation.

Second, two of defendant's other customers (who were initially material witnesses, but who fled to China) were specifically indicted

for also doing exactly that. In <u>U.S. v. Jun Xiao and Long Jing Yi</u>, SA CR 18-00036-JVS, the Indictment alleges: "Defendants XIAO and YI would falsely claim to United States Customs and Border Protection ('CBP') officials at inspections that defendants XIAO and YI were traveling to Hawaii as tourists for a one-month 'vacation.'"  (SACR 18-00036-JVS DE4 at 5.)  And it also alleges: "Defendants XIAO and YI would falsely claim to CBP officials at inspections that defendant YI would not give birth in the United States."  (*Id.*)

> **4.   Section 2L2.1(b)(2) does not require that the documents be fraudulent, so long as the offense involved those documents.**

Guidelines Section 2L2.1(b)(2) provides: "If the offense involved six or more documents or passports, increase as follows: [3, 6, or 9 levels]."  By its plain language, that section does not require that the documents be fraudulent, as long as they are "involved" in the offense.  "Circuits that have interpreted this provision have construed the word 'involved' broadly and noted that 'involved' does not mean 'produced.'"  <u>United States v. Castilla-Lugo</u>, 699 F.3d 454, 464 (6th Cir. 2012) (citing cases).

In this case, all types of documents were involved in the fraudulent scheme, including the initial visa applications, the subsequently issued U.S. visas, and the immigration/customs forms filled out by the customers.  But there were a bunch of other documents involved in the conspiracy too, such as the customers' foreign passports, their flight itineraries, the customers' hospital admission forms, and the U.S.-born children's birth certificates, U.S. passports, and Social Security cards.  All of those documents and passports should also qualify under Section 2L2.1 as documents or

51

passports involved in the conspiracy.  E.g., <u>United States v. Singh</u>,
335 F.3d 1321, 1325 (11th Cir. 2003) ("In conclusion, we hold that
the term 'documents' in § 2L2.1(b)(2) is not limited by the 'relating
to naturalization, citizenship, or legal resident status' phrase
contained in the title of § 2L2.1.  Instead, the language of
§ 2L2.1(b)(2) instructs a sentencing court to count any documents
that were 'involved' in the offense, and this inquiry naturally
requires the sentencing court to consider the offense of conviction."
(internal footnote omitted)).

Thus, on this separate basis, the PSR erred in concluding that
only seven documents were involved in this huge international
immigration fraud scheme with hundreds of customers, which resulted
in hundreds of children born in the United States.

**5.   Defendant's conspiracy had many more than 100 customers.**

Based upon the number of customers found during the March 2015
searches, the bank records showing the amount of money defendant was
spending monthly for the apartments (approximately $30,000/month),
customer tally records, and defendant's communications, defendant's
scheme had hundreds of customers:

- Customers found during March 2015 searches:
  - On the day of the March 2015 searches, agents
    encountered approximately 23 customers housed in
    apartments rented by defendant to operate her scheme,
    who were listed in a table above.
  - As that table shows, all of those customers' visa
    applications contained false information.  They all
    misrepresented the length of their stay in the U.S.

52

and misrepresented where they would be staying, and most fraudulently claimed "business and tourism" as the purpose of their visit, as opposed to the real reason – to give birth.

- <u>Defendant's website</u>: As shown above, in early 2015, defendant's website boasted that as of that time, their business had already served more than 550 customers.

- <u>Apartments rented from 2013 to 2015 (approximately 15+ apartments/month)</u>:

  o   In 2013, defendant was paying more than $30,000/month to rent apartments from just one location to house customers from her fraudulent scheme.

     ▪   For example, September 2013, defendant purchased and used a cashier's check for more than $70,000 to pay for apartments used in the scheme.



1       ▪       In October 2013, defendant wrote two checks to

2               pay for apartments used in the scheme,

3               including one for $30,965 and another for

4               $4,750:

5

   

6

7

8

9

10      ▪       In November 2013, defendant wrote a check for

11              $30,321 to pay for apartments used in the scheme.

12



13

14

15

16

17   o   Defendant also wrote or caused to be written many

18       checks in 2014 and 2015.  For example:

19       ▪       In January 2014, defendant wrote a check for

20              $30,954 to pay for apartments used in the scheme.

21       ▪       In February 2014, defendant wrote a check for

22              $31,738 to pay for apartments used in the scheme.

23       ▪       In March 2014, defendant wrote a check for

24              $30,965 to pay for apartments used in the scheme.

25       ▪       In February 2, and February 3, 2015, 20 checks

26              totaling $59,260.87 from Ping Han's checking

27              account ending in 8933 were written to the

28

54

1       Douglas apartment complex to pay for 19 separate

2       apartments.

3   o   Defendant's communications and other documents re:

4       number of customers at different specific points of

5       time during 2014 and 2015:

6       ▪   11/18/2014 WeChat: defendant listed 16 current

7           customers by apartment number to one of her

8           accountants in China ("Total 16 mothers"):

9

10

Sis: I got it.

11

Nov 18, 2014 4:30 AM

12

13                                                              ☺

14

Nov 18, 2014 7:14 PM

15

[Photo of a list of customers]

16

Customers List
123 XIA, Hangyan

17

125 FAN, Yunmei; ZHENG, Qingmei
223 WU, Rong

18

225 ZHANG, Jie; GONG, Xuanhui
311 BAI, Jie
314 WU, Yilin

19

317 JIANG, Ling
318 ZHAO, Yanling

20

321 ZHANG, Bing
403 YE, Lin; SU, Meng

21

416 LI, Hongxin; YANG, Minge
417 WANG, Yuhua

22

325/206/411 Vacant rooms
Total 16 mothers

23

24   o   Spreadsheet seized from defendant's computer: a

25       spreadsheet seized from defendant's computer listed **47**

26       customers for the time frame January to July 2014:

27

28

- o 12/26/14 WeChat: defendant asked scheme participant Lili Li about how many customers currently scheduled, and the answer was 55.

- **Customer's husbands**: Most if not all of the customers had their husbands also subsequently (or concurrently) travel with them.  The husbands' visa applications also routinely contained false information, just like the wives'.

- **Hospital records**: PSR ¶ 26 n.3 provides that "during 2013, 2014, and early 2015, approximately 400 children tied to the addresses used by Li and Chen in their birth tourism scheme were born at [Fountain Valley Hospital] alone."

Using any of those above data yields that during the time frame

of the conspiracy – September 2013 to March 2015 – defendant's scheme involved well over 100 customers.

### 6.  Conclusion re: number of documents

This conspiracy involved more than 100 documents, which includes the initial visa applications uploaded in China; the resultant visas that were used and possessed as part of the scheme, both in China and the U.S., by defendant's customers; the customs and immigration documents completed by defendant's customers at the U.S. ports of entry; the visa extension applications and resultant extensions filed for customers in the U.S.; and all the non-immigration documents such as the customers' flight itineraries, the customers' hospital admission forms, the U.S.-born children's birth certificates, U.S. passports, and Social Security cards.

Thus, Section 2L2.1's nine-level increase for "100 or more" documents applies.

### D.  The PSR erred factually and legally in its conclusion that defendant should not receive an aggravating role.

Guidelines Section 3B1.1, entitled "Aggravating Role," provides that based upon a defendant's role in the offense, the offense level can be increased by two, three, or four levels.  U.S.S.G. §§ 3B1.1(a) (four levels for organizer or leader); 3B1.1(b) (three levels for manager or supervisor).

The PSR concluded that defendant occupied the role of only an average participant, so no role adjustment should apply.  (PSR ¶¶ 61-65.)

The government objects to that conclusion, because based upon the facts detailed *supra*, as discussed *infra*, defendant occupied the

role of a manager or supervisor of this international immigration fraud conspiracy.

Defendant occupied the role of a manager/supervisor of her large international immigration fraud scheme, which was extensive and involved five or more participants.  Thus, under U.S.S.G. § 3B1.1(b), her offense level should be increased by 3 levels based on her aggravating role in her fraudulent scheme.

Defendant was the person running the U.S. half of the scheme and controlling the flow of the money; multiple times she directed international wire transfers for $100,000 each.  Or as she put it in her own words to the undercover agent: "I'm in charge."  She controlled millions of dollars of the money from the scheme, while simultaneously directing participants and coaching customers. Moreover, other participants sought permission from defendant to take various actions in the scheme, and defendant gave directions regarding multiple aspects of the scheme.  And as noted *supra*, even other scheme participants noted defendant's role when they addressed her (or asked her for authorization) – as "Manager Li."

Several examples of defendant's directing other participants what to do (or their asking defendant for approval or authorization or permission to act) follow:

- <u>12/26/14 WeChat message from defendant to accountant in China, giving direction</u>: "Qiu, confirm these.  These are the current customers.  Just check to see if all these customers have paid first.  You should check it out first.";

- <u>01/08/15 WeChat message from defendant to accountant in China</u>: ""Transfer the salary for the aunties today, ok/I

58

haven't received the 100,000";

- 01/25/15 WeChat message to defendant: "**Manager Li**, how are you?  Pregnant mom ZHANG Haixia had booked Gold Package. Now because the baby is a girl, her husband arranged abortion for her.  Therefore request refund.  Amount is 23,800 – 1,080 = 22,720.  **Please approve**.  **Thank you manager Li**." (emphasis added);

- 03/01/15 WeChat message from defendant to one of her accountants in China: Defendant directed that accountant to wire transfer $100,000 to defendant to use to pay for the apartments being used to house the birth tourism customers.

- WeChat messages/voicemails from defendant to customer Xiao Yan Liu, giving multiple different directions to her: (1) fly from China to Hawaii, not LAX, because her other birth tourism customers were being denied entry at LAX; (2) conceal pregnancy from U.S. customs at port of entry; and (3) providing other person's itinerary and directing her to alter it to match her return ticket.

Defendant was not only *a* manager or supervisor of this scheme – she really was *the only* such manager or supervisor of it.  All of the factors listed in the notes to U.S.S.G. § 3B1.1 directly support that conclusion:

- Decision-making authority: as shown throughout this memorandum, defendant made many decisions regarding her fraudulent scheme.  Moreover, as the above communications demonstrate, with other authority she exercised, defendant's role included the authority to control millions of dollars of scheme funds (including, *e.g.*, whether to

issue refunds), which further shows the level of her authority.

- <u>Nature of participation in the commission of the offense</u>: Defendant participated in all aspects of her fraudulent scheme, from "soup to nuts," including:

  - o   Directing potential customers to the Beijing office for training on how to pass the visa interview at the U.S. consulate in China (in defendant's own words to the undercover agent: "*We* will tell you how to apply for the visa and what to say at the interview with the immigration officer." (emphasis added));

  - o   Directing customers to fly through Hawaii instead of LAX to bypass the more strict customs at LAX;

  - o   Coaching customers how to trick U.S. customs, including altering documents (in defendant's own words to the undercover agent: "And then, after the visa interview is over, we'll also tell you how to go through customs successfully when you go through customs.  We have training for all of that.")

  - o   Renting and paying for the many apartments in U.S. to house the customers; and

  - o   Obtaining visa extensions when customers were stamped in only for short period, which included fraudulently transferring funds and submitting a visa extension application with false information;

- <u>Claimed right to a larger share of the fruits of the crime</u>: Defendant controlled the millions of dollars flowing from the scheme;

- <u>The nature and scope of the illegal activity</u>: As described above, defendant's multi-million-dollar international immigration fraud scheme was extensive.

- <u>The degree of control and authority exercised over others</u>:
  - o  Defendant directed other scheme participants to send wire transfers from China to U.S.;
  - o  Defendant had approval authority over actions by scheme participants in the U.S. and China, including issuing refunds;
  - o  Other scheme participants addressed defendant as "Manager Li"; and
  - o  Defendant directed her mother to open bank accounts and sign checks in her name, which defendant used to pay rent and other expenses to operate the scheme, while simultaneously attempting to conceal her role and involvement in the scheme by using such nominees.

In addition, as detailed above, customer/material witness D.L. described defendant as the "the owner" of the U.S. half of the conspiracy.  She also added that "Big Pang" worked for defendant as the general manager, which also shows defendant's level of supervisory/management authority, *i.e.*, other management level participants answered to her.

Thus, defendant's offense level should be increased by 3 levels based on her aggravating role as a manager or supervisor, pursuant to U.S.S.G. § 3B1.1(b).[15]

---

[15]Under Section 3B1.1(b), in addition to being a supervisor or manager of the scheme, for the three-point enhancement to apply, the scheme needs to either involve 5 or more participants, or be "otherwise extensive."  Either of these qualifies for application of

**V.   GUIDELINES CALCULATION**

The government calculates that the final applicable Guidelines level is **20**.  In the written plea agreement, the parties agreed to the following Guidelines factor:

Counts 1 and 2: immigration fraud conspiracy and visa fraud

Base Offense Level:               11      U.S.S.G. § 2L2.1(a)

As demonstrated *supra*, the following additional Guidelines factors apply: (1) nine-point adjustment under Section 2L2.1(b)(2)(C) for an offense involving 100 or more documents; and (2) three-point adjustment under Section 3B1.1(b) for aggravating role.  Applying those enhancements yields the following:

---

the enhancement, *i.e.*, you just need one: "If defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels."

Here, defendant qualifies for the aggravating role enhancement, because her fraudulent scheme <u>both</u>: (1) was "extensive"; and (2) involved five or more <u>participants</u>.

As detailed above, defendant's huge international immigration care fraud scheme was extensive: it was the largest in Orange County, involving millions of dollars of income and more than 100 customers, complex, and was permeated with fraud. Defendant's extensive fraud was complicated, with many different aspects and employees in China and the U.S. working in concert to exploit weaknesses in the U.S. immigration system.  Defendant's extensive fraud involved multiple layers of falsities that spanned the globe, from China to the U.S. Defendant's extensive fraud involved plans to alter documents and fraudulently transfer money to fake "proof of funds" for customers. And it all involved defendant - a crafty, rich, and smart criminal who understood how to make all the moving parts work together to make millions of dollars and trick U.S. authorities 100s of times – both in China at the U.S. consulate there, and here in the U.S. at ports of entry, including defendant's using nominees for scheme bank accounts and renting apartments, all in order to hide her involvement as a manager/supervisor of the scheme.

Moreover, in addition to being extensive, as described above, defendant's fraudulent scheme involved five or more participants, including herself, her husband Yan, their partner Chao Chen, scheme employees in China (Lilly Li, Diana, Mr. Zhu the trainer in China, Shirley Zhang, and miscellaneous accountants), her mother P.H., defendant's scheme employees in the U.S., and customer Xiao Yan Liu.

<u>Counts 1 and 2</u>

| | | | |
|---|---|---|---|
| Base Offense Level: | 11 | U.S.S.G. § 2L2.1(a) | |
| More than 100 documents: | +9 | U.S.S.G. § 2L2.1(b)(2)(C) | |
| Aggravating role: | +3 | U.S.S.G. § 3B1.1(b) | |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1 | |
| **Total for counts 1 & 2:** | **20** | | |

Thus, the final offense level is **20**.[16]  Accordingly, for an offense level of 20, with Criminal History Category of I, defendant's advisory Guidelines range is 33-41 months' imprisonment.

## VI.  APPROPRIATE SENTENCE

Based upon the totality of the circumstances, the government believes that a low end Guidelines sentence of **33 months of imprisonment** is not unreasonable, and sufficiently addresses the applicable Section 3553(a) factors.

Defendant is 42 years old.  She was and is a rich foreign Chinese national.  Nonetheless, defendant orchestrated a huge international immigration fraud scheme to earn millions of dollars from her fellow Chinese foreign nationals by tricking the U.S. into issuing visitor visas based upon false statements, and to further trick U.S. Customs into admitting those customers to enter the U.S. and give birth using U.S. visas that had been procured by fraud. Also defrauded by defendant's scheme were the apartment owners and hospitals, whom defendant victimized to operate her fraudulent scheme.  Defendant has pleaded guilty to two serious federal felonies.  A Guidelines sentence is not unreasonable, and thus,

---

[16] The government does not believe that any other Guidelines factors or departures apply to this case, so it will not be arguing or moving for the application of any other factors or departures.

63

appropriate.  Accordingly, defendant should be sentenced to 33 months of imprisonment, to be followed by 3 years of supervised release.

Defendant's million-dollar international immigration fraud scheme was huge, and particularly egregious.  That was a particularly involved endeavor, with defendant and other scheme participants figuring out how to trick U.S. State Department employees in China, U.S. Customs officers at the ports of entry, and U.S. Immigration when obtaining visa extensions after entry into the U.S.  And defendant didn't even try to hide their illegality behind closed doors with the other participants of her fraudulent scheme, as demonstrated by the internal communications between her and her husband/co-schemer Yan, when she wrote: "After all, this is not legal!"  (Exh.-4).

Defendant was a manager/supervisor of her huge international immigration fraud scheme.  Defendant orchestrated her scheme. Defendant oversaw other scheme participants.  Defendant paid other scheme participants.  In her role as manager/supervisor, defendant gave final approval to requests sought by other scheme participants. Defendant's own words establish her role in her scheme, when defendant told the UC agent: "**I'm in charge**" of the U.S. half of the scheme.  And other scheme participants recognized her role when addressing defendant with the supervisory title: "**Manager Li**."  She also personally participated in most facets of the scheme, from directing customers to fly from China to Hawaii (instead of directly to LAX), to coaching customers on how to lie to U.S. immigration and customs authorities, advising a customer to alter travel documents to trick customs, and herself transferring funds to trick the U.S. into issuing a visa extension for one of her customers.  She made,

controlled, and owned (with her husband Yan) the lion's share of the fraudulent proceeds, and she directed the other participants involved in the scheme.  And, that involved millions and millions of dollars, and hundreds of fraudulent documents.

Defendant's actions are quite egregious, and quite candidly, in the opinion of the undersigned, they are shameful.  Put aside an international scheme involving filing hundreds of fraudulent visa applications.  Put aside defendant's employees in China who were coaching customers to lie during their visa interview at the U.S. consulate in China.  Put aside that defendant coached customers to bypass immigration controls by flying from China to Hawaii and then to LAX (instead of LAX directly) and she personally coached customers how to trick U.S. Customs at the ports of entry, defendant also gave specific instructions and directed one of her customers to alter travel itineraries.  In fact, when doing so, defendant told that customer:

**These foreigners, they won't look at whether yours are real or fake.**

That statement demonstrates a level of criminal sophistication by defendant.  She was sufficiently astute to comprehend that it would be difficult for U.S. immigration officers to be able to verify the legitimacy of Chinese bank account documents, and she used that understanding as a sword to chop up the U.S. immigration system.  But defendant went even further – she herself transferred approximately $96,000 from her account into a customer's bank account, so that that customer could then use a bank statement from that bank account as proof that the customer had adequate funds to justify a visa extension.  Then, defendant coordinated that customer's visa

1    extension application to be filed with that and other false

2    statements, to further the scheme and again trick U.S. authorities

3    into issuing a visa extension for that birth tourism customer.

4         Even when previously coaching that customer to slip through U.S.

5    customs at the port of entry, defendant exhibited her sophisticated

6    criminal mind.  Defendant instructed that customer:

7              The main thing is that look and see if you look

8              obvious [pregnant]; can they see it?  First thing is

9              not let them see it.  Second thing is don't deny it if

10             they can see it and just say that you're still here

11             for vacation and just show them the return flight

12             ticket.  Mainly, it's going to be depending on the

13             immigration officer, that is … No not an immigration

14             officer…it depends on the Customs officer

15             . . .

16             Of course, there aren't many who were sent back on the

17             same flight.  Some were denied..only got a few days,

18             some only got a week.

19   That short voicemail tells us a lot about defendant and her true role

20   in the scheme.  It shows that defendant is not simply some apartment

21   manager who is providing housing for customers, as the defense wishes

22   to portray her.  Defendant's words in the above voicemail exemplify

23   that defendant is quite cunning – she first directs the customer to

24   try to hide her pregnancy.  But defendant's sufficiently

25   knowledgeable that that ruse may not work.  So, defendant planned for

26   that contingency by instructing the customer that if U.S. immigration

27   did discover her pregnancy, for that customer to not deny being

28   pregnant.  Instead, defendant directed the customer to lie to the

officer and say she is just in the U.S. "for vacation" and to show
the return flight ticket (which defendant had earlier instructed that
customer to fabricate).   Further, defendant's words in the above
voicemail demonstrate that defendant is very cognizant of U.S.
immigration controls; she corrects herself as to the proper agency –
U.S. Customs versus immigration.   Last, defendant's words in the
above voicemail also show that defendant is well aware that many
birth tourism customers were slipping by U.S. Customs, but that some
were being caught and "sent back."

Further, in addition to texting to her husband Yan that she knew
that their fraudulent scheme was illegal, defendant attempted to
conceal her involvement in the scheme by using nominees.   That also
demonstrates a level of criminal sophistication.   For example,
defendant fraudulently used her mother's identity to rent apartments
in her mother's name to use in the scheme, as well as opened and used
bank accounts in her mother's name to receive payments and pay
expenses to further the scheme's operation.

The increasing size of defendant's fraud definitely shows how
greedy defendant really was, as well as the success her involvement
in the scheme created, *i.e.*, when she and Yan joined the conspiracy
with Chen in September 2013, Chen appears not to have had a lot of
customers.   One has to ask – had federal agents not executed the
search warrants in March 2015 and shuttered defendant's huge
operation, how many more hundreds of false visa applications would
have been filed in China, how many more hundreds of U.S. visas
procured by fraud would have been used to fraudulently enter the
U.S., and how many more millions of dollars would defendant and her
conspirators have made from defrauding the United States.

1      Last, **general deterrence** also supports the recommended sentence.
2  This case was one of the largest Chinese birth tourism fraud
3  operations uncovered in the history of the United States, involving
4  multiple millions of dollars and hundreds of customers, and this set
5  of Chinese birth tourism fraud cases was the first ever charged
6  criminally.  Like the U.S. government does with federal income taxes,
7  the U.S. Department of State and federal immigration rely heavily
8  upon the accuracy and truthfulness of the information that aliens
9  provide to them, because it is impossible to check every submission
10 for accuracy (particularly involving Communist countries).  Countless
11 investigative resources were expended to uncover and dismantle
12 defendant's large scale immigration fraud, which was widely
13 publicized in Southern California, nationally, and internationally,
14 including in Chinese press.  A sizable sentence is further justified
15 to deter others – both domestically and internationally – from also
16 attempting to defraud U.S. immigration in this manner.  For example,
17 as charged in the Indictment against defendant and noted in the
18 government's filings addressing defendant's multiple challenges to
19 her detention, one of the material witnesses who had fled in
20 violation of Court Order scoffed at the ability of the United States
21 criminal system to ever hold him accountable:

22          **"Anyway, I'm already home.  U.S. can't do**
23          **anything to me."**
24 Thus, for general deterrence, Chinese foreign nationals like
25 defendant need to know that if they engage in large scale immigration
26 fraud against the U.S. government, U.S. authorities will prosecute
27 them, and once convicted, they will be sentenced to a sizable term of
28 federal prison, regardless of how wealthy they are in China.  The

U.S. can and does do something about international immigration fraud.

In conclusion, the egregious nature of defendant's fraud, the size of her million-dollar international immigration fraud scheme, her aggravating role, the number of customers, and general deterrence all mandate the reasonable Guidelines prison sentence recommended by the government.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sustain the government's factual and legal objections to the PSR, and sentence defendant to 33 months of imprisonment and three years of supervised release.