UNDER SEAL

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>18880 Douglas, Unit 123<br>Irvine, California 92612 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  SA15- 88M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____Central_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB 2 7 2015

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Sections 371 and 1546; Title 26, U.S.C., Sections 7201, 7203, and 7206; and Title 31, U.S.C., Sections 5314 and 5322(a) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

JEFFREY EASTMAN, Special Agent - HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: FEB 27 2015

**DOUGLAS F. McCORMICK**
*Judge's signature*

City and state: Santa Ana, CA

HON. DOUGLAS F. McCORMICK, U.S. Magistrate Judge
*Printed name and title*

AUSA: C. Pell and S. Leal

## Table of Contents

I.    INTRODUCTION ...................................................... 1

II.   PURPOSE OF AFFIDAVIT ............................................. 1

III.  STATEMENT OF PROBABLE CAUSE ..................................... 4

    A.    Summary of Investigation .................................. 4

    B.    Overview of B-2 Nonimmigrant Visa ("Tourist
          Visa") and Arrival/Inspection/Admission to the
          United States ............................................. 7

    C.    Background on visa fraud involving pregnant
          Chinese nationals ....................................... 11

    D.    Background Information regarding marriage-based
          nonimmigrant visas ...................................... 15

    E.    Training and Experience in Investigations
          involving documents written in foreign languages. ....... 16

    F.    Anonymous Tip Letter Received by Irvine Police
          Department ............................................... 17

    G.    Business Records from the California Secretary of
          State ................................................... 20

    H.    Examples of pregnant Chinese nationals tied to
          CHEN and LI's visa fraud scheme ......................... 20

          1.    June 6, 2014: pregnant Chinese national
                intercepted at LAX en route to CHEN admits
                that visa was fraudulent. ....................... 20

          2.    February 2014: foreign national couple
                travels from China to Douglas Apartment
                Complex to give birth, writing two checks to
                CHEN that total $25,000. ........................ 24

          3.    September 2014: Chinese couple provides
                false information on visa and travels from
                China to Douglas Apartment Complex to give
                birth in the United States. ..................... 26

    I.    Internet advertisements with CHEN'S cell phone
          number .................................................. 28

    J.    UNDERCOVER OPERATION ON CHEN AND HIS EMPLOYEES IN
          CHINA ................................................... 32

          1.    Overview of international undercover
                operation. ...................................... 32

i

2.  June 26, 2014: undercover call and in-person meeting with CHEN ................................. 32

3.  September 18, 2014: undercover call and in-person meeting with CHEN .......................... 37

4.  HSI undercover agent pretending to be pregnant Chinese national contacts CHEN's staff in China about obtaining a U.S. visa so that she can come to the United States to give birth. ........................................ 41

5.  CHEN's trainer in China uploads a fraudulent visa application on behalf of the HSI undercover agent. ................................. 50

6.  CHEN threatens to "cancel" the visa if the undercover agent does not pay $8,000 more. ......... 53

K.  January 2015: LI takes over the day-to-day operations of the scheme at the Douglas Apartment Complex ................................................ 55

L.  January 28, 2015: HSI agents review  trash from LI's residence in Irvine, CA (SUBJECT PREMISES #13) ................................................. 65

M.  Additional Surveillance ................................. 66

1.  February 4, 2015: Surveillance at Douglas Apartment Complex ................................. 66

2.  February 13, 2015: Surveillance of LI .............. 66

3.  January and February 2015: surveillance of 2850 Kelvin Avenue, Irvine, California ("Kelvin apartments") ............................. 67

N.  Internet-Based Websites/Advertisements/Blogs Re: LI's Operation ......................................... 67

O.  February 23, 2015: Undercover call to LI verifies that LI continues to operate the visa fraud scheme, including from her residence in Irvine, CA (SUBJECT PREMISES #13). ............................. 73

P.  January 2015: CHEN and ZHU move their residence from the Douglas Apartment Complex to 28601 Los Alisos, Apt. 1088, Mission Viejo, CA (SUBJECT PREMISES #14) .......................................... 74

Q.  There is probable cause to believe that CHEN and ZHU have committed marriage fraud. ..................... 75

R.   CHEN's bank records ...................................... 81

S.   CHEN failed to report hundreds of thousands of dollars in income on his 2013 federal tax return. ....... 84

T.   CHEN failed to report his foreign bank accounts to the IRS. ........................................... 88

U.   Even though LI received hundreds of thousands of dollars in income in 2013, LI has never filed a federal income tax return. ............................ 90

V.   LI failed to report foreign bank accounts to the IRS. ................................................... 94

W.   Cash deposits by CHEN and ZHU .......................... 95

X.   Use of cash to further fraudulent activities ........... 96

Y.   CHEN's and LI's visa fraud customers fail to pay the actual amount charged by the hospitals, instead either paying nothing or paying greatly reduced amounts designed for low income individuals who do not have insurance. ................. 96

IV.  CONCLUSION ................................................. 98

## Index

| | PREMISE | PAGES |
|---|---|---|
| A-1 | 18880 Douglas, Unit 123, Irvine, California 92612 | 2, 3, 25, 26, 56, 57, 61, 66, 83, 84, 97, 100 |
| A-2 | 18880 Douglas, Unit 125, Irvine, California 92612 | 2, 3, 36, 37, 56, 57, 61, 62, 66, 83, 84, 100 |
| A-3 | 18880 Douglas, Unit 206, Irvine, California 92612 | 2, 3, 56, 62, 100 |
| A-4 | 18880 Douglas, Unit 223, Irvine, California 92612 | 2, 3, 56, 57, 62, 83, 84, 100 |
| A-5 | 18880 Douglas, Unit 225, Irvine, California 92612 | 2, 3, 57, 62, 83, 84, 100 |
| A-6 | 18880 Douglas, Unit 311, Irvine, California 92612 | 2, 3, 56, 63, 66, 100 |
| A-7 | 18880 Douglas, Unit 315, Irvine, California 92612 | 2, 3, 20, 27, 40, 56, 63, 67, 85, 100 |
| A-8 | 18880 Douglas, Unit 318, Irvine, California 92612 | 2, 3, 56, 64, 100 |
| A-9 | 18880 Douglas, Unit 325, Irvine, California 92612 | 2, 3, 56, 57, 64, 83, 100 |
| A-10 | 18880 Douglas, Unit 403, Irvine, California 92612 | 2, 3, 26, 56, 64, 83, 100 |
| A-11 | 18880 Douglas, Unit 416, Irvine, California 92612 | 2, 3, 56, 60, 64, 83, 100 |
| A-12 | 18880 Douglas, Unit 417, Irvine, California 92612 | 2, 3, 33, 56, 60, 65, 100 |
| A-13 | 78 Harrison, Irvine, California 92618 | 2, 3, 56, 57, 59, 65, 66, 73, 90, 91, 100 |
| A-14 | 28601 Los Alisos Boulevard, Apt. 1088, Mission Viejo, California 92692 | 2, 3, 67, 74, 75, 80, 100, 101 |

## **AFFIDAVIT**

I, Jeffrey Eastman, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I have been employed as a Special Agent ("SA") for Homeland Security Investigations ("HSI") and its predecessor agencies since November 2001.  For approximately four years prior to my employment with HSI, I was a SA with the U.S. State Department, Diplomatic Security Service ("DSS").  I have investigated white-collar crimes since 2001.  I am currently assigned to the Orange County Office of HSI and work on fraud and financial investigations, and other violations of law enforced by HSI, including money laundering and fraud offenses. I have successfully completed U.S. Customs Services ("USCS") Basic Enforcement School at the Federal Law Enforcement Training Center, Glynco, Georgia.  In addition, I have participated in advanced training through USCS in financial investigations, asset forfeiture, and smuggling.  I have participated in detaining and executing numerous search warrants and the civil seizure of bank accounts, currency, vehicles, and real properties based on money laundering and structuring offenses.

### II.   **PURPOSE OF AFFIDAVIT**

2.   The locations to be searched are:

a.   Units 123, 125, 206, 223, 225, 311, 315, 318, 325, 403, 416, and 417, within an apartment building

1

located at 18880 Douglas, Irvine, California 92612 ("the
Douglas Apartment Complex"), which locations are more fully
described in Attachments A-1 through A-12, respectively:

       i.    SUBJECT PREMISES #1 (Unit #123);

      ii.   SUBJECT PREMISES #2 (Unit #125);

    iii. SUBJECT PREMISES #3 (Unit #206);

      iv.   SUBJECT PREMISES #4 (Unit #223);

       v.    SUBJECT PREMISES #5 (Unit #225);

      vi.   SUBJECT PREMISES #6 (Unit #311);

    vii. SUBJECT PREMISES #7 (Unit #315);

  viii. SUBJECT PREMISES #8 (Unit #318);

      ix.   SUBJECT PREMISES #9 (Unit #325);

       x.    SUBJECT PREMISES #10 (Unit #403);

      xi.   SUBJECT PREMISES #11 (Unit #416); and

    xii. SUBJECT PREMISES #12 (Unit #417);

    b.   78 Harrison, Irvine, California 92618
(SUBJECT PREMISES #13), described more fully in Attachment
A-13; and

    c.   28601 Los Alisos Boulevard, Apt. 1088,
Mission Viejo, California 92692 (SUBJECT PREMISES #14),
described more fully in Attachment A-14; and

    3.   This affidavit is made in support of an
application for search warrants based on violations of Title 8,
United States Code, Section 1325(c); Title 18, United States
Code, Sections 371 and 1546; Title 26, United States Code,
Sections 7201, 7203, and 7206; and Title 31, United States Code,
Sections 5314 and 5322(a), which criminalize, respectively,

marriage fraud, conspiracy, fraud and misuse of visas, permits, and other documents, tax evasion, failure to file a tax return, false tax return, and willful failure to file report of foreign bank and financial accounts ("FBAR").

4.      Based on my training and experience, and the facts set forth in this affidavit, I believe the locations described in Attachments A-1 through A-11 are where evidence, contraband, fruits, or instrumentalities of conspiracy; fraud and misuse of visas, permits, and other documents; tax evasion, failure to file a tax return, false tax return; and willful failure to file report of foreign bank and financial accounts, as specified further in Attachment B, will be found.

5.      Based on my training and experience, and the facts set forth in this affidavit, I believe the locations described in Attachments A-12 and A-13 are where evidence, contraband, fruits, or instrumentalities of conspiracy; fraud and misuse of visas, permits, and other documents; tax evasion, failure to file a tax return, false tax return; and willful failure to file report of foreign bank and financial accounts, as specified further in Attachment C, will be found.

6.      Based on my training and experience, and the facts set forth in this affidavit, I believe the location described in Attachment A-14 is where evidence, contraband, fruits, or instrumentalities of marriage fraud; conspiracy; fraud and misuse of visas, permits, and other documents; tax evasion, failure to file a tax return, false tax return; and

willful failure to file report of foreign bank and financial accounts,, as specified further in Attachment D, will be found.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

A.    <u>Summary of Investigation</u>

8.    The United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and the United States Department of the Treasury, Internal Revenue Service ("IRS"), are conducting a criminal investigation of Chao CHEN ("CHEN"), Jie ZHU ("ZHU"), and Dong LI ("LI"), related to visa fraud, marriage fraud, and tax fraud, surrounding the operation of a so-called "Chinese birthing house" in apartments located within Orange County, California.

9.    <u>Visa Fraud</u>: CHEN and LI operate a multinational business based in Orange County, California, that commits visa fraud by bringing pregnant Chinese foreign nationals to the United States for the sole purpose of giving birth in the United States to obtain U.S. citizenship, while misrepresenting the

true intention of their visit to the United States.  CHEN and
LI's business is advertised on the internet, including the
business' website www.yyusa.com.  CHEN and LI's business offers
the following services to pregnant Chinese nationals:
(1) fraudulently obtaining nonimmigrant visitor visas to enter
the United States; (2) housing in apartments in Orange County
for a period of approximately three months or the duration of
the pregnancy and postnatal care; (3) transportation for
restaurants, shopping, and recreation; (4) transportation for
prenatal visits and hospitals; and (5) obtaining birth
certificates, United States passports, and Social Security card
for children born in the United States.  CHEN and LI charge fees
ranging from $40,000 to $80,000 for these services.

10.  **Marriage Fraud**: CHEN and ZHU, who are both
citizens of China, committed marriage fraud by each entering
into sham marriages with United States citizens to obtain lawful
permanent resident status ("green cards") for themselves.
Specifically, CHEN and ZHU, who were married to each other,
claimed to have divorced in July 2012.  A few months later in
Las Vegas, each married United States citizens who then filed
petitions for lawful status in the United States on behalf of
CHEN and ZHU.  CHEN and ZHU continued to live together as
husband and wife, while CHEN wired money on at least 16
occasions to ZHU's purported United States citizen spouse,
totaling over $10,000.

11.  **Tax Fraud**: CHEN and LI earn hundreds of thousands
of dollars in income from their visa fraud scheme, which they

failed to report to the IRS, either by a filing false tax return (CHEN), or not filing any tax return (LI).

12. **Failure to report foreign bank accounts**: In 2013 and 2014, CHEN and LI received hundreds of thousands of dollars in wire transfers from China.  For example, in 2013, CHEN received more than $500,000 in wire transfers from bank accounts in China, and LI received more than $1,500,000 in wire transfers from bank accounts in China.  Neither CHEN nor LI has ever reported to IRS the existence of their foreign bank accounts, even though federal law requires such reporting by June 30 every year.

13. **Defrauding hospitals**: Customers of CHEN and LI's visa fraud scheme have the ability to (and do) pay approximately $50,000 to CHEN and LI for their service.  However, these customers do not pay the full costs incurred and/or billed by the local hospitals for performing the births, which often exceed $25,000 per birth.  In most cases, CHEN and LI's customers either fail to pay anything or pay a greatly-reduced amount designed for indigent or low income patients lacking insurance, which is often only approximately $4,000 per birth. During the approximately two years from January 2013 to present, more than 400 children linked to CHEN and LI's visa fraud scheme were born at just one of the local Orange County hospitals used by CHEN and LI's customers.

**B.   Overview of B-2 Nonimmigrant Visa ("Tourist Visa") and Arrival/Inspection/Admission to the United States**

14.   Generally, a citizen of a foreign country who wishes to enter the United States must first obtain a visa, either a nonimmigrant visa for temporary stay, or an immigrant visa for permanent residence.   Visitor visas are nonimmigrant visas for persons who want to enter the United States temporarily for business (visa category B-1), tourism, pleasure or visiting (visa category B-2), or a combination of both purposes (B-1/B-2).

15.   In order to apply for a tourist visa, an applicant must complete and submit a Form DS-160, Nonimmigrant Visa Application, and schedule an appointment for a visa interview. Generally, the visa interview takes place at the U.S. Embassy or Consulate in the country where the applicant resides.

16.   Based on my training and experience, I know that visas are a privilege, not a right.   In order to be granted a non-immigrant visa, applicants must overcome the presumption in Section 214b of the Immigration and Nationality Act ("INA") that all visa applicants are intending immigrants.   Generally, an applicant can overcome this presumption by providing evidence that he/she has strong ties to a residence abroad (e.g., employment, assets, or family ties) that he/she has no intention of abandoning.

17.   Additional documentation may be required or requested to establish whether an applicant is qualified.   For example, additional requested documents may include evidence of:

7

a.   the purpose of the applicant's trip;

b.   the applicant's intent to depart the United States after his/her trip; and/or

c.   the applicant's ability to pay all costs of the trip.

18.   Generally, an applicant will be required to provide evidence of employment and/or family ties in order to support the purpose of the applicant's trip and the applicant's intent to return to his/her home country.

19.   In order to be granted a nonimmigrant visa, an applicant must also establish that, at the time of application for a visa and application for admission, that he/she is not likely to become a "public charge." (See INA §§ 212(a)(4)(A), (B)).   In determining whether an alien is inadmissible as a "public charge," the consular officer considers the alien's age, health, family status, assets, resources, financial status, and education.

20.   Based on my training and experience, I know that medical services in the United States are rather expensive when compared to other countries.   As explained above, United States laws prohibits the issuance of a nonimmigrant visa to anyone who is likely to become a "public charge," including individuals who might require medical care at the expense of federal, state, or local government agencies in the United States.   In order to qualify for a nonimmigrant visa to seek medical care in the United States, an applicant will generally need to present certain information during the interview at the Consulate to

8

show that he/she will not be treated at the expense of a governmental entity in the United States.  The applicant will also need to show that he or she is otherwise eligible for the visa.

        a.    The Customs and Border Protection ("CBP") website in relevant part provides that for visitors to the United States who are pregnant: "When determining if you will be allowed to enter the U.S., CBP Officers take into consideration the date your child is due for delivery and the length of time you intend to stay in the U.S. In addition, they want evidence that you have sufficient medical insurance to cover any medical necessities while you are in the U.S. and that you intend to return home. If it is determined that you do not have sufficient medical insurance to cover any unexpected or expected medical care while in the U.S., you can be denied entry."

        21.  In order to establish eligibility for a nonimmigrant visa where an applicant intends to seek medical treatment in the United States, an applicant may be required to provide evidence of:

        a.    commitment by the applicant or a family member to pay for the treatment, as well as the ability to pay for the treatment;

        b.    sufficient income and/or other financial resources to enable the applicant or sponsor to pay for the treatment;

c.    a show of significant resources, controlled by the applicant, which are sufficient for use in meeting expenses,

d.    a letter from the treating institution, indicating that all expenses of treatment in the United States will be covered by the institution itself; and

e.    the financial evidence presented should also cover living arrangements for any accompanying family members (where will they stay, for how long, at what cost, and who will pay).

22.   In order to travel to the United States on a nonimmigrant visa, a foreign national will be subject to arrival inspections by CBP and either be admitted or denied entry into the United States.  Although there are no specific regulations prohibiting pregnant foreign nationals from entering the United States, entry is allowed or denied at the discretion of the admitting CBP officer. If the CBP officer determines that a foreign national is likely to become a ward of the government or "public charge" (meaning that the government must provide medical care because the foreign national does not have medical coverage), the foreign national can be denied entry.  When determining if a foreign national will be allowed to enter the United States, CBP officers take into consideration the following:

a.    the date a foreign national's child is due for delivery;

10

b.    the length of time a foreign national intends to stay in the United States;

c.    whether the foreign national has sufficient medical insurance to cover any medical necessities while in the United States including any unexpected or expected medical care;

d.    whether the foreign national has sufficient financial resources to fund the foreign national's purpose of stay in the United States; and

e.    whether he/she intends to return to the country of origin.

23.   In evaluating whether a foreign national is eligible for admission to the United States on a visa that has been issued, CBP will consider a variety of factors, including the truthfulness of the applicant's statements at time of admission as well as the statements provided in the visa application and entry documentation (i.e., CBP Form 6059B: Customs Declaration Form).  If it is determined that a foreign national does not have sufficient medical insurance or financial ability to cover any unexpected or expected medical care while in the United States, that applicant can be denied entry into the United States.

C.    **Background on visa fraud involving pregnant Chinese nationals**

24.   Based on my training, experience, and participation in this investigation, I am aware of a common

11

scheme in which businesses based in the United States and China solicit the business of pregnant Chinese foreign nationals who wish to come to the United States to give birth. This type of business is generally referred to in the Chinese community as a "confinement center" and in the American media as "birthing houses" or "maternity hotels."

25. For the past several years, thousands of pregnant women from China have been traveling to the United States using temporary visitor visas for the sole purpose of giving birth in the United States so that their children will enjoy the benefits of natural-born American citizens. According to a recent *CNN-Money* article entitled "Why Chinese Moms want American babies," a "booming birth tourism industry has sprouted from coast to coast to cater to growing interest -- in 2012, about 10,000 Chinese women gave birth in the U.S., more than double the 4,200 in 2008, according to Chinese state media."[1] A 2015 law review article noted that one source "estimates that, of the more than 300,000 children born to foreign citizens in the United States every year, 40,000 are to birth tourists—foreign individuals legally in the United States with a travel visa."[2] The reasons for wanting to have birth in the United States include:

---

[1] Yan, Sophia, "Why Chinese Moms want American babies," CNN Money (Feb. 8, 2015), *available at* http://money.cnn.com/2015/02/08/news/china-birth-tourism/index.html (hereinafter "CNN-Money").

[2] Grant, Tyler, "Made in America: Medical Tourism and Birth Tourism Leading to a Larger Base of Transient Citizenship," 22 VA. J. SOC. POL. & LAW 159 (2015).

- "Many of the families want an American kid because a foreign passport could be the family's ticket out of China if they grow weary of pollution or food safety scares;"[3]

- United States "superior education resources" and "clean environment;"[4]

-  United States "free public schools and low-interest loans;"[5] and

- "The whole family may eventually get in on the act, since parents may be able to piggyback on the child's citizenship and apply for a green card when the child turns 21."[6]

In most cases, those coming to the United States from China to give birth are wealthy: "[t]he desire to leave China is especially pronounced among the wealthy. Almost two-thirds of Chinese with more than 10 million yuan ($1.6 million) in the bank have emigrated, or are planning to, according to a *Hurun* report released last year."[7]  Moreover, according to a recent *New York Times* article entitled "Wary of Future, Professionals Leave China in Record Numbers," middle-class Chinese "don't feel

---

[3] CNN-Money.

[4] Lu, Rachel, "Look Who's Walking: Chinese Birth Tourism Goes Stateside," Foreign Policy (April 25, 2014), *available at* http://foreignpolicy.com/2014/04/25/look-whos-walking-chinese-birth-tourism-goes-stateside/.

[5] Chang, Cindy, "In suburbs of L.A., a cottage industry of birth tourism – Companies operating 'maternity hotels' cater to pregnant women from Chinese-speaking nations who want an American-citizen newborn," LA Times (Jan. 3, 2013), *available at* http://articles.latimes.com/2013/jan/03/local/la-me-birthing-centers-20130104  (hereinafter "LA Times").

[6] LA Times.

[7] CNN-Money.

secure for their future and especially for their children's future" because "[t]hey don't think the political situation is stable."[8]   Perpetrators of visa fraud schemes typically charge $40,000 to $60,000, which is a fee able to be paid by the wealthy in China.

26.   Based on my training, experience, and participation in this investigation, the scheme begins in China where the pregnant foreign national is assisted in obtaining a nonimmigrant visa for pleasure ("tourist visa") by misrepresenting their true intentions for travelling to the United States.   Generally, the foreign nationals will be assisted by the "birthing house operators" or associated "travel agencies" in China in filing a nonimmigrant visa application indicating their intention to travel to the United States for a short vacation period to a tourist attraction in the United States.   However, in truth and fact, the foreign national has prepaid to travel and reside in a "birthing house" for three to four months in order to give birth to a United States citizen child (based on birth on United States soil).

27.   Based on my training, experience, and participation in this investigation, birthing houses will generally advise foreign national clients to fly to tourism points of entry such as Hawaii or Las Vegas and to avoid travelling directly to Los Angeles International Airport

---

[8] Johnson, Ian, "Wary of Future, Professionals Leave China in Record Numbers," N.Y. Times (Oct. 31, 2012), *available at* http://www.nytimes.com/2012/11/01/world/asia/wary-of-future-many-professionals-leave-china.html

("LAX").  This advice is due to heightened scrutiny by CBP officials at LAX based on the volume of fraudulent visas and false statements in entry documents that CBP officials have experienced over the last decade related to birth tourism.

28.  Based on my participation in this investigation, I have reviewed numerous advertisements for "birthing houses" on the internet or in newspapers describing the benefits of having a child born in the United States including a United States passport and social security for the United States citizen child, access to United States educational institutions, health care, and the ability to assist parents and family members to immigrate to the United States.

29.  Based on my training, experience, and participation in this investigation, I know that "birthing houses" also provide pregnant foreign nationals with housing, transportation, and medical care/child birth arrangements for the duration of their stay in the United States.  Based on my training, experience, and participation in this investigation, I know that "birthing houses" provide contracts for their services.  These "birthing houses" businesses operate for profit and typically charge between $15,000 to $50,000 per person depending on the type of packages selected.

D.    **Background Information regarding marriage-based nonimmigrant visas**

30.  Based upon my training, experience, and conversations with other law enforcement officers that investigate immigration fraud, I am aware of the following:

15

a.   Foreign nationals who enter the United States pursuant to nonimmigrant visas and subsequently marry United States citizens, may seek conditional and permanent residency in the United States despite entering the United States on a nonimmigrant visa.  Section 245 of the Immigration and Nationality Act provides that a nonimmigrant may adjust to the status of permanent resident while physically present in the United States.  This relieves the foreign national/beneficiary from the requirement of leaving the United States and re-entering as an immigrant.

b.   In order to obtain an immigrant visa based on a relationship with a United States citizen spouse, the United States citizen spouse (petitioner) must file a Petition for Alien Relative ("Form I-130") with the United States Citizenship and Immigration Services ("USCIS").  The Form I-130 establishes the relationship between the United States citizen spouse and the alien spouse.

E.   **Training and Experience in Investigations involving documents written in foreign languages.**

31.   I have conducted and participated in, and discussed with other agents who have conducted, investigations involving individuals who spoke a language other than English, including Spanish, Armenian, and Chinese.

32.   Based on such experience, I know that often, documents are written in the foreign language, and that when

searches are conducted of locations involved in such investigations, it is difficult for the searching agents (who generally read only English) to determine whether a particular document is covered by the items to be seized from the search warrant.

33.  Thus, additional time is usually needed after seizing all the documents written in the foreign language so that a qualified individual who can read the foreign language can determine whether the foreign language documents are covered by the terms of the search warrant.

**F.    Anonymous Tip Letter Received by Irvine Police Department**

34.  On June 4, 2014, I was contacted by the Irvine Police Department ("IPD") regarding an anonymous letter they had received concerning CHEN.  The letter provided, in part, the following information: (a) CHEN and his wife, ZHU, were engaged in sham marriages to other individuals and were actually living together at the Douglas Apartment Complex; (b) CHEN was operating a "mother group" in the Douglas Apartment Complex utilizing approximately ten units within that apartment complex; (c) Pregnant foreign nationals paid CHEN between $36,745 and $52,721 to enter the United States as tourists, reside in his units, and give birth to children in the United States; (d) CHEN did not pay any taxes related to this business operation; and (e) the pregnant foreign nationals did not have any medical insurance.

35.    Based on the above-mentioned tip, I conducted further queries of CHEN and learned that in or around February 2014, a detailed anonymous letter was also received by the USCIS in Washington, D.C., and forwarded to the USCIS Offices located in Laguna Niguel, California.  This letter provided the following identifying information regarding CHEN: (a) California driver's license number XXX95609; (b) alien registration number XXX-696-242; and (c) three vehicles associated with CHEN – a Dodge Caravan bearing CA license plate number 6YNX772, a BMW bearing CA license plate number 5NQA667, and an Audi bearing CA license plate number 6XXU464.  I confirmed that these identifiers did pertain to CHEN.

36.    The letter received by USCIS and additional tip letters received by USCIS furnished greater detail into the alleged visa and marriage fraud schemes.  According to the tip letters, CHEN was introduced to E.C., a United States citizen, through a marriage agency in exchange for cash.  The purpose of the marriage was for CHEN to obtain lawful permanent residency in the United States ("a green card").  The letters also indicated that CHEN was a "ringleader" who has been arranging for additional fraudulent marriages in exchange for cash, marrying mostly Chinese foreign nationals to United States citizens in order to fraudulently obtain green cards for the Chinese foreign nationals based on their sham marriages to United States citizens.  Additionally, the letters indicated that the Douglas Apartment Complex was used as the residence in

which the petitioners and beneficiaries were residing and receiving mail.

37.   Regarding the visa fraud scheme, the tip letters detailed allegations that CHEN and his business partner Dong Yuan LI harbor pregnant Chinese nationals at various locations in Irvine, California.  The letters indicated that, in order to care for their pregnant clientele, CHEN and LI hire "illegal workers" to serve as cooks, drivers, and baby sitters.  The letters indicated that the most recent location used by CHEN and LI was the Douglas Apartment Complex, where CHEN and LI had over twenty units.  The letters also indicated that CHEN previously used the following Irvine, California, addresses to house pregnant foreign nationals: 107 San Marino, Irvine; 204 Santa Maria, Irvine and 401-405 Rockefeller, Irvine.

38.   The tip letters also described the services provided by CHEN and LI's business operation.  According to the tip letters, CHEN and LI bring pregnant Chinese national into the United States, house the pregnant Chinese nationals in various apartments in the Orange County area, provide food and transportation, and assist in the obtaining United States passports for the children born in the United States.  Such services are provided by CHEN and LI for a fee that is paid in cash in China in order to avoid paying state and federal taxes in the United States.

**G.   Business Records from the California Secretary of State**

39.   On or about January 22, 2015, I conducted a search of the records maintained with the California Secretary of State for any corporations/entities affiliated with CHEN. From this search, I discovered that CHEN was associated with three businesses: (1) You Win USA Vacation Services Corporation, filed on August 25, 2014, with listed address of 18880 Douglas, Unit 315, Irvine, CA; (2) California Lotuscare Surrogacy LLC, filed October 22, 2014, with listed address of 18880 Douglas, Unit 315, Irvine, CA; and (3) USA Angel 8 Vacation Services Ltd., dated January 1, 2013, with listed address of 2 Angell Street, Irvine, CA (this listing indicates that the corporation is "dissolved").

**H.   Examples of pregnant Chinese nationals tied to CHEN and LI's visa fraud scheme**

**1.   June 6, 2014: pregnant Chinese national intercepted at LAX en route to CHEN admits that visa was fraudulent.**

40.   In or around August 2014, I conducted a query of the TECS database.  TECS is a database that tracks various individuals, businesses, vehicles, aircrafts, or vessels at land-border crossings along the Canadian and Mexican borders, and at sea and air ports of entry.  I located a record for an individual named Miaoxiang Gao ("Gao").  Gao had been interviewed by CBP officers at LAX on June 6, 2014, after GAO had arrived via China Southern Airlines.  I contacted CBP Officer Lee, who had interviewed Gao on that date and received a

copy of a Record of Sworn Statement (Form I-867A) from CBP.  I reviewed that Form I-867A and learned the following:

        a.   CBP Officer Lee identified herself as a CBP Officer, introducing herself in Gao's native language, Mandarin. CBP Officer Lee asked Gao if she had any health concerns, to which Gao replied that she was pregnant but was not taking any medications.  CBP Officer Lee asked Gao if she was willing to make a statement freely and voluntarily to which Gao replied affirmatively.  CBP Officer Lee asked Gao if she presented a valid B2 nonimmigrant visa at LAX, to which Gao replied "yes."

        b.   CBP Officer Lee asked Gao what she had told the CBP primary officer was the purpose of her (Gao) trip.  Gao stated that she had misunderstood the primary officer's questions and that she had mistakenly stated she owned a house in the United States.  Gao stated that the address she provided to CBP in the arrival form was provided to her by the operator of the maternity center.  Gao stated that the purpose of her trip to the United States was to give birth to her second child. Gao stated that she planned to stay three months and that her husband would come over when it was time for delivery.

        c.   CBP Officer Lee asked Gao for her intended address in the United States.  Gao replied that she was traveling to 18880 Douglas, Irvine, California (the Douglas Apartment Complex) and that address had been provided to her by Edwin CHEN, the operator of the maternity center.  Gao provided 818-635-6668 as the phone number for CHEN and stated the name of the maternity center was "YY USA."  Gao stated that CHEN's

Chinese name was "Chao CHEN" and that CHEN came from Hangzhou, China.  Gao stated that she would be able to positively identify CHEN'S photograph.  CBP Officer Lee obtained a photograph of CHEN from the USVISIT database and showed it to Gao.  When asked if she recognized said photo, Gao stated: "Yes, this is CHEN Chao also known as Edwin Chen."

        d.   Gao stated that she had met CHEN via "WeChat," and that CHEN had sent her a picture of himself.  (I know from my conversations with other law enforcement officers that WeChat is an online social room used by many in China.)  Gao stated that she had no idea if the Douglas address was a commercial address or a residence, because everything was arranged by CHEN and the maternity center.  Gao stated she paid the maternity center about 240,000 Yuan (approximately $40,000).  Gao explained that for the fee she was provided a visa, airport pickup, drivers for doctors' appointments and three months of room and board, as well as three daily meals at the maternity center.  Gao said she had discovered CHEN from online research.  Gao stated that CHEN said he would be picking her up at the airport that day.

        e.   CBP Officer Lee asked Gao if she was pregnant when she received her United States tourist visa in Guangzhou, China.  Gao stated that she was three months pregnant when she applied for the tourist visa.  GAO stated that the reason why she failed to tell the consular officer she was pregnant because, "We were afraid if we tell the truth we would be refused a visa.  The maternity center also advised us to say

22

tourism." When asked by CBP Officer Lee if Gao had willfully concealed her true purpose of her visit during the visa process in order to obtain a B1/B2 nonimmigrant visa, Gao replied, "yes."

       f.   During the interview, Gao was permitted to contact her husband by telephone, who she said had received instructions from CHEN the operator of YY USA Maternity Center. Gao also said that her husband stated that CHEN wanted to forward a message to Gao, to request a lawyer and to pretend to have a stomach ache. When CBP Officer Lee asked Gao if she had a stomach ache, Gao replied that she did not. Gao stated that she guessed that CHEN told her husband to instruct her, Gao, to get a lawyer because CHEN thought it would help her be admitted.

       g.   CBP Officer Lee took pictures of Gao's cell phone, which contained text messages from CHEN detailing the above instructions provided to Gao's husband. The sender of said text messages was phone number 818-635-6668, the same number Gao had previously stated was CHEN'S phone number. The text messages were sent in Chinese, which were translated by a Mandarin-speaking CBP Officer. The text messages stated in part: "What is the situation? Still in the little black room? Contact me at once when you see this." CBP Officer Lee also took a photo of Gao's cell phone, which showed a WeChat page for "You Win." Above the name "You Win" logo were two Chinese characters, which loosely translate into English as "Superior Pregnancy." Underneath the words, "You Win" were written the words, "USA VACATION RESORT." On this same screen shot was a

LinkedIn name of "Edwin CHEN" and the following website: www.yyusa.com.  This same "You Win" logo, as detailed below, was later utilized in other WeChat communications with an undercover officer.

41.  In or around August 2014, I received subscriber information from AT&T Mobility for the cellular number (818) 635-6668 and learned that the cellular number was subscribed to CHEN and the billing address was 18880 Douglas, Unit 409, Irvine, CA.  According to said records, CHEN had a "user" address of 18880 Douglas, Unit 209.

42.  During June 2014, I located the LinkedIn page for CHEN that had been referenced on Gao's cell phone.  Depicted on said LinkedIn page was a photograph of an Asian male, who I recognized as CHEN from a review of CHEN's California driver's license.  Under the "Background" section of said page, CHEN listed that he was the CEO of "you win usa vacation services llc" since October 2012.  CHEN's name appeared as "Edwin CHEN" next to his photo, which again stated he was a CEO, in this instance, a CEO of "YOU WIN LLC."

**2.  February 2014: foreign national couple travels from China to Douglas Apartment Complex to give birth, writing two checks to CHEN that total $25,000.**

43.  I reviewed TECS records, which indicated that Hongbao Xu ("H. Xu") and Xiaojing Cao ("Cao") traveled together from Shanghai, China, to LAX on February 10, 2014, aboard a China Eastern Airlines flight.  From these records, I discovered the following:

24

a.   On February 10, 2014, upon entry into the United States, H. Xu was stopped by CBP and declared that he had $16,000 cash on his person.

b.   Approximately three and one-half months later, on May 30, 2014, H. Xu and Cao, and their newborn son S. Xu, departed LAX for Shanghai aboard a China Eastern Airlines flight.  S. Xu's date of birth was listed as being in April 2014. S. Xu was traveling on a United States passport, while H. Xu and Cao were traveling on Chinese passports.

44.   I reviewed Citibank ("Citi") records which indicated that on or about March 21, 2014, H. Xu and Cao opened a Citigold Account at Citi, which included a checking and savings account, ending in 2606.  H. Xu and Cao provided the address of 18880 Douglas, Unit 123, Irvine, California (SUBJECT PREMISES #1 (Unit #123)), to Citi.  Unit 123, as detailed above, has been rented by CHEN at the Douglas Apartment Complex.

45.   On March 27, 2014, the aforementioned account received an international wire transfer from China in the amount of $203,335.74.

46.   According to Citi statements, on April 18, 2014, a debit card purchase was made from that same account to Fountain Valley Regional Medical Hospital (hereinafter "FVH"). This date corresponds very closely to S. Xu's actual date of birth in April 2014.

47.   I reviewed checks written from the aforementioned H. Xu and Cao Citi account.  On May 15, 2014, check number 105 for $15,000 was written on said account and made payable to

25

"Chao Chen" (CHEN).  Furthermore, according to Citi records, on May 27, 2014, check number 108 for $10,000 was written on said account and made payable to "Chao Chen" (CHEN).

48.  I reviewed a Form DS-11, Application for United States Passport, for S. Xu, born in April 2014 to parents H. Xu and Cao.  In this application, H. Xu lists their mailing address as 18880 Douglas, Apt. 123, Irvine, California (SUBJECT PREMISES #1 (Unit #123)), and their contact phone number as 818-635-6668, which was one of CHEN's telephone numbers.

49.  I reviewed the DS-160 nonimmigrant visa application for H. Xu and Cao and discovered the following:

a.   H. Xu and Cao indicated that the purpose of their trip to the United States was "tourism/medical treatment (B2)"; and

b.   H. Xu and Cao indicated that they intended to stay in the United States for 15 days at 333 S Figueroa Street, Los Angeles, CA (the "LA Hotel Downtown").

I reviewed the consular "memo" from Xu and Cao's visa interview at the American Embassy in Shanghai and learned that the officer concluded that the couple was "credible tourists" traveling for leisure in the United States.

3.   **September 2014: Chinese couple provides false information on visa and travels from China to Douglas Apartment Complex to give birth in the United States.**

50.  On September 27, 2014, a child with the last name of Tong was born at FVH.  According to hospital records, the address of record for the child was 18880 Douglas, unit 403, Irvine, CA (SUBJECT PREMISES #10 (Unit #403)).  Tong's DS-11

passport application filed by the child's parents Y. Tong and
Wenyan L. ("Wenyan") lists 18880 Douglas address, but listed
unit 315 (SUBJECT PREMISES #7 (Unit #315)).  The primary contact
phone number provided on the DS-11 was CHEN's cell number.

51.  I reviewed Wenyan's DS-160 visa application,
which was filed on April 22, 2014.  On her application, Wenyan
stated that she intended to travel to the United States on May
20, 2014, and would be staying for twelve days at the Trump
International Hotel, providing the address of 223 Saratoga Road,
Waikiki, Honolulu, Hawaii.

52.  I reviewed TECS records that indicated that
Wenyan traveled to Hawaii onboard a China Eastern Airlines
flight on August 4, 2014.  Wenyan provided CBP with an address
in Honolulu Hawaii, where she would purportedly be staying,
which is a different address than that Wenyan provided to the
State Department.  According to TECS records, on November 6,
2014, Wenyan departed the United States with her United States
citizen newborn via LAX, onboard a China Southern Flight.
Based on my training, experience and conversations with other
investigators who have conducted similar investigations, I
believe that there is a flight pattern for those wishing to come
to the United States to give birth that is indicative of a visa
fraud scheme.  I have noted that on numerous occasions, pregnant
individuals flying into the United States from China and
destined to Los Angeles, often times accompanied by their
husbands, will enter the United States via Hawaii, Las Vegas, or
a stopover in countries such as Korea, rather than flying

directly to LAX.  The ultimate destination of these individuals
from my own investigation has been the alleged birthing house at
18880 Douglas, Irvine, CA.  These same individuals will return,
with their newborn, on direct flights to China.  There is no
reason why these same individuals, when pregnant, could not have
flown directly into LAX, except I believe that they are
attempting to evade perceived heightened detection at LAX.  From
my training and experience, as well as discussions with other
experienced HSI and CBP officers, I know that customs at LAX is
perceived as more strict at detecting pregnant foreigners than
other ports of entry.  As discussed below, both CHEN and his
employee trainer in China repeatedly warned the HSI undercover
officer and his notional "cousin" to avoid flying into Los
Angeles because they would be caught and sent back.  Both CHEN
and his trainer stated that they flew their clients into the
United States via Hawaii where their clients had never had
experienced any issues.  Once those individuals who are
attempting to evade detection give birth to a child in the
United States, they are no longer concerned about detection
because they have accomplished their intended objective, i.e.,
to have a child that is a United States citizen.  Thus, they
then return to China via a direct return flight from LAX.

**I.   Internet advertisements with CHEN'S cell phone number**

         53.  During June 2014, I conducted a query of the
Internet using CHEN'S identified cell phone number, 818-635-
6668.  I located numerous blogs relating to birthing houses that

provided that number.  I located a post on the website
www.eso411.com/ads, under the heading "Childcare/Confinement,"
dated October 11, 2013.  Based on my conversations with other
law enforcement officers, including law enforcement officers who
are native Chinese speakers, I know that the Chinese utilize the
term "Confinement Houses" when referring to "Birthing Houses."
This posting was in Chinese, which I translated using an online
translator program.  This particular posting under "Confinement"
stated "Noble City of Irvine" and provided a photo of an
apartment unit, CHEN's cell phone number and an email address of
397391907@qq.com.

        54.  I located a blog at http://blog.sina.com entitled
"Excellent Pregnancy American Blog."   This posting was in
Chinese, which I translated using an online translator program.
The blog extolled the virtues of having a child born in the
United States, including: (1) the educational system; and
(2) the ability of the child when turning twenty-one years of
age to petition for their relatives to come to the United
States.  The posting referred to the advertised company as the
"American Center" and listed an address in China and a phone
number in the United States, (818) 635-6668, which was
identified as one of CHEN'S cell phone numbers.  The
advertisement also listed the same webpage that was found on
Gao's cell phone, yyusa.com, and stated that the company was
ranked first in Newport Beach/Irvine.

        55.  During June 2014, I queried the website
http://yyusa.com and noted that it contained detailed

information on the process of having a child born in the United
States, including a large question-and-answer section about the
benefits of doing so.  Various addresses and points of contact
in the United States and China were provided on the website.
CHEN's cell number was listed under the heading "American Club."
On another page of the website were posted congratulations to
purported customers for their smooth arrival and stay.  I viewed
a portion of a question-and-answer page, which stated in part
that all children born in the United States receive United
States passports, not a "Green Card," and that their package
includes a passport and social security card.  The website
described the benefits of gaining United States citizenship,
including that the United States has military, political,
technological, and cultural strength, and that there are no
signs of this fading, and that being a United States citizen is
the most attractive nationality.  I reviewed a page of the
website that contained information on the different packages
available.  In the middle of the webpage, a picture of the front
entrance and leasing office of the Douglas Apartment Complex was
displayed.  This page included details of the various available
packages, such as the fact that two mothers share a suite but
with independent bathrooms, and reiterated that a United States
passport and social security card for the newborn was included.

        56.  Further, the yyusa.com website also offered many
of the same justifications for traveling to the United States to
have birth as the known visa fraud schemes involving pregnant
Chinese nationals.  Based upon my discussions with IRS Special

30

Agent D. Liang, who can read and write the Chinese language, I know that the yyusa.com website stated the following as benefits of giving birth in the United States, as opposed to China:

- United States citizens enjoy low tuition and great scholarship opportunities;

- 13 years of free education from grade school to high school.  U.S. citizen's cost for college and master's degree is only 10% of foreign students.  It is also easier for a U.S. citizen to get into top tier colleges and enjoy those scholarships that are only available to USCs.  1% interest rate financial aid will allow a USC student to save over 1 million Yuan in 4 years in college over a foreign student.

- Less pollution.  The water and air in China are severely polluted, and food safety is a major concern.  If the child lives in the United States, there is at least some guarantee to air, water, and food…;

- An easier way for the whole family to immigrate into the United States.  After the child becomes an adult, parents can also immigrate.  This is an 18-year backup plan.  If the initial investment of giving birth in the United States results in the entire family's immigration, then it becomes a lucrative investment;

- Retirement benefits: after 10 years of paying taxes, enjoy life long retirement payments from 700-1200 USD a month.  If no 10-year tax history, get SSI after retirement for about 600 USD a month;

31

- High quality healthcare services; and

- Priority for jobs in U.S. government, public companies, and large corporations.  A lot of key positions such as government officials, defense, foreign affairs, high technology, and nuclear research labs are only restricted to U.S. citizens.

## J.   UNDERCOVER OPERATION ON CHEN AND HIS EMPLOYEES IN CHINA

### 1.   Overview of international undercover operation.

HSI conducted an undercover operation regarding CHEN and LI's visa fraud scheme, which as discussed below, involved multiple undercover agents.  During the undercover operation, CHEN described the scheme in detail and demonstrated his knowledge of the false statements on the visa applications. Further, CHEN's employees in China advised the undercover agents on how to obtain a visa to come to the United States from China to give birth.  Further, during the undercover operation, CHEN's accomplices in China uploaded a visa application in China for a notional pregnant foreign national, which application contained multiple false statements.

### 2.   June 26, 2014: undercover call and in-person meeting with CHEN

57.  On June 26, 2014, HSI initiated an undercover meeting with CHEN by placing a call to cell phone number 818-635-6668, which had previously been identified as belonging to CHEN.  That day, an undercover agent (hereinafter "UC-1"), who is fluent in both Chinese dialects of Mandarin and Cantonese,

placed a call to CHEN from the HSI offices in Irvine, California.  CHEN answered the call in Mandarin, agreeing to meet shortly thereafter with UC-1 to tour the Douglas Apartment Complex.  UC-1 called under the pretext that UC-1 wished to examine the actual apartment where his notional family member might be staying when coming from China to give birth in the United States.  CHEN and UC-1 also briefly discussed the cost of CHEN's services.

58.  On June 26, 2014, UC-1 drove to the Douglas Apartment Complex located at 18880 Douglas Irvine, CA.  UC-1 was equipped with both an audio and video recording device.  CHEN arrived in a BMW, later identified as bearing California license plate number 5NQA667.  I queried law enforcement indices which indicated that as of that date, that vehicle was registered to Chao CHEN at the Douglas Apartment Complex, Unit 409.  CHEN and UC-1 conversed in both Cantonese and Mandarin during the course of their meetings.  CHEN took UC-1 on a tour of the Douglas Apartment Complex and specifically showed UC-1 unit number 417 (SUBJECT PREMISES #11 (Unit #417)).  UC-1 asked CHEN if he could take pictures for his family of the room, and CHEN agreed.  During the meeting, UC-1 showed CHEN a printout of the http://yyusa.com website, and CHEN confirmed that that website was his company.

59.  CHEN stated to UC-1 that he was born in China and has been living in Hong Kong for ten years.  UC-1 asked CHEN how many units he rents in the Douglas Apartment Complex to which CHEN replied "several tens."  Based on my conversations with law

33

enforcement officers who are native Chinese speakers, I know
that the phrase "several tens" is a common Chinese expression to
indicate the number is more than ten.  UC-1 asked CHEN if his
office is also located in the same complex, and CHEN stated
"yes."

60.  UC-1 proceeded to ask CHEN how many people share
a room.  CHEN indicated that one to two people depending on
their choice.  CHEN told UC-1 that the normal length of stay is
three months.  CHEN stated that he has been in this business for
several years and it is not a simple business, noting that it is
a difficult business with a lot of competition.  CHEN indicated
to UC-1 that there are people in the complex currently.

61.   UC-1 asked CHEN about the visa application
process.  CHEN stated that his company will provide the
assistance.  CHEN stated that UC-1's notional cousin would have
to provide the information to CHEN either by email or personally
deliver the information to him.  CHEN stated that he would then
advise UC-1's cousin how to apply and prepare for the visa
interview.  CHEN stated that they will assist in filling out the
visa application.

62.  CHEN stated that he has a system in China with
people who are specialized in the visa application process and
that it was very simple.  CHEN stated that it can be done via
email.  CHEN explained that, after the application is completed
and submitted, there will be an appointment for the interview.
CHEN related that if UC-1's cousin is not familiar with the
questions for the interview, they can provide training in how to

34

answer questions to avoid being detected by the interviewing
official.  CHEN stated that the entire process from the visa
application to the time of delivering the baby should take only
three months to complete.  CHEN further stated that the fees
include everything.

63.  UC-1 stated to CHEN that there is no visa for
delivering a baby.  CHEN responded that it would be a B1-B2 visa
and that the majority of the people came in that way.  UC-1
asked CHEN what would happen if the consulate discovers that the
applicant is not being honest.  CHEN stated that it is important
to apply early, stating that the earlier the better, in order to
conceal the pregnancy.  UC-1 asked CHEN what if the consular
officer asks UC-1's cousin whether she is pregnant or not.  CHEN
stated that the consular officer normally does not ask that
question unless the "stomach" shows the sign of pregnancy.  CHEN
said that if the consular officer does not ask the question, do
not volunteer the answer.

64.  CHEN further indicated to UC-1 that problems
arise solely when only one person applies for the visa.  He said
that if UC-1's cousin is married, then the couple should apply
together.  CHEN stated that they will handle the visa situation.
CHEN stated that all meals are included, as is the pick up from
the airport upon arrival.  However, CHEN said that there was no
medical insurance provided if complications occur.  When UC-1
asked CHEN about the method of payment, CHEN told UC-1 that
there is a 40% deposit before travel to the United States, and
the remaining 60% is due when the baby is delivered.  CHEN

stated that the payment can be paid by either cash or wire to a
bank in China.  CHEN stated that the company's headquarters was
located in Beijing, China, and that if there was any problem or
complaint, it should be directed to Beijing.  CHEN said that if
the problem occurs in the United States, then CHEN would be the
point of contact.  CHEN indicated that it is his company, and he
works for the company as a manager.

65.  UC-1 also asked CHEN about the doctor, and CHEN
stated that the doctor is close by, within a ten minute drive.
CHEN further indicated that the doctor's fee is included.  CHEN
also stated that the application for an United States passport
is also included, and it would take about ten days to obtain.
CHEN indicated to UC-1 that the starting price for the package
is 238,000 Renminbi ("RMB") (approximately $38,000), and the
price is based on the selection of room.  UC-1 then asked CHEN
if he has any special method that allows the pregnant person to
enter the United States, such as any particular lane to use at
the airport.  CHEN told UC-1 that everyone enters through Hawaii
because the Hawaii route is well established and it is easier to
gain entry.

66.  During the aforementioned undercover meeting, IRS
SA Yim and I were assigned to provide cover to UC-1 inside the
Douglas Apartment Complex.  While positioning ourselves to do
so, IRS SA Yim and I walked past unit number 125 (SUBJECT
PREMISES #2 (Unit #125)).  (Unit 125 at the Douglas Apartment
Complex is a unit that has been linked to CHEN, as detailed
further below.)  The door to said room was propped open and the

36

sound of a crying baby could be heard from the hallway.  Two
basinets could be observed from the open doorway, and it
appeared that someone was cleaning the room.  I was able to take
a picture of the open doorway from the hall.  When we exited the
hallway door closest to unit 125, SA Yim and I observed four
Chinese women, who all appeared to be in the later stages of
pregnancy conversing at the tables closest to unit 125.  I
observed that the apartments located on the first floor have a
back door, which opens onto a small patio.

### 3.   September 18, 2014: undercover call and in-person meeting with CHEN

67.  On September 18, 2014, UC-1 initiated an
undercover meeting with CHEN by placing a call to cell phone
number 818-635-6668, which was previously identified as
belonging to CHEN.  CHEN answered the call and conversed with
UC-1 in Cantonese, agreeing to meet that same day in the
afternoon with UC-1.  UC-1 called to make a payment to CHEN for
arranging for UC-1's notional "cousin" to travel from China to
the United States to have a child.  It was noted that when CHEN
later called UC-1 back, CHEN did so from a new cell phone number
ending in 8888.

68.  Later that same day, UC-1 met with CHEN at the
Douglas Apartment Complex.  CHEN and UC-1 conversed in Cantonese
during the course of their conversations.  UC-1 gave CHEN a Bank
of America cashier's check, number XXXX400092, made payable to
CHEN in the amount of $15,000.  The payment represented a 40%

down payment for CHEN's services in arranging for UC-1's cousin to travel from China to Irvine to have a child.

69.   Amongst the topics discussed, CHEN detailed the structure of his organization to UC-1 and answered questions posed by UC-1 concerning the visa process.  UC-1 asked CHEN about how UC-1's notional cousin would be able obtain the visa. CHEN replied that his employees would contact her: "In China, I have the visa…I have, have, have people who service, I have employees who handle visas, everything is there."  CHEN further stated, "I will tell my colleagues in China to call her.  They will tell her to send an email to him and what [documents] she needs to prepare.  For example, the property deed, the marriage certificate, and other documents."

70.   CHEN stated that after his employees assist UC-1's notional cousin in getting her documents ready, they would set up an appointment for UC-2 at the embassy and prep her for the interview: "After she has all of them ready, they will help her make an appointment, make an appointment, to go to the United States Embassy."  UC-1 asked CHEN whether CHEN's employees would prep his notional cousin for the embassy interview, to which CHEN replied: "Then they'll prep her on how to . . . for example, how to answer the questions."  CHEN reiterated during this conversation that it would be best if CHEN's cousin applied with someone else for her visa, so that she might have a better chance at getting the visa issued.

71.   UC-1 specifically informed CHEN that his notional cousin in China did not have a job, and CHEN replied that his

38

people in China would assist with that.   CHEN and UC-1 also
discussed how much additional money was owed to CHEN when UC-1's
notional cousin arrived in the United States and what costs were
and were not covered.   Regarding the notional cousin's flight to
the United States, UC-1 asked if the notional cousin could fly
into Los Angeles.   CHEN was adamant that the notional cousin
could not because the risk of her getting caught was too great.
CHEN stated in part regarding this issue, "Definitely not!   [Out
of those who] came, 25% got sent back on the same plane.   25%.
Yes, yes."   UC-1 replied that 25% get sent back on the same
plane and CHEN replied affirmatively and that recently they were
very strict.   CHEN discussed in part regarding using LAX: "I
don't do it because it's too risky.   That's because 90% of the
work is already done before they come over, and if they get sent
back on the same plane, then I'm the one to blame for it."

        72.   CHEN also stated to UC-1 in substance that CHEN
was afraid of being audited by the IRS.   Indicating his
knowledge that he knew he had to pay taxes on the money he was
collecting from his clients even though that money was collected
from his clients in China, CHEN stated: "I do file taxes but
there are so many things that I can't explain clearly.   They say
since money is being collected in China, then money should be
collected in the United States as well."

        73.   CHEN provided a paper receipt for the $15,000
payment received from UC-1, which was made out to the assumed
name used by UC-1.   CHEN provided his own California driver's
license number F4995XXX and listed a cell phone number ending in

8888.  CHEN wrote his address on said receipt as being, "18880
Douglas Apt. 315 Irvine CA 92612" (SUBJECT PREMISES #7 (Unit
#315)).

74.  I reviewed CHEN's Bank of America account ending
in 9902 and noted that the Cashier's Check, number XXXX400092,
in the amount of $15,000 provided by UC-1 to CHEN was deposited
into CHEN's bank account on September 19, 2014, i.e., the day
after UC-1 gave CHEN the check.

75.  I reviewed subscriber information provided by
AT&T Mobility regarding the new cell phone number provided by
CHEN, ending in 8888.  According to AT&T Mobility, that phone
number was activated on July 18, 2014, and was registered to
Chao CHEN with listed address 18880 Douglas, Apt. 409, Irvine,
CA.

76.  I reviewed email correspondence between UC-1 and
CHEN.  On September 19, 2014, UC-1 sent an email message to
CHEN.  In that email message, UC-1 provided CHEN with UC-1's
notional cousin's phone number in China, which CHEN had
previously requested.  UC-1 also asked if CHEN had a phone
number for UC-1's notional cousin in China to call.  CHEN wrote
that he did not have a contact number, however, CHEN then
stated: "Your cousin can contact my stuff [sic], her name is
Diana Zhang."  CHEN provided 13337712164 as the phone number for
Zhang and stated that Zhang would be calling UC-1's cousin.

**4.   HSI undercover agent pretending to be pregnant Chinese national contacts CHEN's staff in China about obtaining a U.S. visa so that she can come to the United States to give birth.**

77.   On September 24, 2014, a CBP officer (hereafter referred to as UC-2), who was acting in an undercover capacity as UC-1's cousin, with notional name "Xiaoyan Zhang," made a consensually-monitored phone call to CHEN's staff in China using the contact information provided by CHEN.  UC-1 had been directed by CHEN to contact CHEN's staff for assistance with the visa process.  Both UC-1 and UC-2 are fluent in Mandarin. During the conversations detailed below, among UC-1, UC-2, and a trainer in China, the trainer sometimes mistakenly referred to UC-2 as being UC-1's "younger sister" instead of being UC-1's cousin.

78.   The UC-2 was able to reach Zhang using the Chinese phone number provided by CHEN and conversed with Zhang in Chinese.  According to a subsequent review of the recorded conversation, Zhang stated the following in substance only: (1) Zhang acknowledged that she knew about UC-1's notional cousin and that the payment already happened in the United States; (2) Zhang requested that the UC-2 add her to WeChat and stated that she will provide the contact information of the training teacher; (3) Zhang provided her WeChat contact information as "YOUYUNUSA;" (4) Zhang inquired about UC-2's pregnancy and asked if the pregnancy was obvious; (5) Zhang asked UC-2 if she has been to other countries and about her total net assets, and when informed that UC-2 does not have any

41

banking information, Zhang told her to talk to the trainer; and (6) Zhang explained to UC-2 that training will be provided and told her not to be afraid.

79.    Subsequent to this call, UC-2 was able to add Zhang to her WeChat account.  HSI SA Harada and I had previously established an undercover WeChat account with a username of "Babypanda85."  Zhang sent UC-2 a phone number in China for the trainer via WeChat.  I examined Zhang's response on WeChat to the UC-2's friend request and noted that Zhang's WeChat user profile picture contained what appeared to be the same "You Win USA VACATION RESORT" logo as the one used by CHEN via WeChat to communicate with Gao as detailed above.  This is the same logo that appears on the website for CHEN's company.  Zhang's WeChat username appeared as "YOUYUNUSA" in her communications with the UC-2.  I examined Zhang's profile under contacts in WeChat and noted that Zhang's region was listed as "Los Angeles, United States."

80.    The UC-2 contacted the trainer via the phone number provided by Zhang.  The trainer answered his cell phone and requested in part that UC-2 add him to her WeChat.  UC-2 was able to add the trainer to her WeChat.  I examined the trainer's user profile on WeChat and noted that it contained a purported photograph of the trainer and listed a location of Shanghai and a WeChat username of "alph88."  Subsequent to this contact, on or about September 26, 2014, the trainer wrote to UC-2 via WeChat in Chinese and began asking UC-2 questions about the stage of her pregnancy and her husband's employment.

81.   During the period of September through December 2014, the UC-2 and UC-1 were in contact with the trainer in China via email, WeChat, and in recorded telephone conversations.  The purpose of these interactions was to provide the trainer with information that the trainer wanted in order to be able to obtain a visitor's visa for UC-2.  The trainer, as further detailed below, offered several options to UC-2 regarding how to best obtain a visa from the United States Embassy.  The trainer stated in part that UC-2 should try applying for a visa with a friend that had an extensive travel history, preferably having visited Europe.  Despite the fact that it was understood by the trainer that this friend would not be traveling with UC-2, and that the purpose of the friend was to merely increase the success rate of UC-2's visa application being granted by the United States Embassy in China.  The trainer also informed the UC-2 that he would help her craft or "package" UC-2's employment history, with the full knowledge that UC-2 had no such employment history, because as discussed below, UC-2 provided information to the trainer that UC-2 did not have a job.  The trainer instructed UC-2 on how to look for a business that could be used as UC-2's purported employment. The trainer also stated that he would help UC-2 obtain a fake diploma for a college UC-2 purportedly attended and would have UC-2 memorize said college for visa interview purposes.  These conversations culminated with the trainer uploading the UC-2's visa application to the United States Department of State website on or about November 26, 2104 and scheduling an

interview appointment for UC-2 at the U.S. Consulate in Shenyang on December 10, 2014.

82.   On or about October 1, 2014, the trainer provided via email several forms for UC-2 to complete, including a version of the DS-160, Nonimmigrant Visa Form, that had been translated into Chinese.

83.   On October 8, 2014, the UC-2 contacted the trainer after having sent back the completed forms via email to the trainer.  The trainer told the UC-2 that if she and her husband could not come up with a property address, UC-2's chances of getting denied for a visa was over ninety-five percent.  The UC-2 asked what she should do and the trainer stated in part: "Because regarding other (things such as) employment, we can cover all those for you and it's not a big deal."  The trainer also instructed UC-2 to look for a man or woman with a "good departure and entry record" to go apply for the visa interview with UC-2.  The trainer stated in part, ". . . it'll be perfect if they have good departure and entry records.  For example, if they have been to places like countries in Southeast Asia or it's even better if they have been to Europe."  UC-2 reiterated several times to the trainer that she wanted to go the United States to have a baby.  The trainer asked UC-2 to see if UC-2's husband's friends could get proof of income for UC-2.

84.   During this same conversation, UC-2 asked about the issue with UC-2 not having a job.  The trainer stated that UC-2's husband must have friends and that those friends must

have companies: "Find out if any of his friends own companies. As long as he has one who owns a company, it doesn't matter how big the company is.  So he can get you an income . . . proof of income."  The trainer also stated the company should have been established for five years.

85.  The trainer also presented another option for applying for a visa, stating in part that if UC-2 paid an addition 60,000 Yuan (approximately $9,600), the trainer could help match the UC-2 up with a guy in Shanghai to apply with UC-2 for a visa.  The trainer stated, "You and the guy from Shanghai will apply for the visa together."  The trainer stated that he had just assisted a woman by matching her up in such a fashion and that she was approved for a visa in Beijing.  The trainer stated regarding his success that, "But she was six months pregnant.  She had a visa (interview) in Beijing and got approved."

86.  The trainer spoke repeatedly of helping UC-2 to "package" her visa application.  Based on my training, experience, and conversations with other law enforcement officers, I believe that the trainer refers to "packaging" as being the process of putting all of the various requested pieces together, however fraudulent, and applying to the United States Department of State for a nonimmigrant visa.  The trainer stated to the UC-2 that regarding her property she cannot use anything fake because it was not the same as the "old days where you could use a fake and get away with it, and it was still useful."

45

87.   The trainer asked for photos of the UC-2 including a picture of the UC-2's belly, "I just need to see what your belly is like right now."  The trainer asked the UC-2 to have a friend take a frontal full-length picture and a side view full-length picture.  The trainer stated that the training to prepare for the visa interview would be only an one-hour online training.

88.   Towards the conclusion of this conversation, the trainer asked for the name of the UC-2's cousin in the United States that was paying for her arrangements.  The trainer stated he needed to speak with the UC-2's cousin.  UC-2 provided the trainer the name of her cousin, Jack Chen, which is the assumed name of UC-1 who had met on several occasions with CHEN in Irvine, CA, as detailed elsewhere in this affidavit.

89.   Pursuant to the trainer's wishes to speak with "Jack Chen" (UC-1), UC-1 contacted the trainer telephonically. UC-1 contacted the trainer at the same phone number in China that had been utilized by UC-2 previously to reach the trainer in the above referenced conversations.  The trainer discussed many of the same options for obtaining a visa for UC-1's "cousin," such as finding someone to apply with the cousin or obtaining an invitation letter from someone in the United States.  The trainer stated in part to UC-1 regarding the option of finding someone to accompany UC-2 for the visa interview: ". . . if you are unable to find a suitable person, then, the only option is to find someone with a better background in Guangdong, who has gone abroad before. . . from your hometown."  UC-2 asked

46

whether the trainer wanted UC-1 to find such a person and the trainer replied, "Of course, you are going to look for one.  If I have to look for one, then the fee will be different."  The trainer stated to UC-1 that if they do not find someone to go with the UC-2 for the interview that the UC-2's chances of getting a visa will be very low.  UC-2 and the trainer then discussed getting an invitation letter for UC-2 to utilize in obtaining a visa.  UC-1 stated that he knew of someone, whom UC-1 identified as "Frank Li" ("Li"), who had been friends with the UC-2 back in China and that said person could write a letter of invitation to be utilized by the UC-2 at her visa interview.

90.    UC-1 and the trainer had subsequent conversations regarding obtaining an invitation letter from Frank Li in the United States for the UC-2 to purportedly come visit Frank Li and attend his wedding.  UC-1 was directed by the trainer to draft a letter of invitation in both English and Chinese.  I assisted UC-1 in drafting said letters, which were then emailed from UC-1 to the trainer.  The trainer had several questions regarding Frank Li and was concerned that Frank Li may be too old to pass for a close friend of the UC-2 in China.  The trainer stated that they need to make it logical, referring to the age difference between the letter writer named "Frank Li" and UC-2: "So when your younger sister was eight or nine years, he was already fifteen or sixteen years old. . . So, it's impossible to say that he knows your younger sister since they were little, right?"  The trainer commented, "What I am saying is that the person you've picked out for her seems to have good

47

criteria.  So, I'm just thinking if I could (interruption occurred on recording due to background noise) would I be able to create a story.  Otherwise, if (she) goes to get her visa without a story, the officer in charge of the visa application may not believe your younger sister. . . Because she has to get her visa in Shenyang; she's not getting her visa in Guangdong. The degree of difficulty is much greater to get a visa in Shenyang."

91.  After weighing the various fraudulent options to secure a visa to travel to the United States, such as having someone else accompany UC-2 to the visa interview versus an invitation letter, the trainer and UC-1 settled upon using an invitation letter from Li and the ability of the trainer to "package" or fabricate an employment history for UC-2 and a college degree in the submission for a visa.

92.  During a subsequent conversation, UC-1 asked the trainer about a statement the trainer had made regarding his company's success rate with fraudulent documents: ". . . you were saying that you had a 60% to 70% success rate last year. Despite the fact that the documents were not genuine, your success rate was still 60% to 70%."  The trainer replied, "That's right, that's right, that's right. . . But, I am unable to do that this year.  They are very strict this year.  Because starting in April or May this year, the embassy of the U.S. and the embassy of the Canada [sic] have become very strict, very strict."  The trainer elaborated, "...back then, as long as your younger sister is willing to spend some money...she would only

have to spend approximately $50,000 to $60,000, I would be able
to prepare a Canadian...after obtaining the Canadian, she would
then go to the United States.  Then she will go to the United
States for her visa interview and she has basically succeeded."

    93.   The trainer stated to UC-1 in this same
conversation regarding UC-2's story, "...as long as the story is
convincing...because I don't know whether your younger sister is
pretty or not.  If the story is convincing and she's good
looking, then the success rate will be pretty high when she goes
for the visa interview."  UC-1 replied to the trainer, "Then,
how do we make up the story?  Are you going to make up the story
for us or what?"  The trainer confirmed that was exactly what he
would do: "I...of course, I'll make up the story for you."

    94.   On November 4, 2014, UC-1 and UC-2 called the
trainer in China in order to check the status of the visa
application.  When the trainer answered said call, he stated
that he had just finished a training session with other
customers: "Yes, yes.  I just finished a customs clearance
training session.  There are more individuals coming to the
United States."  The trainer stated that business is good, and
while chuckling stated there was nothing he could do about it.
The trainer was asked by UC-1 what remained to be done before he
uploaded the UC-2's visa application.

    95.   The trainer explained that UC-2 needed to find a
company to list for employment, and because she was from
Shenyang, that job would have to be from that same area: "But as
far as your sister's visa goes, the first thing she needs to get

right away is a job.  She has to get the work address, name of the company and also a phone number to her workplace."  When UC-1 stated that his cousin, the UC-2, did not have such a job, the trainer replied, "If she doesn't have a job, then you have, you have to figure out a way to make one up."  The trainer stated that he was sure that UC-2's husband had some friends that could provide such job information and a phone number for the job. The trainer explained that it was important to have a phone number to go along with the job: "the phone number...you have to tell them to make sure that someone will be there to answer the calls.  You have to tell the person who answers the phone to say that Zhang, Xiaoyan is working for this company, and what her job is in the company."  The trainer stated he needed the employment information right away for UC-2's visa application. Subsequent to this conversation UC-1 provided a company name, "Shenyang Electrical Machine Co. Ltd.," to the trainer as UC-2's fake employer.  The trainer had full knowledge that UC-2 had no such employment as the trainer was told repeatedly that UC-2 had no employment and had just asked for UC-1 and UC-2 to fabricate said information using the UC-2's husband's friends if possible.

5. **CHEN's trainer in China uploads a fraudulent visa application on behalf of the HSI undercover agent.**

96.  I reviewed a DS-160 Online Nonimmigrant Visa Application Confirmation and an Appointment Confirmation File that was forwarded to UC-2, via email, from CHEN's trainer.  On November 27, 2014, the trainer, using an email address of alph88@vip.qq.com emailed said attachments to UC-2's email

address of babypanda1985.bp@gmail.com.  I noted from my review

of the Appointment Confirmation File that UC-2 had an

appointment scheduled at the United States Consulate located in

Shenyang for December 10, 2014, at 8:15 a.m., and number

"AA004KIZ2M" had been assigned to UC-2's appointment.  From my

review of the DS-160 Online Nonimmigrant Visa Application

Confirmation, the photo on the application was the same photo

that UC-2 had previously emailed to the trainer in China.  On

the visa application for UC-2 that had been uploaded by the

trainer in China, the purpose of travel was listed as:

"Business/Personal B1/B2."  The DS-160 application stated that

the intended length of stay in the United States was for "20

day(s)," and that the UC-2 would be staying at a Long Beach, CA

address, when the trainer knew that the UC-1 was travelling to

the United States for a longer period to give birth to a child

and reside at an apartment managed by CHEN.

        97.  On December 2, 2014, from DSS, I obtained an

electronic copy of the DS-160 that had been uploaded for the UC-

1 named "Xioyan Zhang."  I examined that DS-160 and noted that

the trainer had used the biographic information provided by the

UC-2, such as the names provided by the UC-2 of her parents and

husband and the name of the "employer" Shengang [sic] Electrical

Machine Co. Ltd., which had been previously provided to the

trainer.  This business name had been provided by UC-1 on behalf

of UC-2 with the understanding of all parties involved that this

was simply a company that was being used by UC-2 for sham

employment.  Under the heading, "Present

Work/Education/Training" on said DS-160, the trainer had uploaded the following false information regarding UC-2: "sales manager: responsible for the company's products sales."  False information had also been uploaded regarding UC-2's income, with the DS-160 listing that UC-2 earned 15,000 in monthly income in local currency.  I queried an online currency converter on December 4, 2014, which showed that that 15,000 RMB (Yuan) was equivalent to approximately $2,437.20.  During the various conversations between UC-2 and the trainer, UC-2 made it clear that UC-2 and her husband had very little money and were renting their residence, and that UC-2 was unemployed. According to my review of the aforementioned DS-160, it had been submitted on November 26, 2014, at 10:17:01 PM (GMT).

98.  On December 11, 2014, UC-1 made a recorded call to CHEN regarding the approved United States visa for UC-2. During this call, CHEN discussed the process of getting UC-2 the visa, acknowledging that "...we got it for her in the end. And...uh, I tried to contact you in the middle of the process. I wanted to tell you about the difficulty involved.  She didn't have anything; no house, no car.  She also didn't have uh, a property title or the money in the bank, she had none of that." During the call, CHEN acknowledged that Zhang and the trainer were his employees.  CHEN also acknowledged that lying about employment on the visa application was illegal: "Actually there is risk involved with this matter.  You know, it's illegal the way he tells her to do it.  I'm telling you [it's illegal] if we take it seriously."  CHEN also confirmed that the UC-2 would

need to be trained prior to travelling to the United States in order to pass U.S. inspections: "Training? Of course she needs it.  She needs training to pass Customs.  There are a lot of things to do."

99.  On December 15, 2014, using his I-phone, CHEN sent an email message to UC-1 about UC-2: "Hi jack, the officer of u.s. Immigration department will contact you to check the information of [UC-2].  So please keep your phone on work.  Bests, Edwin."

100. On December 16, 2014, UC-1 made a recorded call to CHEN regarding UC-2's travel and payment arrangements.  CHEN explained that UC-1 needed to pay remaining $8,000 deposit owed for his services, and that he would not allow the trainer or Zhang to prepare UC-2 for Custom inspection until CHEN was paid.  CHEN explained that "[t]o clear Customs inspection, [trainer] will issue some things such as an itinerary, instructing her on how to clear Customs inspection...these things, after you pay up, [trainer] will call and train your sister."

6.   **CHEN threatens to "cancel" the visa if the undercover agent does not pay $8,000 more.**

101. On December 17, 2014, UC-1 made a recorded call to CHEN regarding the UC-2's travel and payment arrangements.  During this call, CHEN demanded that UC-1 make an additional payment of $8,000 for the visa preparation.  CHEN threatened to "cancel" UC-2's visa if he was not paid by the end of the day: "[t]hen, then you have to pay the money before the end of the

day, today.  If you don't pay, I will have to cancel this visa. There is no other option."

102. On December 18, 2014, UC-1 made a recorded call to CHEN regarding travel and payment arrangements.  CHEN urged UC-1 to let his employees arrange UC-2's itinerary and not to book a flight through LAX.  CHEN noted: "[o]f course it won't work.  If you fly to Los Angeles, you're dead.  Am I right? These things are our tools for making money.  As a matter of fact, you don't understand these things.  You don't know about them."

103. On December 21, 2014, UC-2 made a recorded call to the trainer in order to receive training regarding the entry process to the United States.  I debriefed UC-2 regarding this call and reviewed the transcript, learning the following:

a.   The trainer explained that the UC-2 should travel through Hawaii and purchase a tour package in order to best ensure her chances of admission into the United States.

b.   The trainer discouraged the UC-2 from travelling directly to Los Angeles via LAX: "If you fly to Los Angeles directly, you are going to get deported back right away."  The trainer explained that going through Hawaii would be UC-2's best opportunity to clear customs: "You have to choose an easier customs entry.  You[r] English is not good and you don't have the stuff.  You are in such a hurry and rush to, rush to Los Angeles... Right now, it's 100% for us in Hawaii.  [We] haven't had any return."

54

c.     Because the UC-2 purchased a plane ticket directly to LAX, the trainer reluctantly prepared the UC-2 for admission at LAX.  The trainer explained that the UC-2 would need to (a) make a reservation for a hotel near her friend and the wedding location; (b) purchase a round trip ticket as opposed to the open-ended ticket that the UC-2 had purchased; (c) carry at least a couple thousand dollars in cash as well as 200,000 RMB (approximately $32,000) on a "card;" and (d) purchase a "real" tour package.  The trainer explained that the evidence presented to CBP officials for admission needed to be "genuine and none of it should be fake at this point."  The trainer contrasted the admission process with the visa process, explaining that "[t]his is different from the visa interview...Some of the stuff that you used...maybe they were not...maybe they were unable to find out.  However, the stuff that you use to go through customs has to be 100 percent genuine."

104. On December 23, 2014, UC-1 contacted CHEN via email and alerted CHEN that his notional "cousin" (UC-2) had been denied entry into the United States at LAX.  CHEN responded to the email and indicated that perhaps she would still get admission.

**K.     January 2015: LI takes over the day-to-day operations of the scheme at the Douglas Apartment Complex**

105. On or about February 5, 2015, I located an advertisement posted by www.yyusa.com on a Chinese website/blog

that described a business breakup between CHEN and LI.  The advertisement stated the following (translated from Mandarin to English by a HSI agent fluent in Mandarin):

> Edwin, employee of this company, (been terminated and employment contract been canceled): male, during his employment in the US in 2014, he used this company's name/reputation to create false contracts with clients and defraud the clients' money (this matter is under legal process), he falsely claimed expenses, took money, misused company's funds, stole five vehicles from the company and absconded.  The behaviors confirmed this individual's bad character with no discipline of an organization and no gratitude.  This creates a negative impact on clients, the financial and reputation of the company.  There are clients recently reported that this individual continues to use the company to run the illegal business, was also insulted the company.  In addition, he puts on his blog stated that: YouWin has changed the name to Rui Ji U.S.A. Birthing Center (google translation "Saint Regis").  The behavior of this individual has caused negative beyond the financial and reputation of the company.  To avoid clients getting defraud without knowing the situation, we are issuing this special urgent notice, this company is seeking legal channel to stop Edwin's bad behavior. Issued by: Beijing YouWin Business Limited Company February 4, 2015.

106. Beginning in January 2015, I received updated records from Southern California Edison (SCE) for LI and CHEN and learned that CHEN was no longer the subscriber/customer for electrical service for any of the units at the Douglas Apartment Complex, and LI was now the subscriber/customer for services for the following units there: 418, 411, 206, 311, 318, 315, 417, 416, 314, 317, 403, 223, 123, 125, 325.  LI provided the following addresses as her personal addresses: (1) 18880 Douglas Unit 315, Irvine, CA (SUBJECT PREMISES #7 (Unit #315)), with a primary phone number of 818-330-5555; and (2) 78 Harrison, Irvine, CA (SUBJECT PREMISES #13).

107. I had previously located records which I believe corroborated what the anonymous tip letters, referenced in this affidavit, had stated regarding LI, namely that LI and CHEN were business partners. I located a check drawn from a BofA account maintained by LI, dated October 2, 2013 in the amount of $30,965 and made payable to the "Carlyle." The Carlyle is the official name of the Douglas Apartment Complex. The memo portion of said check contained apparent unit notations for the following apartment units: 109, 209, 309, 409, 325, 123, 223, 323, 125 and 225. LI wrote additional checks payable to the Carlyle in January and March 2014, each for $30,965. I also located checks written from LI and made payable to both ZHU and CHEN.

108. Throughout January 2015, HSI agents conducted surveillance of the Douglas Apartment Complex and observed that the white vans previously associated with CHEN's business were no longer present, and that two new vans were now parked at the Douglas Apartment Complex. I subsequently confirmed that the vehicles were purchased by and registered to LI at the 78 Harrison, Irvine, CA address (SUBJECT PREMISES #13).

109. On January 12, 2015, HSI agents conducted surveillance of the Douglas Apartment Complex. At approximately 3:30 p.m., I followed a white Nissan NV300 model van, bearing paper plates away from the Douglas Apartment Complex. This vehicle on previous occasions had been observed parked in the same area as CHEN's vehicles and LI's Mercedes Benz. The van appeared to be empty and traveled to the medical offices of Hoag Irvine. I observed the van pull into a yellow curb loading area

and saw someone enter said vehicle, but could not observe who entered.  The van then traveled back to the Douglas Apartment Complex, and the surveillance agents observed Asian males and at least two Asian pregnant females exiting the van and entering the Douglas Apartment Complex.

110. On January 12, 2015, at approximately 4:58 p.m., I observed LI's Mercedes Benz, CA Plate number 7DYM220, exiting the Douglas Apartment Complex.  IRS SA Yim and I followed LI's vehicle to a Target store in Irvine.  I observed that LI (dressed in a striped sweater and a green purse) was accompanied by an Asian female who appeared to be in some type of black uniform, resembling a nurse's uniform.  The unknown Asian female and LI entered Target where they were observed by SA Yim shopping in the baby aisle.  LI exited the Target store with a cartload of purchases and drove away from the Target store.

111. During January 2015, I reviewed a WeChat account of You Win USA Vacation Resort, WeChat Id: Youyunusa, which is an account operated by Zhang, an employee of CHEN and LI's in China.  According to pictures posted to that WeChat account, an individual who appears to be LI was observed to be inside the FVH on January 12, 2015.  Pictures posted to said WeChat account show the entrance to the hospital, and pictures of an Asian female walking to the admissions or information desk, followed by a series of pictures of a newborn.  The woman depicted in said photos is walking away from the camera but is wearing the identical striped sweater and carrying the same bright green

purse as LI was observed to carry that same night when observed
by IRS SA Yim.  Thus, I believe it was LI.

112. Also on January 12, 2015, after leaving the
Target store, LI travelled in her Mercedes Benz to the Babies R
Us store located at the Tustin Marketplace.  LI and the unknown
female shopped inside said store until 6:10 p.m., when they
exited said store with a cartload of items and were followed
back to the Douglas Apartment Complex.

113. On January 14, 2015, HSI conducted surveillance
at the Douglas Apartment Complex and observed a large Nissan van
and a smaller Toyota van (registered to LI) depart the Douglas
Apartment Complex with six to eight passengers in each vehicle
and travel to a Chinese restaurant in Monterey Park, CA.  The
next day, I located on LI's company WeChat account a series of
photos of the group dining at the Monterey Park Chinese
restaurant.

114. On January 27, 2015, IRS conducted surveillance
at 78 Harrison, Irvine, CA (SUBJECT PREMISES #13) and observed
LI leaving the residence in a black Mercedes Benz SUV
(subsequently confirmed to be registered to LI at the 78
Harrison address (SUBJECT PREMISES #13)).  LI traveled to the
Douglas Apartment Complex and picked up an Asian male and female
and traveled to a business complex in Brea, CA.  IRS SA Yim
reviewed the business complex directory and noted that suite 150
was the office of the Social Security Administration.
Approximately two hours later, LI and the Asian couple returned
to the Douglas Apartment Complex.  LI and the Asian couple

exited the vehicle and LI retrieved items from her trunk and took them into Unit 417 at the Douglas Apartment Complex (SUBJECT PREMISES #12 (Unit #417)).  The Asian passengers entered Unit 416 at the Douglas Apartment Complex (SUBJECT PREMISES #11 (Unit #416)).  IRS SA Chu also noticed two Asian pregnant women walking on the fourth floor of the Douglas Apartment Complex.

115. Later that same day, HSI took over surveillance of the Douglas Apartment Complex and observed numerous Asian pregnant women being picked up and dropped off by the vans registered and associated to LI.

116. That same day at 2:57 p.m., I observed LI and an unidentified Asian female dressed in a black uniform entering the parking garage area of the Douglas Apartment Complex and speaking with the passengers of one of the vans.  At this time, I called LI's cell phone, 818-330-5555 (registered to LI at SUBJECT PREMSES #13 according to Verizon Wireless) and observed LI answer the phone.  Once I confirmed that LI had answered the call to that telephone number, I hung up.

117. Later that same day, HSI agents observed LI depart the Douglas Apartment Complex in her Mercedes Benz SUV and travel to SUBJECT PREMISES #13.  Upon arriving at the Harrison house, I observed LI park in the driveway and exit her vehicle and took a large box out of the trunk of the vehicle and enter the house through an open garage door.

118. Based on my review of SCE records, hospital records, passport applications, and surveillance conducted at

60

the Douglas Apartment Complex, I believe that LI is continuing
to operate the visa fraud birth tourism business at the
following units in the Douglas Apartment Complex:

     a.   **SUBJECT PREMISES #1 (Unit #123)**: According
to SCE, LI is the current subscriber of SUBJECT PREMISES #1
(Unit #123).  On June 26, 2014, during an undercover meeting,
IRS SA Yim and I observed pregnant women seated around outdoor
tables that were located adjacent to units 123 and 125, whose
doors were both open at the time.  According to FVH, a child was
born at FVH on August 6, 2014, whose parents provided SUBJECT
PREMISES #1 (Unit #123) as the address.  A U.S. Passport
Application Form DS-11 was filed with the State Department for
the child born at FVH on August 6, 2014.  A unit number was not
provided on said applications, however the address for Douglas
Apartment Complex was provided, as was a cell phone number
ending in 6668, which is CHEN's cell phone.  On February 18,
2015, SA Eastman and SA Hanson walked past units 123 and 125 of
the Douglas Apartment Complex, and noted that the same back
doors, leading to the porch, were open and that lights were on
inside.

     b.   **SUBJECT PREMISES #2 (Unit #125)**: According
to SCE, LI is the current subscriber of SUBJECT PREMISES #2
(Unit #125).  According to FVH, five children were born at FVH
on the following dates, whose parent(s) provided SUBJECT
PREMISES #2 (Unit #125) as their address: September 16, 2013,
January 4, 2014, May 20, 2014, June 22, 2014, and December 11,
2014.  United States passport applications for these children

were subsequently filed and listed SUBJECT PREMISES #2 (Unit #125) as their address (the application corresponding to the child born on May 20, 2014, contained the address for Douglas Apartment Complex only, without the unit number).   Furthermore, on June 26, 2014, during an undercover meeting, SA Yim and I, while walking inside an interior hallway past SUBJECT PREMISES #2 (Unit #125), observed through an open door bassinets inside the SUBJECT PREMISES #2 (Unit #125).

        c.   **SUBJECT PREMISES #3 (Unit #206)**:  According to SCE, LI is the current subscriber of SUBJECT PREMISES #3 (Unit #206).  According to FVH, a child was born at FVH on September 21, 2014, whose parent(s) provided SUBJECT PREMISES #3 (Unit #206) as the address.

        d.   **SUBJECT PREMISES #4 (Unit #223)**:  According to SCE, LI is the current subscriber of SUBJECT PREMISES #4 (Unit #223).  According to FVH, children were born at FVH on the following dates whose parent(s) provided SUBJECT PREMISES #4 (Unit #223) as their address: July 23, 2014, October 13, 2014, and October 25, 2014.  A United States passport application was filed for the child born on October 25, 2014, listing the Douglas Apartment Complex address.

        e.   **SUBJECT PREMISES #5 (Unit #225)**:  According to SCE, LI is the current subscriber of SUBJECT PREMISES #5 (Unit #225).  According to FVH, children were born at FVH on the following dates whose parent(s) provided SUBJECT PREMISES #5 (Unit #225) as their address: July 2, 2014, and October 29, 2014.  A United States passport application was filed for the

child born on July 2, 2014, listing the address for the Douglas Apartment Complex (without unit number) and CHEN's cell number as the primary contact number. A United States passport application was also filed for the child born on October 29, 2014 listing SUBJECT PREMISES #5 (Unit #225) and CHEN's cell phone number.

        f. **SUBJECT PREMISES #6 (Unit #311)**: According to SCE, LI is the current subscriber of SUBJECT PREMISES #6 (Unit #311). According to FVH, a child was born at FVH on November 6, 2014, whose parent(s) provided SUBJECT PREMISES #6 (Unit #311) as the address. A United States passport application was filed for the child, which listed SUBJECT PREMISES #6 (Unit #311).

        g. **SUBJECT PREMISES #7 (Unit #315)**: According to SCE, LI is the current subscriber of SUBJECT PREMISES #7 (Unit #315). According to FVH, a child was born at FVH on October 5, 2014, who provided SUBJECT PREMISES #7 (Unit #315) as the address. United States passport applications were filed for the child born on October 5, 2014, and a third child born at FVH on September 27, 2014, with SUBJECT PREMISES #7 (Unit #315) listed for the address, as well as CHEN's cell phone number. On August 25, 2014, CHEN was listed as the registered agent for YOU WIN USA VACATION SERVICES CORPORATION with the California Secretary of State, listing as its address SUBJECT PREMISES #7 (Unit #315). On October 22, 2014, CHEN was listed as the registered agent for CALIFORNIA LOTUSCARE SURROGACY LLC with the

California Secretary of State and provided SUBJECT PREMISES #7 (Unit #315) as the entity's and CHEN's address.

h. **SUBJECT PREMISES #8 (Unit #318)**: According to SCE, LI is the current subscriber of SUBJECT PREMISES #8 (Unit #318). According to FVH, a child was born at FVH on July 11, 2014, whose parent(s) provided SUBJECT PREMISES #8 (Unit #318) as the address.

i. **SUBJECT PREMISES #9 (Unit #325)**: According to SCE, LI is the current subscriber of SUBJECT PREMISES #9 (Unit #325). According to FVH, three children were born at FVH on the following dates whose parent(s) provided SUBJECT PREMISES #9 (Unit #325) as their address: April 11, 2014, July 27, 2014, and August 4, 2014. United States passport applications were filed for children that listed SUBJECT PREMISES #9 (Unit #325) as their address, with CHEN's cell phone number listed as their primary point of contact.

j. **SUBJECT PREMISES #10 (Unit #403)**: According to SCE, LI is the current subscriber of SUBJECT PREMISES #10 (Unit #403). According to FVH, three children were born at FVH on the following dates whose parent(s) provided SUBJECT PREMISES #10 as their address: June 15, 2014, September 27, 2014, and December 6, 2014. A United States passport application was filed for the child born on June 15, 2014, and listed the Douglas Apartment Complex as the address.

k. **SUBJECT PREMISES #11 (Unit #416)**: According to SCE, LI is the current subscriber of SUBJECT PREMISES #11 (Unit #416). According to FVH, a child was born at FVH on

October 2, 2104 whose parent(s) provided SUBJECT PREMISES #11 (Unit #416) as their address.  On January 27, 2015, IRS-CI followed a pregnant woman who had been driven into the complex by LI into SUBJECT PREMISES #11 (Unit #416).

        l.  **SUBJECT PREMISES #12 (Unit #417)**: According to SCE, LI is the current subscriber of SUBJECT PREMISES #12 (Unit #417).  On January 27, 2015, IRS-CI Special Agents followed LI enter SUBJECT PREMISES #12 (Unit #417) with a package.  Agents had observed LI take the package from her vehicle's trunk, which according to IRS-CI had not been opened since LI drove the vehicle from her residence at 78 Harrison, Irvine, CA (SUBJECT PREMISES #13).

**L.   January 28, 2015: HSI agents review  trash from LI's residence in Irvine, CA (SUBJECT PREMISES #13)**

        119. On January 28, 2015, HSI obtained and examined the trash left outside 78 Harrison, Irvine, CA (SUBJECT PREMISES #13), which I then sorted.  I found the following documents in that trash:

        a.   Bank of America customer receipt for a savings account ending in 2930 that reflected a $10,000 withdrawal and a balance of $149,638, dated July 2, 2014;

        b.   Medical receipts from May 2014;

        c.   Multiple shopping receipts dated from May through July 2014; and

        d.   Mail addressed to LI and her husband at 78 Harrison, Irvine, CA (SUBJECT PREMISES #13).

M.    **Additional Surveillance**

    1.    **February 4, 2015: Surveillance at Douglas Apartment Complex**

        120. On February 4, 2015, HSI conducted surveillance at the Douglas Apartment Complex and observed units 123, 125, and 311 (SUBJECT PREMISES #1, SUBJECT PREMISES #2, SUBJECT PREMISES #6) had each of their patio and/or balcony doors open and at least three pregnant Asian females in the nearby pool. Shortly thereafter, I observed LI driving into the parking garage in her black Mercedes Benz SUV.

    2.    **February 13, 2015: Surveillance of LI**

        121.  On February 13, 2015, at approximately 8:03 a.m., the HSI/OR effectuated surveillance at LI's residence located at 78 Harrison, Irvine, CA (SUBJECT PREMISES #13).  At 11:28 a.m., I observed an Asian female (subsequently identified as LI) exit the residence and walk towards the black Mercedes SUV.  LI then walked up towards her vehicle, then turned and walked back inside the residence.  At 12:57 p.m., IRS SA Yim observed LI driving away from the residence in the black Mercedes SUV.  LI travelled to a residence in Aliso Viejo and then travelled to the Douglas Apartment Complex, where SA Diaz observed LI park and exit the vehicle, and then proceed into the basement elevators of the Douglas Apartment Complex.  At approximately 2:12 p.m., SA Yim, who was stationed in the basement of the Douglas Apartment Complex, observed an Asian male driver with the Toyota van (registered to LI) pick up two

pregnant Asian women, two Asian males, and a boy and depart the
Douglas Apartment Complex.

3.   **January and February 2015: surveillance of 2850 Kelvin
Avenue, Irvine, California ("Kelvin apartments")**

122. During January and February 2015, HSI conducted
surveillance of apartments at Kelvin and obtained leasing
records for various units there, which I reviewed.  Those
records showed that CHEN had rented two apartments and ZHU had
rented two apartments there.  In the rental application for the
two units that CHEN rented, which CHEN signed on January 6,
2015, CHEN listed SUBJECT PREMISES 14 as his present address.
In addition, on the rental application, CHEN listed his present
employer as "You Win Vacation Ltd." with his position as "CEO,"
and the employer address as SUBJECT PREMISES #7 (Unit #315).

123. On February 17, 2015, HSI Special Agents
conducted a ruse "knock-and-talk" at the two units rented by
CHEN at Kelvin.  The male who answered the door at the first
unit was wearing a black apron bearing the logo "Regis," and an
male inside the other unit was wearing a black shirt with the
logo "REGIS" printed in white letters on the left pocket area.
The two males spoke very little English.

N.   **Internet-Based Websites/Advertisements/Blogs Re: LI's
Operation**

124. Between January and February 2015, I have
reviewed numerous advertisements on the internet and internet
blogs for www.yyusa.com, also known as "YOU WIN USA VACATION
RESORT."  These advertisements generally include LI's cell

number ((818) 330-5555), the company website, and various
contact numbers in China.






125. On February 5, 2015, I visited the WeChat account operated by Zhang and associated with LI's operation You Win USA and viewed a posting of a page of a passport containing an United States visa and an entry stamp dated February 4, 2015. The posting contains the following message (in Mandarin translated to English) at the bottom of the picture: "Congrats to MS. XY for successfully passed [pass the visa process smoothly]. The life style of a wonderful vacation begins/starts."



126. On February 17, 2015, I reviewed the WeChat account operated by Zhang and associated with LI's operation You Win USA and viewed a posting (in Mandarin translated to English) containing photos of a classroom style presentation featuring a slide show:

American Baby
What you need to know to get an ID
Things to pay attention to
Case Study
Q&A with prizes

Text on the bottom of said photo stated:
Go to US give birth You Win America
To give a person fish is not better than teaching a person
how to fish
As a Youwin baby client not only do we help baby get ID ,
we explain what each item is for along the way.

 



127. In addition, I downloaded the following pictures from the internet advertisement for CHEN and LI's visa fraud scheme, which among other pictures, appears to show that a pregnant foreign national arrives in the United States and leaves with a newborn wrapped in an American flag:

71











O.   **February 23, 2015: Undercover call to LI verifies that LI
     continues to operate the visa fraud scheme, including from
     her residence in Irvine, CA (SUBJECT PREMISES #13).**

128.  On February 23, 2015, at approximately 7:30 a.m.,
IRS observed LI leave her residence, 78 Harrison, Irvine, CA
(SUBJECT PREMISES #13), and depart with three adults in her
Mercedes Benz SUV.  At approximately 9:00 a.m., LI returned to
that location.

129.  After IRS confirmed for me that LI had returned
to her residence (SUBJECT PREMISES #13) and while IRS maintained
surveillance on SUBJECT PREMISES #13 and LI's vehicle to confirm
that LI remained at SUBJECT PREMISES #13, I initiated an
undercover phone call to LI using a Citizenship and Immigration
Services ("CIS") officer ("UC-3") who speaks Mandarin fluently.
UC-3 explained to LI that she was interested in giving birth in

73

the United States.  LI told UC-3 that "they" have an office in Beijing that can help her get her visa and coach her on how to clear "customs."  LI told UC-3 that the office in Beijing is part of LI's company (LI said we are the same company).  UC-3 told LI that she had no income and no job, but her husband had a job and money.  LI said that was not a problem, that "we" can tell you what to do on your visa and initial interview.  LI also advised UC-3 not to go to get her visa too late, if her stomach is too big she won't be able to get the visa.  In addition, LI explained that once UC-3 gets the visa, "they" can coach her on how to get through "customs."  LI explained that the fee charged depends on what package is selected, and that the fees can range from 238,000 RMB to 498,000 RMB (approximately $40,000-$80,000).  During the entire call, LI remained at SUBJECT PREMISES #13.

**P.  January 2015: CHEN and ZHU move their residence from the Douglas Apartment Complex to 28601 Los Alisos, Apt. 1088, Mission Viejo, CA (SUBJECT PREMISES #14)**

130. According to SCE records, ZHU established utility services at 28601 Los Alisos Blvd., Apt. 1088, Mission Viejo, CA (SUBJECT PREMISES #14) on December 31, 2014, and provided a phone number of 818-817-6666  (This is the same number that ZHU provided to the preschool referenced below.)

131. On January 21, 2015, HSI conducted surveillance of SUBJECT PREMISES #14 and observed CHEN's BMW, Cal. Lic. Plate 7GBB951, and ZHU's white Mercedes Benz, Cal. Lic. Plate 7ETK721, parked inside the gate of the complex near SUBJECT PREMISES #14.

132. That same day, at approximately 11:20 a.m., SA Yim observed both CHEN and ZHU exit SUBJECT PREMISES #14, and each proceeded to their respective vehicles and departed the area.

133. Between January 22, 2015 and February 11, 2015, HSI conducted surveillance at least seven times, during which agents observed one or both of CHEN and ZHU's registered vehicles at SUBJECT PREMISES #14 (28601 Los Alisos Blvd., Apt. 1088, Mission Viejo, CA).

134. Thus, I believe that CHEN and ZHU currently reside at the SUBJECT PREMISES #14.

## Q.   **There is probable cause to believe that CHEN and ZHU have committed marriage fraud.**

135. I reviewed the Alien Files ("A-Files") for CHEN and ZHU and learned the following:

a.   On or about February 8, 2013, U.S. citizen E.C. filed a Form I-130, Petition for Alien Relative, on behalf of CHEN.  Form I-130 is used for a U.S. citizen to apply for immigration status for a non-U.S. citizen spouse.

b.   As proof of their marriage, E.C. provided a State of Nevada marriage certificate prepared by a Reverend S.M. Smith, photographs of E.C. and CHEN at a restaurant together, and bank statement from Wells Fargo Bank ("WFB") for account number ending in 7118.

c.   CHEN was listed as having two children, a boy born in 2011 and a girl born in 2012.  The I-130 stated that

75

CHEN married E.C. in Las Vegas, NV, on January 7, 2013, and previously divorced ZHU on July 18, 2012.

        d.    The I-130 also stated that CHEN had arrived in the United States on a B2 Visitor visa on October 8, 2012, which was due to expire on April 7, 2013.

        e.    E.C. listed an address for the couple at 2 Angell Street in Irvine, CA, and provided a rental agreement signed by both E.C. and CHEN for 2 Angell Street, Irvine, CA.

        f.    I reviewed the case file notes created by Immigration Officer Vo regarding CHEN's application.  Officer Vo noted that the marriage is very suspect based on the rapid sequence of events, namely the beneficiary's divorce and birth of CHEN's children leading up to the marriage to E.C.  In addition, E.C.'s WFB account showed two $5,000 and one $1,000 deposit from CHEN between January 9 and 30, 2013.  E.C. and CHEN were married in Las Vegas, NV on January 7, 2013.  When asked what the deposits were for, E.C. stated they were from the beneficiary, CHEN, for "expenses."  It was noted by CIS that the funds were electronically transferred out of the joint WFB account to E.C.'s separate bank account.  E.C. stated that she was used to using her own account, so that is why she transferred the funds out of their joint account.

     136. I reviewed the A-File for ZHU, from which I learned the following:

        a.    On June 21, 2013, a CIS officer interviewed CHEN's ex-wife, ZHU.  ZHU claimed to have met her United States citizen petitioner, C.M., a month after giving birth to her

second child with CHEN, and then reported marrying C.M. a few months later.

        b.   As proof of marriage, ZHU's A-file contained a State of Nevada marriage certificate prepared by a Reverend S.M. Smith (the same reverend used in CHEN and E.C.'s marriage certificate).

        c.   The bank statements submitted in ZHU's A-file were also from WFB and showed large deposits totaling over $30,000, which CIS found suspicious given that ZHU is unemployed and currently supported by CHEN.

        d.   I reviewed ZHU's Form I-485: Application to Register Residence or Adjust Status, dated March 21, 2013. ZHU stated that she last entered the United States on August 2, 2012, on a B2 Visitor Visa, which was set to expire on May 31, 2013. ZHU listed her husband on said form as being C.M. and provided the names of two minor children, which had also been listed in CHEN's A-File. ZHU provided joint WFB statements and an electric bill showing the names of both ZHU and C.M. The WFB statement for an account ending in number 5291 had an ending balance of $35,110.64 as of May 31, 2013. The address listed on said statements and electric bill was 109 Santa Maria, Irvine, CA. C.M. provided information to CIS stating that his current income was $39,546.12, yet in one month, a joint account controlled by ZHU and C.M. had a balance equal to the amount of C.M.'s joint salary. The same purported Chinese divorce decree that was located in CHEN's A-File was located in ZHU's A-File.

137. Between December 8, 2013, and January 20, 2015, CHEN, using an address of 2 Angel Street Irvine, used Western Union to wire a total of approximately $10,222 in 16 separate wires to C.M., located in Moreno Valley, CA.  Prior to these wires, between April and August 2013, CHEN wired funds to B.B. four times, which totaled approximately $1,736.  On at least one occasion, B.B.'s California driver's license number ending in 0978 was provided.  I conducted a query of the Department of Motor Vehicles and learned that said license was issued to B.B. by the DMV and that her stated address was the same address for C.M. in Moreno Valley, CA.

138. On February 19, 2015, I spoke with IRS-CI SA Yim regarding a 2011 federal tax return that had been submitted with ZHU's Form I-485 application to CIS.  As part of ZHU's immigration application, a Form 1040EZ tax return for 2011 in the name of C.M. was submitted to CIS, which reported total income of $40,886.  SA Yim informed me that in 2011, C.M. had actually filed a Form 1040, not a short form 1040EZ.  According to IRS SA Yim, the income between the two returns also differed: C.M.'s total income reported on C.M.'s 2011 tax return that had been filed with the IRS was approximately $11,000 – not the $40,886 reported on the tax return submitted with ZHU's immigration application.  IRS SA Yim informed me that C.M.'s 2011 tax return (Form 1040) that had been filed with the IRS listed as prepared by H&R Block, while the C.M. tax return (Form 1040EZ) submitted with ZHU's application listed as self-prepared.  Thus, the 2011 tax return for C.M. submitted with

ZHU's immigration application does not match the 2011 tax return for C.M. that was actually filed with the IRS; the return with the immigration application is fraudulent.  I believe that C.M. and/or ZHU submitted or caused to be submitted a fraudulent federal tax return (Form 1040EZ) to CIS to hide the fact that C.M. already had dependents and in reality had a lower actual income than the income stated to CIS.

139. I reviewed a printout and photos from the LEARN vehicle surveillance system.  LEARN is a system which compiles photos of license plates taken in public areas, such as cameras mounted on major intersections.  I had previously submitted a request for a search of C.M.'s vehicle bearing CA Plate No. 6ADG062  From this query, I learned that between September 2013 and March 2014, C.M.'s vehicle license plate had been recorded on eight separate occasions.  On all of those occasions, C.M.'s vehicle was spotted in either Riverside, CA, or Highland, CA (a city located in San Bernardino County), or except for one occasion on October 3, 2013, when C.M.'s vehicle plate was recorded next to 6 Angell Street in Irvine, California.  2 Angel Street is the address of record that CHEN provided to CIS as his alleged residence in his marriage to E.C.  During this time period that C.M. was supposed to be residing in Irvine with ZHU, his vehicle was in Riverside County.

140. On or about January 16, 2015, I reviewed preschool admission applications for ZHU and CHEN's children (D.C. and J.C.) and discovered the following:

a.   D.C.'s admission application and emergency information form lists ZHU and CHEN as parents residing at 18880 Douglas, Unit 102, Irvine, California 92612. These forms are signed by a parent and dated October 22, 2014.

b.   J.C.'s admission application and emergency information form lists ZHU and CHEN as parents residing at 18880 Douglas, Unit 409, Irvine, California 92612. These forms are signed by a parent and dated October 22, 2014.  An April 22, 2014 admission application listed CHEN and ZHU as parents residing at 18880 Douglas, Unit 102, Irvine, California 92612. A July 3, 2013, identification and emergency information form for J.C. listed ZHU as residing at 109 Santa Maria, Irvine, CA 92606 and CHEN residing at 2 Angell Street, Irvine, CA 92612.

141. I reviewed checks written by CHEN and cashier's checks purchased by CHEN.  I noted that CHEN had purchased cashier's checks in 2013 on which apparent apartment numbers had been noted.  CHEN purchased a check in the amount of $2,569.50 payable to "Santa Maria Re: 109" on April 5, 2013.  CHEN purchased additional cashier's checks during the period of April to July 2013, which were made payable to Santa Maria that referenced what I believe to be apartment numbers 204, 107, and 311.  Apartment 109 Santa Maria was the address provided by ZHU and C.M. as being their alleged residential address, yet CHEN purchased a cashier's check to pay the rent on said apartment.

142. On February 26, 2015, in the morning, HSI Special Agents observed both CHEN's Mercedes Benz vehicle and ZHU's BMW vehicle parked in front of SUBJECT PREMISES #14.

R.    **CHEN's bank records**

143. I reviewed CHEN's Bank of America ("BofA")
accounts, ending in 9902, 3390, 3164, 8548 and 2673.  The
account ending in 9902 was an "eBanking" account, while the
account ending in 2673 was a regular savings account.  According
to my review of the BofA signature card, CHEN opened the account
ending in 2673 as an individual owner account on or about
October 29, 2012, at a BofA branch in Rosemead, CA.  I reviewed
a BofA signature card for the savings account ending in 3164,
which showed that account had been opened by CHEN as an
individual owner on September 6, 2013, at a bank branch in
Irvine, CA.  The BofA signature card for a DDA account ending in
3390 indicated the account was opened by CHEN as an individual
owner on May 3, 2014 at a branch in Irvine, CA.  A review of a
BofA signature card for a DDA account ending in 8548 indicated
the account was opened by CHEN on September 6, 2013, as an
individual owner at a branch located in Irvine, CA.  Last, the
BofA signature card for a DDA account ending in 9902 indicated
the account was opened by CHEN as an individual owner on May 24,
2014, at a branch on Alton Parkway.

144. CHEN's bank statements corroborate the address
information for CHEN detailed above.  On a statement for
September 2013, for accounts ending in 9902 and 2673, CHEN's
address was listed as 107 San Marino, Irvine, CA.  On a previous
statement for the aforementioned accounts for the period of
April 2013, CHEN's address was listed as 2 Angell Street,

81

Irvine, CA.  More recent BofA statements, such as a statement
ending on June 13, 2014, for the account ending in 7947, reflect
an address of 18880 Douglas, Unit 409, Irvine, CA, for CHEN.
CHEN's BofA account ending in 8548, for the period ending on
February 12, 2014, reflected CHEN's address as 18880 Douglas,
Unit 209, Irvine, CA.

145. I reviewed wire activity for CHEN's BofA account
ending in 9902 and noted that CHEN received dozens of wires from
China, most of which were in amounts of approximately $50,000
USD.  The wires generally had a different name listed as the
sender for each separate wire.  During calendar year 2013, CHEN
received approximately $500,000 USD in wires from China.  For
example, on September 16, 2013, CHEN received a wire for $50,000
from China into his 9902 account.  That same day, CHEN
transferred $23,000 to ZHU's BofA account ending in 9915.
During the most recent period of statements that I received from
BofA, during June 2014, CHEN received three wires for $49,000
each, and one wire for $40,000.

146. I reviewed a WFB credit application, dated April
17, 2014, submitted by ZHU for the purchase of a Mercedes-Benz
bearing a VIN ending in 84627 from Mercedes-Benz Foothill Ranch.
ZHU provided her address as being 18880 Douglas, Unit 409,
Irvine, and stated that she was a "manager" for "USA Angel 8
Vacation Services."  ZHU provided a work telephone number for
that business as 818-635-8888, which as discussed above is
CHEN's cell phone number.  ZHU stated she had been so employed
for the last two years and six months and that she earned a

gross monthly income of $5,000.  Under the section, "marital status," ZHU stated that she was unmarried.  ZHU listed her nearest relative as Dongyuan LI, listing LI as her "cousin."  I reviewed photos from the LEARN database vehicle license plate system and learned that on July 9, 2014 at approximately 9:39 p.m., an IPD patrol car captured an image of a white Mercedes-Benz bearing CA Plate# 7ETK721 in the garage at 18880 Douglas, Irvine, CA.  I conducted a query of the DMV database and learned that said plate was assigned to the aforementioned vehicle purchased by ZHU with a VIN ending in 84627.  According to the California DMV, that vehicle was registered to ZHU at 18880 Douglas, Apt. 409, Irvine, CA, on April 18, 2014.

147.   I reviewed checks written by CHEN and made payable to the "Carlyle," which is the formal name of the Douglas Apartment Complex.  During June 2014, CHEN wrote twelve separate checks to the Carlyle from his BofA account ending in 9902, which totaled approximately $49,000.  Each check had a number listed in the memo portion, which I believe to be the apartment number for which each check was being made as payment.  CHEN wrote checks for rent for the following apartments at 18880 Douglas, Irvine, CA (the Douglas Apartment Complex): 123, 125, 209, 223, 225, 309, 323, 325, 403, 409, 416, and 417.  During the month of July and August 2014, CHEN continued to make payments payable to the Carlyle.  During August 2014, CHEN made ten payments from his BofA account ending in 9902, which totaled approximately $33,000.  Once again, each check had a number listed in the memo portion, which I believe corresponds to an

83

apartment number for which each check was written as payment. CHEN wrote checks for rent for the following apartment units during August 2014: 123, 125, 223, 225, 311, 314, 317, 325, 403 and 409.

148. I reviewed BofA statements for ZHU's bank account ending in 9915.  ZHU's address on said account statement, dated June 6, 2014, was listed as being 18880 Douglas, Unit 109, Irvine, CA.  I reviewed deposited items for ZHU's account ending in 9915 and noted that ZHU received a check from LI dated October 1, 2013.  That check, number 1002, was written in the amount of $9,807.44 from a BofA account maintained by LI.  The memo portion of the check stated "return," and LI's address on the check was listed as 107 San Marino, Irvine, CA.  This is an address, as previously stated above, for which CHEN had obtained cashier's checks for rent payments.  I examined checks that had been written by ZHU from her account ending in 9915.  On December 3 2013, ZHU wrote check number 108 in the amount of $1,141, payable to a Newport preschool.  The memo portion listed names, which I recognized from ZHU and CHEN's A-Files to be the names of their minor children.

S.   **CHEN failed to report hundreds of thousands of dollars in income on his 2013 federal tax return.**

149. Based on conversations I had with IRS - Criminal Investigation Special Agent Joshua Yim, I know that CHEN filed a federal income tax return, Form 1040, for the 2013 tax year.  On that 2013 tax return, CHEN reported that he was the proprietor

of a travel agency business, for which he reported gross receipts or sales of $227,453.  On that 2013 tax return, CHEN further reported that the net profit from his business was $19,203, which was calculated by subtracting $208,250 in business expenses from the gross receipts or sales of $227,453. No other income or source of income was reported on CHEN's 2013 tax return.

150. I know from my review of California Secretary of State documents that CHEN was the owner and registered agent for a business entity named USA Angel 8 Vacation Services, LTD in 2013, and that in 2014, CHEN dissolved that entity and formed a new one named You Win USA Vacation Services Corporation ("You Win USA"), which is the business name used by CHEN during his dealings with UC-2 who was posing as a potential client of CHENs in 2014.  On the formation documents for You Win USA, CHEN named himself as the Chief Executive Officer, Secretary, Chief Financial Officer, and Director of You Win USA and listed principal place of business as 18880 Douglas, Unit 315, Irvine, CA (SUBJECT PREMISES #7 (Unit #315)) in Irvine, California, which is otherwise also known to be connected with CHEN's business.  I also know from conversations with IRS SA Yim that there were no corporate or partnership tax returns filed for a USA Angel 8 Vacation Services, LTD. in 2013, and no other returns were filed for CHEN in 2013 other than his own Form 1040.

151. Based on my review of the certified transcript of a consensually monitored meeting between CHEN and UC-1 on

September 23, 2014, I am aware that CHEN told UC-1, who was posing as a potential customer of CHEN's, that his birthing house business brought in one to two million dollars each year, but that the shares of the business were divided among three people: a partner in Beijing, an investor, and CHEN who was the CEO of the business.  In that same conversation, CHEN spoke about his and his business partners' fear of being audited by the IRS.  CHEN also explained that he filed a tax return but indicated that he knew he had to pay U.S. taxes on money received by his business even if the money was collected in China.  Based on the foregoing statements, I believe that CHEN knew that he had to report on his tax return all of the payments he received from his customers.  Furthermore, based on my review of CHEN's bank records, which will be discussed in the next paragraph, I believe that CHEN failed to report on his 2013 tax return some or all of the money he received from operating his birthing house business.

152.  The yyusa.com website claimed that Youwin Baby had serviced over 550 customers.

153.  Based on conversations that I had with IRS SA Yim as well as my own review of the records, I know that during 2013, CHEN received approximately $778,410 in deposits to his Bank of America bank accounts, and that of those deposits, approximately $582,407 came from wire transfers from China. These transfers of money via wire were sent to CHEN from approximately 17 different people in China, which matches up with what CHEN told UC-1 about the money being paid to him in

China.  Additionally, on some of the wire transfers sent to CHEN, the instructions from the originator to the beneficiary, i.e., CHEN, stated "Payment for Travel."  A breakdown of the wire transfers from China during 2013, which appear to be approximate the amount charged by CHEN to each of the birthing house clients, is shown in the following table:

| No. | Date | Originator | Amount | Originator to Beneficiary Instructions |
|-----|------|-----------|--------|------------------------------------------|
| 1 | 01/07/2013 | SUN JIA | $39,982 | |
| 2 | 02/07/2013 | SUN XU DONG | $35,000 | Payment for Travel |
| 3 | 04/08/2013 | XU SHU QUAN | $10,000 | Payment for Travel |
| 4 | 04/25/2013 | MAO ZHENG MEI | $4,795 | |
| 5 | 04/29/2013 | LI XIAO YAN | $50,000 | |
| 6 | 05/16/2013 | JI HUI | $30,000 | Payment for Travel |
| 7 | 05/16/2013 | SUN RONGHUA | $47,150 | Payment for Travel |
| 8 | 06/03/2013 | LIU MENGHU | $50,000 | |
| 9 | 06/24/2013 | ZHANG WEI | $50,000 | |
| 10 | 07/16/2013 | WU TONG | $50,000 | |
| 11 | 08/02/2013 | WANG SHENG | $20,000 | |
| 12 | 08/30/2013 | MA XIURONG | $12,500 | |
| 13 | 09/03/2013 | ZHANGGEGE | $30,000 | |
| 14 | 09/16/2013 | TIANQIUIZI | $50,000 | |
| 15 | 09/16/2013 | ZHANGMEIQIN | $3,000 | |
| 16 | 10/09/2013 | GEZHUANZHUAN | $49,980 | |
| 17 | 10/09/2013 | MAIWEIYAN | $50,000 | |
| | | **TOTAL:** | **$582,407** | |

154. Based on the foregoing, I believe that the source of the $582,407 transferred by wire from China to CHEN's Bank of America accounts in 2013 were payments received by CHEN connected with CHEN's visa fraud scheme in the United States. Based upon my training and experience and discussions with IRS SA Joshua Yim, I know that United States residents are taxed on their world-wide income.  Thus, CHEN was required to report the income from China on his 2013 tax return.  However, CHEN's sole income reported on his 2013 tax return was $19,203 in income, based on net income from a Travel Agency business for which he reported $227,453 in gross receipts, less $208,250 in business expenses.  By comparison, that $227,453, if related to CHEN's birthing house business, would represent less than half of the total deposits that CHEN received via wire transfers from China. Based on the foregoing I believe that CHEN failed to report some or all of his income on his 2013 Federal income tax return in violation of Title 26, United States Code, Section 7206(1) (Making or Subscribing to a False Tax Return), and Title 26, United States Code, Section 7201 (Tax Evasion).

T.   **CHEN failed to report his foreign bank accounts to the IRS.**

155. Based upon my review of the bank records for CHEN and my discussions with IRS SA Yim, who also reviewed CHEN's bank records, I know the following:

a.   On February 15, 2013, CHEN received an international wire transfer of $10,987.13 into his Bank of America account ending in 9902 from a Bank of China (Hong Kong)

88

Ltd. bank account.  The originator of the wire transfer from that foreign bank account was "Chen Chao."

b.   During 2013, CHEN received several international wire transfers to his Bank of America bank account ending in 9902 from Hong Kong and Shanghai Banking Corp., which totaled to more than $10,000.  The originator of the wire transfers from that foreign bank account was "Mr. Chen Chao."

c.   On June 11, 2013, CHEN wire transferred $13,500 from his Bank of America account ending in 9902 to a bank account at the Hong Kong and Shanghai Banking Corp.  The name listed for that foreign bank account was "Chao Chen," listing the address of 2 Angel Street, Irvine, California, which is a known address tied to CHEN.

156. During the undercover operation, when UC-1 asked CHEN how he could pay for CHEN's visa services, CHEN told UC-1 that UC-1 could pay him by wire.  CHEN provided UC-1 with a bank account in China to transfer the 40% initial payment. Ultimately, as discussed above, UC-1 paid CHEN by check that CHEN subsequently deposited into one of his bank accounts.

157. IRS SA Yim told me that CHEN did not report any foreign bank accounts to the IRS for tax year 2013.

158. Based upon the above, I believe that CHEN has control of foreign bank accounts, including those in his name, which he has failed to report to the IRS, as required by Title 31 of the United States Code.

**U.   Even though LI received hundreds of thousands of dollars in income in 2013, LI has never filed a federal income tax return.**

159. I know based on my review of LI's bank records that LI paid approximately $61,286 to the Douglas Apartment Complex in 2013, which is the location of CHEN and LI's visa fraud scheme.  I know from surveillance that LI does not reside at the Douglas Apartment Complex, but instead resides in a house located at 78 Harrison, Irvine, California (SUBJECT PREMISES #13), which she purchased for approximately $2.1 million in 2013.  Furthermore, one of the payments made by LI to the Douglas Apartment Complex in 2013 included payment for apartment unit 409, which was an apartment unit used by CHEN in his birthing house business.  As previously discussed in this affidavit, CHEN revealed to UC-1 during a consensually-monitored conversation on September 23, 2014, that shares of his business were divided among three individuals whom CHEN identified as a business partner in Beijing, CHEN himself, and an investor.  Based on the foregoing, I believe that LI is the "investor" business partner to whom CHEN referred in his conversation with UC-1 on September 23, 2014, and I also believe that LI's payments of $61,286.23 to the Douglas Apartment Complex in 2013 were paid for by LI in order to fund CHEN and LI's business operations at the Douglas Apartment Complex.

160. Based on conversations I had with IRS SA Yim, I know that LI has not ever filed a federal income tax return or paid any U.S. income taxes.

161. Based on my review of LI's immigration records and law enforcement indices, I know that LI has resided in the United States since 2013.  Travel records show that LI visited the United States on April 18, 2013 where she remained until departing nine days later on April 27, 2013.  The next month on May 15, 2013, LI returned to the United States where she was admitted on a B2 visa ("tourist visa").  There is no record of LI traveling out of the United States for the rest of 2013 after she arrived on May 15, 2013.  On or around June 27, 2013, LI submitted a Form I-485, Application to Register Permanent Resident or Adjust Status.

162. Based on my review of property records for LI, along with information gathered through surveillance, I know that LI purchased a house located at 78 Harrison, Irvine, California.  Property records show that LI entered into an agreement to purchase this property on or around July 1, 2013, and finalized the closing on that house on November 14, 2013 with a purchase price of approximately $2.1 million, with no loan.

163. Based on my review of LI's bank records, I know that in 2013, LI, just like CHEN, received a large number of monetary wire transfers from China from people other than herself, and that these wire transfers were consistently transferred to her in amounts of approximately $50,000 each, which approximates to the amount that CHEN charged to each birthing house clients.

91

164. Specifically, in 2013, LI received 21 of these types of wire transfers into her Bank of America accounts, which total to approximately $997,939:

| No.: | Date: | Originator: | Amount: |
|------|-------|-------------|---------|
| 1 | 06/14/2013 | GU JIN HONG | $  20,000 |
| 2 | 06/17/2013 | WU MENG MENG | $  50,000 |
| 3 | 07/02/2013 | GU JIN HONG | $  30,000 |
| 4 | 08/01/2013 | HANPING | $  50,000 |
| 5 | 08/09/2013 | CHENYANYAN | $  49,980 |
| 6 | 08/09/2013 | SHIYINGYING | $  49,980 |
| 7 | 08/15/2013 | YANGXIAOYA | $  50,000 |
| 8 | 09/23/2013 | JINFEIFEI | $  50,000 |
| 9 | 09/23/2013 | LUZHENZHU | $  50,000 |
| 10 | 10/09/2013 | CHANGXINXIN | $  50,000 |
| 11 | 10/09/2013 | GEMENGLI | $  50,000 |
| 12 | 10/09/2013 | LINCHUNLI | $  50,000 |
| 13 | 10/31/2013 | MA CHENCHEN | $  48,000 |
| 14 | 11/07/2013 | CHENPING | $  49,979 |
| 15 | 11/07/2013 | MAJIANMIN | $  50,000 |
| 16 | 11/12/2013 | HOUPINGE | $  50,000 |
| 17 | 11/12/2013 | ZHANGXIAOYUE | $  50,000 |
| 18 | 11/14/2013 | ZHOUWEI | $  50,000 |
| 19 | 11/15/2013 | ZHOUGUOZHANG | $  50,000 |
| 20 | 12/10/2013 | ZHAOXIUFENG | $  50,000 |
| 21 | 12/11/2013 | LIULEI | $  50,000 |
|  |  | **TOTAL:** | **$  997,939** |

165. In her East West Bank accounts, LI received the following 5 wire transfers from China during 2013, which total to approximately $232,937:

| No.: | Date: | Originator: | Amount: |
|------|-------|-------------|---------|
| 1 | 12/13/2013 | ZHANG FEIFEI | $    32,985 |
| 2 | 12/23/2013 | YANG JIAN SEN | $    49,988 |
| 3 | 12/24/2013 | CHENG GONG | $    49,988 |
| 4 | 12/24/2013 | SUN CHAO NAN | $    49,988 |
| 5 | 12/30/2013 | CAO JUNQI | $    49,988 |
| | | **TOTAL:** | **$   232,937** |

166. In her Wells Fargo Bank accounts, LI received the following 7 wire transfers from China in 2013, which total to approximately $297,000:

| No.: | Date: | Originator: | Amount: |
|------|-------|-------------|---------|
| 1 | 06/14/2013 | XIA MENGMENG | $    30,000 |
| 2 | 06/24/2013 | CBENG WENJUAN | $    50,000 |
| 3 | 06/24/2013 | MEI LIN | $    50,000 |
| 4 | 06/25/2013 | LI TAOHUA | $    50,000 |
| 5 | 06/25/2013 | U YINGYING | $    50,000 |
| 6 | 09/13/2013 | ZHANGGEGE SR | $    20,000 |
| 7 | 09/16/2013 | ZHANGMEIQIN | $    47,000 |
| | | **TOTAL:** | **$   297,000** |

167. All of the wire transfers to LI detailed above came from originators in China, just like the wire transfer

deposits that went into CHEN's bank accounts during 2013. Furthermore, the dollar amounts of each of the transfers from China are close in amount to the fee charged by CHEN to birthing house clients.  Based on the foregoing, I believe that the source of these wire transfers were client payments connected with CHEN's birthing house business in the United States.  These payments do not appear to have been reported by LI on any federal tax return.

## V.   LI failed to report foreign bank accounts to the IRS.

168. Based upon my review of the bank records for LI and my discussions with IRS SA Yim, who also reviewed LI's bank records, I know the following:

a.   As discussed above, LI received approximately $1,500,000 in wire transfers from China during 2013.

b.   In addition, in December 2014 and January 2015, LI received wire transfers from two bank accounts in China for $49,000 each.

169. IRS SA Yim told me that LI has never filed a federal income tax return nor reported having control of any foreign bank accounts.

170. Based upon the above, I believe that LI has control of foreign bank accounts, which she has failed to report to the IRS, as required by Title 31 of the United States Code.

**W.     Cash deposits by CHEN and ZHU**

171. I reviewed a Currency Transaction Report ("CTR")
filed by BofA for a transaction occurring on April 17, 2014,
regarding a cash deposit of $18,000 by CHEN.  CHEN provided his
SSN ending in 4218 and provided his address as 18880 Douglas,
Unit 409, Irvine, CA.  BofA noted that the transaction was
conducted by CHEN on behalf of ZHU and that the $18,000 was
deposited into ZHU's account ending in 9915.  I reviewed a
subsequent CTR, filed by BofA for a cash withdrawal of $19,700
on April 17, 2014.  According to that CTR, ZHU withdrew said
funds from her BofA account ending in 9915.  ZHU provided BofA
with an address of 18880 Douglas, Unit 109, Irvine, CA, and
listed her occupation as "homemaker."  On June 1, 2014, BofA
filed an additional CTR on CHEN when he withdrew $15,500 from an
account ending in 9902 on May 23, 2014.  CHEN provided an
address of 18880 Douglas, Unit 409, Irvine, CA, his phone number
of 818-635-6668, and listed his occupation as "unemployed."

172. On July 20, 2014, BofA filed a CTR on CHEN when
he withdrew $20,000 from an account ending in 9902 on July 9,
2014.  CHEN again provided an address of 18880 Douglas, Unit
409, Irvine, CA.  CHEN provided an occupation of "Travel Agency
Owner." BofA filed subsequent CTRs on CHEN for cash withdrawals
during August and September 2014.  CHEN withdrew $18,180 in cash
from accounts ending in 9902, 7947, and 9016 on September 2,
2014.  CHEN again provided an address of 18880 Douglas, Unit
409, Irvine, CA, but listed an occupation of "unemployed."

95

**X.    Use of cash to further fraudulent activities**

173. Based on my training, experience, and previous
financial fraud investigations, I know that individuals engaged
in white collar crimes, such as visa fraud, will often work with
cash and keep large amounts of cash on hand because cash helps
maintain their anonymity.  Fraudsters often attempt to avoid
leaving a paper trail, via checks or credit cards, and will
instead make cash deposit and withdrawals.

**Y.    CHEN's and LI's visa fraud customers fail to pay the actual
amount charged by the hospitals, instead either paying
nothing or paying greatly reduced amounts designed for low
income individuals who do not have insurance.**

174. As part of this investigation, I reviewed
documents obtained from FVH, a hospital located in Orange
County, which showed that approximately 400 children associated
to addresses used by CHEN and LI in their visa fraud scheme were
born at FVH between 2013 and present.

175. Included among those FVH records was the record
for newborn S. Xu, who was born on April 16, 2014, and which was
discussed above regarding SUBJECT PREMISES #1 (Unit #123).
Based upon my review of bank records, the parents of S. Xu,
Hongbao Xu ("H. Xu") and Xiaojing Cao ("Cao"), opened an account
ending in 2606 at Citibank ("Citi"), on or about March 21, 2014.
On March 21, 2014, there was a teller deposit in the amount of
$34,000 into said account.  On March 27, 2014, there was an
incoming wire from a Mr. Xu in the amount of $203,335.74,
resulting in a $238,145.22 balance on that date.  Between March
and May 2014, there were various charges from that account at

locations such as the Wynn Las Vegas Hotel, Bose Store, Rolex in Costa Mesa, and Louis Vuitton in Beverly Hills.  On April 22, 2014, there was a debit card purchase for "medical services" in the amount of $4,080 at FVH (where S. Xu was born).  On April 30, 2014, said account had a balance of $176,318.58.  On May 19, 2014, there was a teller deposit into said account for $146,000, which resulted in an ending balance on that same date of $297,235.24.  On May 29, 2014, there was an outgoing international wire to China for $220,000 from the account.

176. I reviewed the billing records from FVH and discovered that the total charges for the birth of S. Xu were $28,845.29, for which S. Xu's father (H. Xu) paid a total of only $4,080 on April 18, 2014.  FVH's billing records also indicated that the guarantor, S. Xu's mother, Cao, was "not-employed."  According to Cao's nonimmigrant visa application, Cao stated that she was employed in China as a "sales director" earning a monthly income of 10,000 RMB (approximately $1,600 USD).  As noted above, as of April 30, 2014, the bank account for H. Xu and Cao had a balance exceeding $175,000, and a month later they transferred $220,000 from that bank account to China. As noted above, TECS records indicated that H. Xu and Cao traveled together from China to LAX on February 10, 2014, and departed LAX to China together with their newborn son S. Xu (who was born on 04/16/14) on May 30, 2014.

177. Thus, it appears that while H. Xu and Cao had hundreds of thousands of dollars available to pay the full

hospital charges, they paid only $4,080 of $28,845 charges, which is a difference exceeding $24,000.

178. On February 26, 2015, I reviewed records from another hospital located in Orange County, Hoag Hospital. Like the records from FVH, the records from Hoag also confirmed that many children were born there from 2013 to 2015, who also appear to be tied to CHEN and LI's visa fraud scheme. For example, on November 27, 2013, a child was born at Hoag, whose parent(s) listed the address 18880 Douglas, Unit 409, Irvine, California and the billing records show them as "private pay maternity discount." Unit Number 409 at the Douglas Apartment Complex is the same address that was: (1) registered with CHEN's telephone number ending in 6668; (2) the registration address for the BMW that CHEN was driving when he met with UC-1 on June 26, 2014; (3) listed on the $30,965 check that LI wrote for multiple units at the Douglas Apartment Complex; (4) listed as the emergency contact address for CHEN and ZHU on one of their children's preschool admission applications; and (5) the statement address for one of CHEN's bank accounts.

## IV.  **CONCLUSION**

179. For all the reasons described above, there is probable cause to believe that beginning in or around 2013:

    a.   CHEN and LI have engaged in a visa fraud scheme by bringing pregnant Chinese foreign nationals to the United States for the sole purpose of giving birth in the United States to obtain U.S. citizenship, while

misrepresenting the true intention of their visit to the United States.

b.   CHEN and LI have failed to report to the IRS hundreds of thousands of dollars of income that they made from operating their visa fraud scheme.

c.   CHEN and LI have failed to report their foreign bank accounts to the IRS.

d.   CHEN and ZHU committed marriage fraud by each entering into sham marriages with United States citizens to obtain lawful permanent resident status ("green cards") for themselves.

180. For all the reasons described above, there is probable cause to believe that evidence of violations of Title 18, United States Code, Sections 371 and 1546; Title 26, United States Code, Sections 7201, 7203, and 7206; and Title 31, United States Code, Sections 5314 and 5322(a), which criminalize, respectively, marriage fraud, conspiracy, fraud and misuse of visas, permits, and other documents, tax evasion, failure to file a tax return, false tax return, and willful failure to file report of foreign bank and financial accounts (FBAR), as described above and in Attachment B of this affidavit, will be found in a search of SUBJECT PREMISES #1 to #11, as further described above and in Attachments A-1 to A-11 of this affidavit.

181. For all the reasons described above, there is probable cause to believe that evidence of violations of Title 18, United States Code, Sections 371 and 1546; Title 26, United

States Code, Sections 7201, 7203, and 7206; and Title 31, United States Code, Sections 5314 and 5322(a), which criminalize, respectively, marriage fraud, conspiracy, fraud and misuse of visas, permits, and other documents, tax evasion, failure to file a tax return, false tax return, and willful failure to file report of foreign bank and financial accounts (FBAR), as described above and in Attachment C of this affidavit, will be found in a search of SUBJECT PREMISES #12 to #13, as further described above and in Attachments A-12 to A-13 of this affidavit.

182. For all the reasons described above, there is probable cause to believe that evidence of violations of Title 8, United States Code, Section 1325(c); Title 18, United States Code, Sections 371 and 1546; Title 26, United States Code, Sections 7201, 7203, and 7206; and Title 31, United States Code, Sections 5314 and 5322(a), which criminalize, respectively, marriage fraud, conspiracy, fraud and misuse of visas, permits, and other documents, tax evasion, failure to file a tax return, false tax return, and willful failure to file report of foreign bank and financial accounts (FBAR), as described above and in

//

//

Attachment D of this affidavit, will be found in a search of
SUBJECT PREMISES #14, as further described above and in
Attachment A-14 of this affidavit.

_____
JEFFREY EASTMAN, Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this _____ day of February 2015.


_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

101