NICOLA T. HANNA
United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. Bar No. 210309)
Assistant United States Attorney
Santa Ana Branch Office
    Ronald Reagan Fed. Bldg. and U.S. Courthouse
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3542
    Facsimile: (714) 338-3561
    E-mail:    charles.e.pell2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

                          SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | No. SA CR 19-00016-JVS |
|---|---|
| Plaintiff, | OBJECTIONS TO PRESENTENCE REPORT AND GOVERNMENT'S SENTENCING POSITION |
| v. | |
| DONGYUAN LI, | Hearing Date: December 16, 2019 |
| Defendant. | Hearing Time: 9:00 a.m. Location:   Courtroom of the Hon. James V. Selna |

        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Charles E. Pell,

hereby files its Objections to the Presentence Report (PSR), and the

government's sentencing position.

        This Objection and sentencing position is based upon the

attached memorandum of points and authorities, the files and records

///

///

in this case, the attached exhibits, and such further evidence and argument as the Court may permit.

Dated: December 12, 2019[1]          Respectfully submitted,

                                      NICOLA T. HANNA
                                      United States Attorney

                                      BENJAMIN R. BARRON
                                      Assistant United States Attorney
                                      Chief, Santa Ana Branch Office

                                      _____/s/_____
                                      CHARLES E. PELL
                                      Assistant United States Attorney
                                      Santa Ana Branch Office

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

---

[1] Per the Court's Order dated December 10, 2019 (DE 112), the government hereby files this revised brief with no more than 30 pages.  The government sincerely apologizes for failing to have sought leave of the Court prior to having filed its oversized 69-page brief on December 6, 2019.

**TABLE OF CONTENTS**

**DESCRIPTION**                                                          **PAGE**

TABLE OF CONTENTS...................................................i

TABLE OF AUTHORITIES..............................................iii

TABLE OF EXHIBITS.................................................iv

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................2

      A.   Overview of the fraudulent Chinese birth tourism
           scheme.................................................2

      B.   Facts defendant admitted in plea agreement and plea
           hearing................................................5

      C.   Customers encountered during March 2015 searches.........7

      D.   Undercover operation..................................10

      E.   March 2015 interview of defendant.....................11

      F.   Defendant's fraudulent conduct surrounding Count Two.....12

III.  ARGUMENT...................................................15

      A.   The PSR erred by failing to include several important
           facts relevant to the contested Guidelines factors.......15

      B.   The PSR erred by requiring clear and convincing
           evidence for the Guidelines factor of number of
           applications..........................................15

      C.   The PSR erred factually and legally in its conclusion
           that there were only seven documents involved in the
           conspiracy............................................17

           1.   The documents involved in the conspiracy include
                the visas procured by fraud, which were then used
                and possessed in the conspiracy...................18

           2.   There is sufficient evidence that You Win helped
                the applicants to fraudulently obtain visas in
                China............................................19

           3.   The documents involved in the conspiracy also
                include documents that scheme customers completed
                at the ports of entry, which also contained false
                information......................................21

i

4.    Section 2L2.1(b)(2) does not require that the documents be fraudulent, so long as the offense involved those documents...........................22

5.    The conspiracy had many more than 100 customers.....22

6.    Conclusion re: number of documents involved in scheme.............................................24

D.    The PSR erred factually and legally in its conclusion that defendant should not receive an aggravating role....24

IV.   GUIDELINES CALCULATION......................................26

V.    APPROPRIATE SENTENCE.........................................27

**TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                          **PAGE(S)**

United States v. Castilla-Lugo,
    699 F.3d 454 (6th Cir. 2012) ................................. 22

United States v. Felix,
    561 F.3d 1036 (9th Cir. 2009) ............................... 16

United States v. Jenkins,
    633 F.3d 788 (9th Cir. 2011) ................................ 16

United States v. Jordan,
    256 F.3d 922 (9th Cir. 2001) ................................ 16

United States v. Riley,
    335 F.3d 919 (9th Cir. 2003) ................................ 17

United States v. Singh,
    335 F.3d 1321 (11th Cir. 2003) .............................. 22

**FEDERAL STATUTES**

18 U.S.C. § 1546 ........................................... 12, 18

18 U.S.C. § 3553 .............................................. 27

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 2L2.1 .......................................... passim

U.S.S.G. § 3B1.1 ................................ 1, 24, 25, 26

U.S.S.G. § 3E1.1 .............................................. 26

**TABLE OF EXHIBITS**

**DESCRIPTION**

1. Diagram of You Win birth tourism fraud scheme

2. Page from YYUSA website (6/27/14)

3. DL proffer report dated 06/17/15

4. 11/18/14 WeChat re: "Total 16 mothers"

5. 47 customers spreadsheet and translation

6. 12/26/14 WeChat with Lili Li re 55 customers

7. 12/26/14 WeChat re: customers paid

8. 12/26/14 not legal WeChat

9. Visa from customer March 2015

10. Search Warrant SA 15-88M, dated 02/27/2015

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendant operated and managed a large international Chinese birth tourism fraud scheme, for which she has pleaded guilty to two serious felonies of visa fraud and conspiracy to commit immigration fraud. As detailed below, defendant should be sentenced to 33 months' imprisonment, which is a low end Guidelines sentence.

In the written plea agreement, the parties agreed that the base offense level is 11 under U.S.S.G. § 2L2.1(a). Based upon the facts of this case, the following two additional Guidelines adjustments also apply: (1) nine-point adjustment under Section 2L2.1(b)(2)(C) for an offense involving 100 or more documents; and (2) three-point adjustment under Section 3B1.1(b) for aggravating role. Because the PSR concluded otherwise, the government objects to the PSR's conclusions that this vast international immigration fraud conspiracy, with hundreds of customers, involved only seven (7) visa applications, and that defendant did not occupy a management or supervisory role in the conspiracy.

*First*, as discussed in depth below, defendant was a manager or supervisor of this extensive international immigration fraud scheme, as shown by her: (1) Decision-making authority, including controlling the money (*e.g.*, when and how much to wire from China to the U.S. and whether to issue refunds to customers); (2) Nature of participation in the commission of the offense, including directing customers to training on how to trick U.S. immigration and customs (and doing herself also), controlling the bank accounts (including those she had opened in nominee names), renting the housing (including fraudulently using her mother's identity to do so), and obtaining visa extensions

for customers who needed them (also through fraud); (3) Claimed right to a larger share of the fruits of the crime: Defendant exercised control over millions of dollars in scheme proceeds flowing from China into U.S. bank accounts in her name or her mother's name, as well as directed and approved wire transfers and customer refunds; and (4) Degree of control and authority exercised over others, including telling the undercover agent "I'm in charge," and other schemers' acknowledgment of defendant's position ("Manager Li").

*Second*, defendant's scheme with hundreds of customers involved more than 100 documents, which included: (1) fraudulent U.S. visitor visas, which had been procured by visa applications containing false information, and were used and possessed in the scheme by the customers; (2) visa applications submitted in China on behalf of hundreds of customers, which had false statements as to purpose of trip, duration of trip, and location where customer would be staying; (3) Customs and immigration forms completed by the customers at U.S. ports of entry; (4) visa extension applications submitted and obtained in the U.S.; and (5) Related documents such as customer flight itineraries and customers' U.S.-born children's birth certificates, U.S. passports, and Social Security cards.

The government recommends a sentence at the low end of the applicable Guideline range - 33 months of imprisonment.

Multiple reasons justify that recommended sentence, including the sheer extent of fraud and size of the scheme, defendant's role as a manager/supervisor in the scheme, and general deterrence.

## II.  STATEMENT OF FACTS

### A.  Overview of the fraudulent Chinese birth tourism scheme

Defendant, defendant's husband Qiang Yan (Yan), Chao Chen

(Chen), and their employees and co-schemers in the U.S. and China operated a multinational business primarily based in Orange County and the People's Republic of China (PRC) that committed visa fraud by housing pregnant foreign nationals in the United States for the sole purpose of giving birth in the United States so their children would obtain birthright U.S. citizenship, even though their customers had fraudulently procured U.S. visitor visas by misrepresenting the true intention of their visits to the United States.  Their business offered the following services to pregnant Chinese nationals: (1) fraudulently obtaining nonimmigrant visitor visas to enter the U.S.; (2) coaching for the visa interviews at the U.S. consulate in China; (3) coaching to pass the U.S. Customs at U.S. ports of entry; (4) housing in apartments in Irvine for a period of approximately three months; and (5) obtaining birth certificates, U.S. passports, and Social Security cards for the customers' children born in the United States.

The following diagram created by the government roughly depicts how defendant's international immigration fraud scheme operated:



Defendant charged fees ranging from $40,000 to $80,000 for the

birth tourism services.  Bank records show that in 2013, defendant received approximately $1,500,000 and Chen $500,000 in wire transfers from China, and in 2014, defendant received approximately $1,500,000 in such transfers from China.

In June 2016, Chen pleaded guilty pre-indictment to visa fraud, marriage fraud, and tax fraud, and agreed to cooperate.  However, several months later, he fled to China pending sentencing (for which he has been separately charged).

During the search of her multi-million-dollar house in Irvine in March 2015, agents interviewed defendant, and she made many admissions regarding her involvement in the scheme, including that: she herself first used birth tourism in 2013 to have U.S. born children; she knew customers would fly in through Hawaii instead of directly to LAX because it would be easier to get pass immigration there; and she had advised customers to conceal their pregnancies or they would not pass immigration or obtain a visa.

In addition, evidence obtained during the searches – including WeChat[1] text and voice messages – is some of the most damning proof against defendant, including one text message where when explaining the need for a new front person because Chen was gone, defendant wrote to her husband Yan that their birth tourism operation was illegal.  Other text and voice messages include defendant's coaching a customer to get through customs and directing that customer to alter travel and bank documents.[2]

---

[1] According to *Wikipedia*, WeChat (Chinese: 微信; literally: "micro-message") is a Chinese multi-purpose messaging, social media and mobile payment app developed by Chinese company Tencent.

[2] Counts 3-13 of the Indictment charge defendant with wire fraud for making multiple false statements to, and concealing operative

**B.   Facts defendant admitted in plea agreement and plea hearing**

In the plea agreement (DE 65) and during her change of plea hearing, defendant admitted that she and others operated a birth tourism scheme business named You Win USA Vacation Services Corporation (You Win) in Irvine, California, and the PRC, which would assist pregnant foreign nationals (typically PRC nationals) to travel to the United States and/or to remain in the United States to give birth, so that their children would receive birthright U.S. citizenship.  She also admitted that You Win's pregnant customers would generally obtain nonimmigrant visas from the U.S. government in order to come to the United States and/or remain in the United States to give birth, and that some of those customers made false statements on their visa applications and/or to U.S. immigration officials.

Defendant also admitted that You Win assisted some of its customers in preparing and/or submitting visa applications that You Win knew contained false statements.  For example, many of You Win's customers' visa applications would state that the purpose of their trip to the United States was for business and/or tourism; that the length of their stay would be approximately eight to 14 days; and that they would be staying in Hawaii, New York, or Los Angeles.  But

_____

facts from, the apartment owners, thereby tricking the owners into renting many apartments then used to operate the immigration fraud scheme.  Defendant and Chen also further tricked the apartment owners by using the names on the lease applications who were not going to be the actual occupants of the apartments.  For example, defendant used her mother P.H.'s identity to fraudulently rent an apartment used in defendant's birth tourism scheme.  Count 28 of the Indictment charges defendant with aggravated ID theft for using her mother's identity to rent apartments used in the scheme.  The surrounding counts also charge defendant for the same offenses for using other identities in her scheme.  Counts 14-22 charge defendant with international (promotional) money laundering for directing and receiving millions of dollars in international wire transfers from China to the United States, which she then used to operate the scheme.

defendant admitted that many of those customers intended to come to the United States to give birth, to stay in the United States for up to three months, and to stay in Irvine, California. She also admitted that once the customers' visa applications had been filed, You Win's agents and employees in China would coach some of their Chinese customers on how to pass the U.S. Consulate interview in China, including by telling customers to falsely say they were going to visit the U.S. for only two weeks.

Defendant specifically admitted that once customers received visas to travel to the United States, You Win's agents and employees in China would also coach some customers how to pass the U.S. Customs inspection at the port of entry by concealing their pregnancies, and directing customers to fly through Hawaii instead of LAX.

Defendant also admitted that at the time she operated the birth tourism business, she was generally aware that You Win's agents and employees in China would assist You Win's customers in submitting applications for nonimmigrant visas and/or visa extensions; that some of those applications might contain the above-identified false statements; and that You Win "trained" its customers on how to pass interviews with U.S. immigration and/or customs officials, including by telling its customers how to respond to certain questions and to conceal their pregnancies. Defendant received and housed You Win's customers after they arrived in the United States. Defendant admitted she hired several persons in Irvine, California, to assist her with providing these services to You Win's customers.

Defendant admitted she had assisted Chinese national X.Y.L., once that customer was in the United States, to fraudulently obtain a visa extension to stay in the United States to give birth.

1    When during the change of plea hearing the Court asked defendant
2    to tell the Court what she had done, defendant said:

3         Your Honor, from October 2013 until March of 2015, I
4         participated in a company called You Win USA.  The company
5         business was to assist some Chinese national moms to give birth
6         to their babies in the U.S.

7         I knew this company would help for some customers.  They
8         would make false statements when they applied for a visa, for
9         example, how to conceal the pregnancy from the immigration
10        officers; for example, telling the immigration officer they
11        were only going to remain in the U.S. for a few weeks.  For
12        example, they flew from China only to Hawaii and then a change
13        of flight from Hawaii to Los Angeles.

14        I was in charge of these customers' housing, meals, and
15        transportation while they were in the U.S.

16   (Trans. at 29-30.)  The Court then asked defendant whether she had
17   agreed with others to participate in that scheme to assist the women
18   to come illegally into the United States, and she confessed "Yes."
19   (*Id*. at 30.)  In response to the Court's questioning about who else
20   was involved with her in the scheme, defendant admitted:

21        I do know in China there was a person whose name is Li
22        Li who helped these people obtain the false visa.  Then
23        once they arrived in the U.S., I provided the housing,
24        meals, and the transportation.

25   C.   **Customers encountered during March 2015 searches**

26   Defendant's birth tourism customers would make false statements
27   on their visa applications about the purpose of their trip, the
28   intended length of stay in the U.S., and the location where they

7

would be staying.  For example, the customers' visa applications would falsely list the purpose of trip as "Temp. Business Pleasure Visitor (B)"/"Business & Tourism (Temporary Visitor) (B1/B2)" and would list that the visit would last only a week or two – when in fact, they were present to give birth in the U.S., and were going to stay in the U.S. much longer than a week or two.  In addition, most of the visa applications also falsely listed the purported location where they would be staying – never listing Irvine.

An example of one of defendant's customer's visa applications with those false statements follows:



The agents reviewed the visa applications of more than 20 You Win birth tourism customers (and husbands) who were encountered during the searches executed in March 2015 at the apartments being used by defendant to house her birth tourism customers.  Based upon review of those customers/material witnesses' visa applications, all had the same types of false statements in their visa applications:

| DEFENDANT'S CUSTOMERS FOUND ON MARCH 3, 2015 DURING SEARCHES (IRVINE, CA) | | | | | | |
|---|---|---|---|---|---|---|
| NAME | VISA APP DATE | LISTED PURPOSE | LISTED DURATION | LISTED STAY LOCATION | ENTRY & EXIT DATES | CHILD DOB & LOCATION |
| Y.W. | 09/02/14 | Business & tourism (B1/B2) | 20 days | New York, NY | 01/20/15 HI 07/09/15 LAX | 03/21/15 Fountain Valley |
| M.S. | 06/30/14 | Business & tourism | 18 days | San Francisco | 11/09/14 HI 03/13/15 LAX | 02/07/15 Fountain |

| DEFENDANT'S CUSTOMERS FOUND ON MARCH 3, 2015 DURING SEARCHES (IRVINE, CA) | | | | | | |
|---|---|---|---|---|---|---|
| **NAME** | **VISA APP DATE** | **LISTED PURPOSE** | **LISTED DURATION** | **LISTED STAY LOCATION** | **ENTRY & EXIT DATES** | **CHILD DOB & LOCATION** |
| | | (B1/B2) | | | | Valley |
| Q.P. | 06/30/14 | Business & tourism (B1/B2) | 18 days | San Francisco | 11/09/14 HI 03/13/15 LAX | Husband of M.S. |
| Liu, Xiao Yan | 09/29/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/26/14 LAX 06/03/15 LAX | 03/30/15 Fountain Valley |
| D.L. | 08/27/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 01/02/15 HI 09/26/15 LAX | 03/09/15 Fountain Valley |
| Z.W. | 10/06/14 | Tourism/ Medical treatment (B2) | 15 days | Florida | 02/15/15 HI 05/23/15 LAX | 04/24/15 Fountain Valley |
| Y.S. | 10/30/14 | Tourism/ Medical treatment (B2) | 2 weeks | San Francisco | 12/13/14 HI 03/04/15 LAX | 01/27/15 Santa Ana |
| Y.Z. | 09/03/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/02/14 HI 03/05/15 LAX | 02/03/15 Fountain Valley |
| S.Y.Y. | 09/03/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 01/20/15 SFO 03/05/15 LAX | Husband of Y.Z. |
| Y.R. | 08/22/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 11/30/14 HI 03/05/LAX | 02/02/15 Fountain Valley |
| J.C. | 08/22/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 01/18/15 SFO 03/05/15 LAX | Husband of Y.R. |
| L.G. | 11/18/14 | Business & tourism (B1/B2) | 4 months | Monterey Park | 01/06/15 HI 03/29/15 LAX | 02/27/15 Fountain Valley |
| Y.C. | 11/18/14 | Business & tourism (B1/B2) | 20 days | Monterey Park | 01/06/15 HI 03/29/15 LAX | Husband of L.G. |
| J.Z. | 09/05/15 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/27/14 HI 03/29/15 LAX | 02/21/15 Fountain Valley |
| X.Z. | 09/05/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 12/27/14 HI 03/24/15 LAX | 02/21/15 Fountain Valley |
| L.Y. | 09/04/14 | Tourism/ Medical treatment (B2) | 14 days | San Francisco | 01/04/15 HI 04/03/15 LAX | 03/17/15 Fountain Valley |
| J.X. | 09/04/14 | Tourism/ Medical treatment (B2) | 14 days | San Francisco | 01/04/15 HI 04/03/15 LAX | Husband of L.Y. |

| DEFENDANT'S CUSTOMERS FOUND ON MARCH 3, 2015 DURING SEARCHES (IRVINE, CA) | | | | | | |
|---|---|---|---|---|---|---|
| **NAME** | **VISA APP DATE** | **LISTED PURPOSE** | **LISTED DURATION** | **LISTED STAY LOCATION** | **ENTRY & EXIT DATES** | **CHILD DOB & LOCATION** |
| L.L. | 12/25/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 02/12/15 HI 05/28/15 LAX | 04/04/15 Fountain Valley |
| Y.Zha. | 07/27/14 | Business & tourism (B1/B2) | 21 days | New York, NY | 02/12/15 HI 05/05/15 LAX | 04/01/15 Newport Beach |
| Y.Zho. | 09/09/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 11/15/14 HI 03/05/15 LAX | 02/03/15 Santa Ana |
| Y.D. | 09/09/14 | Business & tourism (B1/B2) | 8 days | Howard Johnson Fullerton/LAX | 11/15/14 HI 03/05/15 LAX | Husband of Y.Zho. |
| W.Y. | 12/04/14 | Business & tourism (B1/B2) | 30 days | New York, NY | 02/12/15 HI 05/15/15 LAX | 04/27/15 Newport Beach |
| Y.S. | 10/10/14 | Business & tourism (B1/B2) | 8 days | Los Angeles | 02/01/15 IAH 06/03/15 LAX | 04/25/15 Newport Beach |

### D. __Undercover operation__

PSR Paragraphs 30-33 describe the international undercover operation that HSI and IRS-CI conducted into defendant's scheme. Her own words captured during that UC operation demonstrate that defendant was intimately familiar with all aspects of the scheme.

Defendant told the undercover agent that their Beijing office would help the UC obtain a visa to come to the U.S., including applying and training for the interview, and to coach her on how to clear customs. (PSR ¶ 30.) Defendant also admitted that the operation in China and the U.S. operation were the "same company:" "Li told the female undercover agent that the office in Beijing is part of the You Win Company in Southern California, stating, 'we are the same company.'" (PSR ¶ 31.) Defendant also showed that applying for the fraudulent visa was part of her international immigration fraud scheme: "We will tell you how to apply for the visa and what to

10

say at the interview with the immigration officer." (*Id.*)  By her own words, defendant demonstrated her extensive knowledge of the visa application fraud portion of the conspiracy: "Li also advised the female undercover agent not to wait too long to get her visa because if her stomach is too big then she will get denied on the spot." (*Id.*)  In addition, defendant explained that once the undercover agent obtains the visa to come to the U.S., her company would coach the customer on how to slip through U.S. Customs. (*Id.*)  Defendant gave additional details regarding how to trick immigration during the visa interview at the U.S. embassy: "Because if your belly is obvious when you go to the U.S embassy for the visa interview, then you'll get denied on the spot.  So you'll need to get the visa first and then come over, come over to the U.S two months later."  Defendant then directed the undercover agent to contact the company's office in Beijing, providing the phone number.  (PSR ¶ 32.)  "Li then told the undercover female agent that she was in charge of the birth tourism operation in the U.S.," noting that the scheme's participants in China "includes all of the visa application, training, and all of the stuff like signing a contract." (*Id.*)  She explained the pricing structure for her birth tourism services - up to $80,000. (PSR ¶ 33.)

HSI and IRS-CI also conducted an undercover investigation of Chen.  During that undercover operation, scheme participants in China uploaded a visa application in the undercover agent's notional name, which had false statements as to purpose, duration, and location.

E.   **March 2015 interview of defendant**

On March 3, 2015 (the day of the searches), Mandarin-speaking IRS-CI SAs interviewed defendant, who admitted:

- She was a birth tourism customer herself earlier in 2013,

when she gave birth to twins in the U.S.[3]

- Shortly after she and her husband paid Chen for her own birth tourism package, they decided to invest in his company. She noted that at that time, Chen did not have many customers and could not pay the rent for the business so he needed help.

- Her and her husband's "partnership" with Chen in the birth tourism operation began in August 2013.

- She has 9 employees for You Win in the U.S., but she is unsure of their legal status. She pays those employees in cash, with salaries that range between $2,000 and $3,000. She pays the manager Pang Z.X. $4,000/month.

- She knows it is illegal to submit false visa applications. Defendant acknowledged that she had advised a customer not to look noticeably pregnant or else they would not pass immigration or be approved for a visa. She said she never told a customer to lie on the visa application, but that she told them only to "not look pregnant."

- She reiterated that Lilly was in charge of helping the customers with the visas. She noted that Lilly hires a company in China to help their customers with visas, and pays that company 1,000 RMB (currently $150) per person.

(PSR ¶ 51 & defendant's MOI dated 03/03/2015.)

**F.   Defendant's fraudulent conduct surrounding Count Two**

Defendant also pleaded guilty to Count 2 (visa fraud in violation of 18 U.S.C. § 1546(a)) for a visa extension that defendant assisted one of her birth tourism customers (Xiao Yan Liu) to obtain

---

[3] Defendant's 2013 visa application falsely stated that she would be coming for only 15 days and staying in Los Angeles.

1  after she had arrived in the U.S.  That fraud occurred after

2  defendant had previously coached that same customer through U.S.

3  customs when the customer was at the port of entry.[4]

4      Defendant coordinated Liu's visa extension and committed fraud

5  by transferring money from her (defendant's) bank account to Liu's

6  bank account, to use as "proof of funds" for that extension.

7      On December 23, 2014, in the following voice message, defendant

8  coached Liu on how to slip through U.S. Customs:

9  
[The message in the audio recording is translated below]

10  ---------------------------------------------------

11  Dongyuan:   The main thing is they look and see if you look obvious [pregnant]; can they see
it? First thing is not to let them see it. Second thing is don't deny it if they can see

12  it and just say that you're still here for vacation and just show them the return
flight ticket. Mainly, it's going to be depending on the immigration officer, that

13  is... No, not an immigration officer... it depends on the Customs officer...
Actually, a lot of it depends on the... how do I say it...your luck. Of course,

14  there aren't many who were sent back on the same flight. Some were
denied...only got a few days, some only got a week... After coming in, there will
be a need to look for an attorney, which is about two thousand...two thousand

15  U.S. dollars to look for an attorney. Mm... it's all possible, so there's nothing
that's absolute.

16  Defendant went so far as providing Liu with someone else's itinerary

17  and directing her to alter it to slip through U.S. Customs:

18

19  Dec 25, 2014 11:49 AM

20  
[The message in the audio recording is translated below]

21  ---------------------------------------------------

22  Dongyuan:   Yanchen, what I'm giving you here is a friend's itinerary. She's coming here on
the same flight as yours. So you can look at the itinerary and then make

23  modifications according to your return flight ticket. And then, you can hold onto
it. If they can't tell that you're pregnant, then you can show this to them and they

24  probably won't ask you anything additional. Once the sun comes up, I'll tell you
the specifics, all right?

25  When Liu landed at LAX, because she appeared to be pregnant and had

26  not mentioned during her visa interview that she planned to give

27  _____

28      [4] In November 2018, in <u>United States v. Liu</u>, SA CR 18-00239-JVS,
Liu was charged with visa fraud and false statement for lying to CBP
officers at the port of entry.

birth, CBP stamped her in for only 15 days, which allowed her to
remain in the U.S. only until 01/10/15.  That meant that Liu had to
obtain a visa extension in order to be able to stay and give birth in
the United States.  So, defendant instructed her on the information
needed to secure a visa extension, which included defendant's
transferring money into Liu's bank account for "proof of funds":

Jan 16, 2015 4:57 PM

[The message in the audio recording is translated below] 

---------------------------------------------------

Dongyuan:  Yanchen, so it's like this: because it's a little bit of a rush if it's next week. I have
to get all of your documents ready tomorrow and give them to the attorney. I've
spoken to the doctor as well and I will pick up the doctor's proof. So do you have
all the documents that are needed? Have you prepared them? Either on your cell
phone or your computer. For example: your property deed, proof for your car,
photos, do you have them all? If you do have them, then I will have to print them
out. As for money, I will transfer the money to you from over here first because
wire transfer won't make it in time and you can't make any wire transfers on
Saturday and Sunday in China. I will transfer the money from my account to
yours first, so you get a proof of funds, all right? All…all the stuff that I asked
you to prepare, do you have…can you print all of them out right now? You need
to get them ready, all right?

Defendant then explained to Liu that she also needed a bank account
document from China showing that she had assets to include with her
application to extend her visa.  So in a phone message to Liu on
01/16/15, defendant directed Liu to alter the banking documents she
had in order to (falsely) show she had more money:

> You can have him just get one, but it can't be fake. Just
> have him print one out from the computer and send it to you
> and then print it out from over here. Make it a little bit
> more…a little bit more, so they won't think…. Don't make it
> even numbers with too many zeros ….

In another voicemail, defendant also demonstrated her knowledge of
whether U.S. law enforcement would be able to verify the documents:

Dongyuan:  No, they just want a scanned copy. These foreigners, they won't look at whether
yours are real or fake. They can't tell if it's real or fake. You just have to…
[Chuckle] It can be edited on it…they want a scanned copy. So you can scan a
copy onto a computer and then make editing on the computer. Once you edit it,
you can send it over. The foreigners, they can't…it's impossible that they will
connect to the network in China. They can't tell if it's real or fake. They'll think
it's real as long as you provide it to them, you know?

14

On January 23, 2015, Liu filed an application to extend her nonimmigrant status (Form I-539) to USCIS, which was fraudulent.

### III.  ARGUMENT

**A.   The PSR erred by failing to include several important facts relevant to the contested Guidelines factors.**

The PSR failed to include any of the facts about the Weichat voice messages between defendant and customer Xiao Yan Liu (from Count Two), which were detailed directly *supra*.  The government objects that the PSR did not include those five Weichat voicemail messages, which relate to defendant's role in the conspiracy.[5]

As of mid-2014, You Win's website claimed that it had served more than 550 birth tourism customers.  (Exh.-2.) The PSR failed to include this fact, which is relevant to the number of documents.[6]

Also, the PSR failed to include the interview statements of customer/material witness D.L., which relate directly to defendant's role in the fraudulent scheme.  According to D.L.'s 06/17/15 interview (Exh.-3):

would bring fruit and visit with the women. LI understood that Dongyuan was the owner of the U.S. portion of the YouWin operation   LI stated that she did

[D.L.]   stated that Big Pang worked for Dongyuan and acted as a general manager,

The government objects that the PSR failed include those statements.[7]

**B.   The PSR erred by requiring clear and convincing evidence for the Guidelines factor of number of applications.**

To conclude that only seven documents were involved in the

---

[5] By transmissions dated October 24 and 29, 2019, the government provided this information to the assigned Probation officer.

[6] By transmissions dated October 24 and 29, 2019, the government provided this information to the assigned Probation officer.

[7] By transmissions dated October 24 and 29, 2019, the government provided this information to the assigned Probation officer.

1    scheme, the PSR required "a demonstrable connection by clear and

2    convincing evidence" between You Win and each specific customer's

3    fraudulent visa application(s).  (PSR ¶ 59.)

4         The government objects to that higher standard, because

5    preponderance of the evidence is the proper standard at sentencing.

6    United States v. Felix, 561 F.3d 1036, 1045 (9th Cir. 2009).

7         The exception to that general rule is only when "the sentencing

8    factor has an 'extremely disproportionate effect on the sentence

9    relative to the offense of conviction,' in which case findings of

10   fact must be supported by clear and convincing evidence."  United

11   States v. Jenkins, 633 F.3d 788, 808 (9th Cir. 2011).  The Ninth

12   Circuit has identified six factors to determine whether an

13   enhancement has such an effect.  United States v. Jordan, 256 F.3d

14   922, 928 (9th Cir. 2001) (quoting case).

15        That exception should not apply based upon the facts of this

16   case, because "[s]entencing enhancements based entirely on the nature

17   and extent of the conspiracy, as opposed to acquitted or uncharged

18   conduct, typically do not require proof by the clear and convincing

19   standard."  Jenkins, 633 F.3d at 808 n.8 (citing cases).  Here, the

20   challenged Guidelines factor is based on the extent of the

21   conspiracy.  So, such enhancement does not constitute the type of

22   "extremely disproportionate effect on the sentence relative to the

23   offense of conviction" that would require application of the clear-

24   and-convincing exception to the general rule.

25        Moreover, fewer than 2 years of additional imprisonment does not

26   seem to be the type of "extremely disproportionate effect" where the

27   exception is intended to apply, particularly because the factor in

28   question applies directly to the scope of the conspiracy, as opposed

                                    16

1    to uncharged conduct.  E.g., United States v. Riley, 335 F.3d 919, 26

2    (9th Cir. 2003) ("The fact that an enhancement is based on the extent

3    of a conspiracy for which the defendant was convicted weighs heavily

4    against the application of the clear and convincing evidence standard

5    of proof.").[8]

6         **C.   The PSR erred factually and legally in its conclusion that**

7              **there were only seven documents involved in the conspiracy.**

8         Guidelines Section 2L2.1(b) provides that "[i]f the offense

9    involved six or more documents or passports," the offense level is

10   increased by three, six, or nine levels, depending on the number of

11   documents or passports involved.  U.S.S.G. § 2L2.1(b)(2)(A)-(C).

12        The PSR concluded that "[i]n this case, the relevant fraudulent

13   documents are the nonimmigrant visa applications that You Win USA's

14   clients submitted to the U.S. government," and based on that

15   conclusion, made the factual finding that the offense involved only 7

16   applications. (PSR ¶¶ 58-59.)  The government objects to that

17   conclusion for the following three reasons: (1) based upon the facts

18   of this case, the relevant documents under Section 2L2.1(b) include

19   all of the following: (a) the initial visa applications uploaded in

20   China; (b) the subsequent visas procured by those fraudulent visa

21   applications; (c) the immigration and customs forms filled out by all

22   customers at the U.S. ports of entry; (d) visa extension applications

23

24        [8] Even if the exception could apply to this conspiracy, applying
     the Ninth Circuit's factors weighs strongly against requiring proof
25   by clear and convincing evidence here: (1 and 2) the enhanced
     sentence of 33 months falls way below the statutory maximum of 10 (or
26   15 years) applicable to the crimes to which defendant pleaded guilty;
     (3 and 4) the facts supporting the enhancement do not create new
27   offenses - "the increase in sentence [is] based on the extent of a
     conspiracy;" (5) the increase is greater than four offense levels;
28   and (6) the increase in sentence more than doubles the length of the
     sentence (11 months to 33 months).

done in the U.S.; and (e) the resulting visa extensions procured by those fraudulent visa extension applications; (2) the evidence establishes that You Win was, in fact, involved with many more than 7 visa applications in China; and (3) Section 2L2.1(b) does not require the documents involved in the scheme be themselves fraudulent to be counted, so long as those documents were involved in the scheme, such as the customers' children's birth certificates and U.S. passports.

> **1.**    **The documents involved in the conspiracy include the visas procured by fraud, which were then used and possessed in the conspiracy.**

The PSR improperly limits the scope of Section 2L2.1's documents involved in the offense to the initial visa applications themselves, as opposed to all documents involved in the scheme.  In other words, the PSR limits 2L2.1's "documents" to the initial visa applications, as opposed to the customers' use or possession of the resulting visas procured by that fraud and other documents involved in the scheme.

As discussed in the next section, the government objects to the PSR's conclusion that there was insufficient connection between the visa applications that took place in China and You Win.  But that is of no moment, because there can be no dispute that defendant and You Win did have a direct connection to their customers' use, attempted use, and possession of the visas that the customers had procured by fraud.[9]  In other words, the entire purpose of this immigration fraud scheme was to receive the customers once they had used their fraudulently-procured visas to enter and remain in the United States, which the customers had contracted with You Win before coming to the

---

[9] See 18 U.S.C. § 1546(a) (proscribing using, attempting to use, or possessing any visa procured by fraud).

U.S.  So, all of the customers' issued U.S. visas were both used and possessed as part of defendant's conspiracy: (1) used/possessed to fly from China to the U.S.; (2) used/possessed to enter the U.S. at the ports of entry; (3) used/possessed to fly from the ports of entry to LAX, to arrive in Irvine; (4) used/possessed to be able to legally remain in the U.S.; and (5) used/possessed to fly back to China with newborn baby with birthright U.S. citizenship.  That's all that Section 2L2.1 requires for documents "involved" in the offense.[10]

Thus, on this independent basis, regardless of whether You Win was directly involved with the initial visa applications in China, defendant's conspiracy involved 100 or more documents.

**2.    There is sufficient evidence that You Win helped the applicants to fraudulently obtain visas in China.**

Defendant specifically admitted that You Win helped customers obtain visas by submitting visa applications with false statements. (DE 65 at 8 ("You Win assisted some of its customers in preparing and/or submitting visa applications that You Win knew contained false statements.").)  In her own words, defendant admitted the same during her change of plea hearing on September 17, 2019: "The company business was to assist some Chinese national moms to give birth to their babies in the U.S. … They would make false statements when they applied for a visa, for example, how to conceal the pregnancy from the immigration officers; for example, telling the immigration officer they were only going to remain in the U.S. for a few weeks. … I do know in China there was a person whose name is Li Li who helped

---

[10] An example of such an issued U.S. visa from one of defendant's customers was photographed when that customer was found during the March 2015 searches.  (Exh.-9.)

these people obtain the false visa." (Trans. at 29-31.)

The PSR also found that You Win helped customers in "fraudulently obtaining nonimmigrant visitor visas to enter the U.S." and "training for the visa interview at the U.S. consulate." (PSR ¶ 22.) It further found that "You Win assisted some of its customers in preparing and/or submitting visa applications that You Win knew contained false statements." (PSR ¶ 23.)

Defendant further confirmed You Win was involved with the applications, when she told the undercover agent that "they have an office in Beijing that can help her get her visa to come to the U.S. and to coach her on how to clear customs, as follows: 'Our company in Beijing covers helping you with applying for the visa and training you, which includes the training to pass customs…the training to apply for the visa. We'll need to train you for the visa so you can go through the visa interview without problems.'" (PSR ¶ 30.) She also said: "'We will tell you how to apply for the visa and what to say at the interview with the immigration officer.'" (PSR ¶ 31.)[11]

All of the above shows that as part of the scheme, You Win did in fact assist their customers with obtaining their visas in China, including filing the visa applications with false information, coaching to pass the visa interviews at the U.S. consulate in China, and coaching to slide through U.S. customs at the ports of entry.

Given the hundreds of customers, all of whom had visas procured by false statements, it was error for the PSR to conclude that there

---

[11] As detailed in the search warrant affidavit, during the 2014 undercover operation, scheme participants in China uploaded a visa application for the notional customer, which had false information. (Exh.-10 at 50-53.)

1  was a total of only seven documents involved in the conspiracy.[12]

2         **3.**  **The documents involved in the conspiracy also include**

3               **documents that scheme customers completed at the ports**

4               **of entry, which also contained false information.**

5       Steps 7 and 8 of the scheme diagram show when the customers had

6  arrived from China at the U.S. port of entry, which was generally

7  Hawaii, before the customers would shortly thereafter catch domestic

8  flights to Los Angeles.  At that entry point, all foreign visitors

9  must complete various customs declaration forms and/or DHS Forms I-94

10  admission record.  One piece of information that U.S. Customs and

11  immigration officers were seeking was the purpose and location of the

12  stay in the United States.  In this scheme, the customers would

13  continue the lies and state that they were only visiting the U.S. and

14  would list Hawaii or some other location, instead of Irvine.

15       First, the voicemail messages that defendant left to customer

16  from Count Two of the Indictment (Xiao Yan Liu) show exactly that –

17  defendant's instructing that customer to lie to U.S. Customs and say

18  she was visiting the U.S. only for a short vacation.

19       Second, two of defendant's other customers (who were initially

20  material witnesses, but who fled to China) were specifically indicted

21  for exactly that conduct.[13]

---

22

23      [12] The PSR found that customer X.Y.L. counted as one of the 7
applications.  In fact, that customer actually had at least <u>4</u>

24  separate documents involved in the scheme: (1) initial application
for visa; (2) visa issued in China and used to enter the U.S.;

25  (3) visa extension application in U.S.; and (4) visa extension.

26      [13] In <u>U.S. v. Jun Xiao and Long Jing Yi</u>, SA CR 18-00036-JVS, the
Indictment alleges: "Defendants XIAO and YI would falsely claim to

27  United States Customs and Border Protection ('CBP') officials at
inspections that defendants XIAO and YI were traveling to Hawaii as
tourists for a one-month 'vacation.'"  It also alleges: "Defendants

28  XIAO and YI would falsely claim to CBP officials at inspections that
defendant YI would not give birth in the United States."  (*Id.*)

### 4. Section 2L2.1(b)(2) does not require that the documents be fraudulent, so long as the offense involved those documents.

Guidelines Section 2L2.1(b)(2) provides: "If the offense involved six or more documents or passports, increase as follows: [3, 6, or 9 levels]." By its plain language, that section does not require that the documents be fraudulent, so long as they are "involved" in the offense. "Circuits that have interpreted this provision have construed the word 'involved' broadly and noted that 'involved' does not mean 'produced.'" United States v. Castilla-Lugo, 699 F.3d 454, 464 (6th Cir. 2012) (citing cases).

In this case, all types of documents were involved in the fraudulent scheme, including the initial visa applications, the subsequently issued U.S. visas, and the immigration/customs forms filled out by the customers. But there were a bunch of other documents involved in the conspiracy too, such as the customers' foreign passports, their flight itineraries, the customers' hospital admission forms, and the U.S.-born children's birth certificates, U.S. passports, and Social Security cards. All of those documents and passports should also qualify under Section 2L2.1 as documents or passports involved in the conspiracy. E.g., United States v. Singh, 335 F.3d 1321, 1325 (11th Cir. 2003).[14]

### 5. The conspiracy had many more than 100 customers.

Defendant's scheme had hundreds of customers:

- Customers found during March 2015 searches: On the day of

---

[14] "[T]he language of § 2L2.1(b)(2) instructs a sentencing court to count any documents that were 'involved' in the offense, and this inquiry naturally requires the sentencing court to consider the offense of conviction." (internal footnote omitted).

22

the March 2015 searches, agents encountered approximately 20 customers housed in apartments rented by defendant to operate her scheme, who were listed in the above table.  As that table shows, all of those customers' visa applications contained false information.

- <u>Defendant's website</u>: In early 2015, defendant's website boasted that they had already served more than 550 customers.

- <u>Apartments rented from 2013 to 2015 (approximately 15+ apartments/month)</u>: In 2013, defendant was paying more than $30,000/month to rent apartments from just one location to house customers from her fraudulent scheme.  For example, September 2013, defendant purchased and used a cashier's check for more than $70,000 to pay for apartments used in the scheme:



In October and November 2013, defendant continued to write huge checks to pay for apartments used in the scheme:



- <u>Defendant's communications re: number of customers</u>:  In a 11/18/2014 WeChat, defendant listed customers by apartment number to one of her accountants in China, writing "Total 16 mothers." (Exh.-

4).  A spreadsheet seized from defendant's computer listed **47** customers for the time frame January to July 2014. (Exh.-5.)  And in a 12/26/14 WeChat, defendant asked scheme participant Lili how many customers were currently scheduled, and the answer was **55**. (Exh.-6.)

- Hospital records: PSR ¶ 26 n.3 provides that "during 2013, 2014, and early 2015, approximately 400 children tied to the addresses used by Li and Chen in their birth tourism scheme were born at [Fountain Valley Hospital] alone."

   **6.   Conclusion re: number of documents involved in scheme**

   The conspiracy involved more than 100 documents, including the initial visa applications uploaded in China; the resultant visas that customers used and possessed as part of the scheme; documents completed by customers at the U.S. ports of entry; the visa extension applications and resultant extensions filed for customers in the U.S.; and all the non-immigration documents such as the customers' U.S.-born children's birth certificates and U.S. passports.

   **D.   The PSR erred factually and legally in its conclusion that defendant should not receive an aggravating role.**

   Guidelines Section 3B1.1, entitled "Aggravating Role," provides that based upon a defendant's role in the offense, the offense level can be increased by two, three, or four levels.  U.S.S.G. § 3B1.1.

   The government objects to the conclusion that defendant occupied the role of an average participant (PSR ¶¶ 61-65), because based upon the facts, defendant occupied the role of a manager or supervisor of this international immigration fraud conspiracy.  Thus, under U.S.S.G. § 3B1.1(b), defendant's offense level should be increased by three levels based on her aggravating role in the fraudulent scheme.

   Defendant was the person running the U.S. half of the scheme and

controlling the flow of the money; multiple times she directed
international wire transfers for $100,000 each.  Or as she put it in
her own words to the undercover agent: "I'm in charge."  She
controlled millions of dollars of the money from the scheme, while
simultaneously directing participants and coaching customers.
Moreover, other participants sought permission from defendant to take
various actions in the scheme, and defendant gave directions
regarding multiple aspects of the scheme.  And as noted *supra*, even
other scheme participants acknowledged defendant's role when they
addressed her (or asked her for authorization) – as "Manager Li."

Several examples of defendant's directing other participants
what to do (or their asking defendant for approval) follow:

- <u>12/26/14 WeChat message from defendant to accountant in
  China, giving direction</u>: "Qiu, confirm these.  These are the current
  customers.  Just check to see if all these customers have paid first.
  You should check it out first." (Exh.-7);

- <u>01/08/15 WeChat message from defendant to accountant in
  China</u>: "Transfer the salary for the aunties today, ok/I haven't
  received the 100,000" (PSR ¶ 27);

- <u>01/25/15 WeChat message to defendant</u>: "**<u>Manager Li</u>**, how are
  you?  Pregnant mom ZHANG Haixia had booked Gold Package.  Now because
  the baby is a girl, her husband arranged abortion for her.  Therefore
  request refund.  Amount is 23,800 – 1,080 = 22,720.  **<u>Please approve</u>**.
  **<u>Thank you manager Li</u>**." (PSR ¶ 28 (emphasis added)).

Appling the factors in Section 3B1.1's notes shows that defendant
occupied the role of supervisor or manager of the conspiracy:

- <u>Decision-making authority</u>: Defendant made many decisions in
  the fraudulent scheme.  Moreover, as the above communications

25

demonstrate, defendant's role included the authority to control millions of dollars of scheme funds and issue refunds.

- **Nature of participation in the commission of the offense**: As detailed above, defendant participated in many aspects of the fraudulent scheme, from "soup to nuts."

- **Claimed right to a larger share of the fruits of the crime**: Defendant controlled millions of dollars flowing from the scheme. Moreover, customer/material witness D.L. described defendant as the "the owner" of the U.S. half of the operation.

- **The degree of control and authority exercised over others**: Defendant directed other scheme participants to send wire transfers from China to U.S. Defendant had approval authority over actions by scheme participants in the U.S. and China, including issuing refunds. And other scheme participants addressed defendant as "Manager Li." D.L. added that "Big Pang" worked for defendant as general manager.

Thus, defendant's offense level should be increased by 3 levels based on her aggravating role as a manager or supervisor.[15]

## IV.  GUIDELINES CALCULATION

The government calculates the applicable Guidelines level as:

| | | |
|---|---|---|
| Base Offense Level: | 11 | U.S.S.G. § 2L2.1(a) |
| More than 100 documents: | +9 | U.S.S.G. § 2L2.1(b)(2)(C) |
| Aggravating role: | +3 | U.S.S.G. § 3B1.1(b) |
| Acceptance of Responsibility: | −3 | U.S.S.G. § 3E1.1 |
| **Total for counts 1 & 2:** | **20** | |

---

[15]Under Section 3B1.1(b), for the three-point enhancement to apply, the scheme needs to either involve 5 or more participants, or be "otherwise extensive." The fraudulent scheme both: (1) was "extensive"; and (2) involved five or more participants, including defendant, her husband Yan, their partner Chen, scheme employees in China (Lilly Li, Diana, trainer Mr. Zhu, and miscellaneous accountants), her mother P.H., and customer Xiao Yan Liu.

## V.    APPROPRIATE SENTENCE

Based upon the totality of the circumstances, a low end Guidelines sentence of **33 months of imprisonment** is not unreasonable, and sufficiently addresses the applicable Section 3553(a) factors.

Defendant was and is a rich foreign Chinese national, who used birth tourism fraud to give birth on U.S. soil in 2013.  But she didn't stop there: she then joined an international immigration fraud scheme to earn millions of dollars from her fellow Chinese foreign nationals by tricking the U.S. State Department into issuing visitor visas based upon false statements, and to further trick U.S. Customs into admitting those customers into the United States using U.S. visas procured by fraud, who then gave birth in the United States.

Defendant's million-dollar international immigration fraud scheme was huge, and particularly egregious.  It tricked U.S. State Department employees in China, U.S. Customs officers at ports of entry, and U.S. Immigration when obtaining visa extensions.  And defendant didn't even try to hide the scheme's illegality in communications with other participants of the scheme, when she said: "After all, this is not legal!" (Exh.-8.)

Defendant was a manager/supervisor of her huge international immigration fraud scheme.  She controlled millions of dollars of scheme proceeds, both in the U.S. and the PRC.  Defendant paid other scheme participants.  In her role as manager/supervisor, defendant gave final approval to requests sought by other scheme participants. Defendant's own words establish her role in her scheme, when she told the UC agent: "**I'm in charge**" of the U.S. half of the scheme.  And other scheme participants recognized defendant's role when addressing her using the supervisory title "**Manager Li**."  Defendant also

1   personally participated in most facets of the scheme, from directing

2   customers to fly from China to Hawaii (instead of directly to LAX),

3   coaching customers on how to lie to U.S. immigration and customs

4   authorities, advising a customer to alter travel documents to trick

5   U.S. Customs, and herself transferring funds to trick U.S.

6   immigration into issuing a visa extension for one of her customers.

7        Defendant's actions are egregious, and quite candidly, they are

8   shameful.  Put aside that defendant first tricked U.S. immigration to

9   enter the United States and give birth here.  Put aside her

10  international scheme involving filing hundreds of fraudulent visa

11  applications.  Put aside defendant's employees in China who were

12  coaching customers to lie during their visa interviews at the U.S.

13  consulate in China.  Put aside that she personally coached customers

14  how to trick U.S. Customs at the ports of entry.  Defendant went even

15  further – she gave specific instructions and directed one of her

16  customers to alter a travel itinerary.  When directing that same

17  customer to also fabricate bank records, defendant noted: "**These**

18  **foreigners, they won't look at whether yours are real or fake.**"  That

19  statement demonstrates a level of criminal sophistication by

20  defendant.  She was sufficiently astute to know that it would be

21  difficult for U.S. immigration officers to be able to verify the

22  legitimacy of Chinese bank account documents, and she used that

23  understanding as a sword to chop up the U.S. immigration system.  But

24  defendant went even further – she herself transferred approximately

25  $96,000 from her account into a customer's bank account, to use as

26  proof of adequate funds to fraudulently qualify for a visa extension.

27  Then, defendant coordinated that customer's visa extension

28  application with that and other false statements.

Even when previously coaching that customer to slip through U.S. customs at the port of entry, defendant exhibited her sophisticated criminal mind.  That short voicemail tells us a lot about defendant and her true role in the scheme.  It shows that defendant is not simply some apartment manager who is providing housing for customers. Defendant's words in the voicemail exemplify that defendant is quite cunning – she first directs the customer to try to hide her pregnancy.  But defendant understood that that ruse may not work. So, defendant planned for that contingency by instructing the customer that if U.S. immigration did discover her pregnancy, for that customer not to deny being pregnant.  Instead, defendant directed the customer to lie to the officer and say she is just in the U.S. "for vacation" and to show the return flight itinerary (which defendant had earlier instructed that customer to fabricate). Further, defendant's words in the above voicemail demonstrate that defendant was very cognizant of U.S. immigration controls; she corrects herself as to the proper agency – customs vs. immigration.

Defendant also attempted to conceal her involvement in the scheme by using nominees, further showing criminal sophistication.

The increasing size of defendant's fraud definitely shows the success *her* involvement in the scheme occasioned, *i.e.*, when she joined the conspiracy with Chen in September 2013, Chen appears not to have had lots of customers.  One has to ponder – had federal agents not executed the search warrants in March 2015 and shuttered defendant's huge operation, how many more hundreds of false visa applications would have been filed in China, how many more hundreds of U.S. visas procured by fraud would have been used to fraudulently enter the U.S., and how many more millions of dollars would defendant

1   and her conspirators have made from defrauding the United States.

2       Last, **general deterrence** also strongly supports the recommended

3   sentence.  This set of Chinese birth tourism fraud cases was the

4   first ever charged criminally.  Like the U.S. government does with

5   federal income taxes, the U.S. Department of State and federal

6   immigration rely heavily upon the accuracy and truthfulness of the

7   information that aliens provide, because it is impossible to check

8   every submission for accuracy (particularly involving Communist

9   countries).  Countless investigative resources were expended to

10  uncover and dismantle defendant's large scale immigration fraud,

11  which was widely publicized nationally and internationally.  A

12  sizable sentence is further justified to deter others – both

13  domestically and internationally – from also attempting to defraud

14  U.S. immigration.  For example, as charged in the Indictment against

15  defendant, one of the material witnesses who had fled to China in

16  violation of Court Order scoffed at the ability of the U.S. criminal

17  system to ever hold him accountable: **"Anyway, I'm already home.  U.S.**

18  **can't do anything to me."**  Thus, for general deterrence, Chinese

19  foreign nationals need to know that if they engage in immigration

20  fraud against the United States, U.S. authorities will prosecute

21  them, and once convicted, they will be sentenced to a sizable term of

22  federal prison, regardless of how wealthy they are in China.

23      In fine, the egregious nature of defendant's fraud, the size and

24  scope of her million-dollar international immigration fraud scheme,

25  her aggravating role, and general deterrence all mandate the

26  recommended 33-month low-end Guidelines prison sentence.

27

28